IVY T. NGO (249860)
**FRANKLIN D. AZAR & ASSOCIATES, P.C.**
388 Fulton Avenue, Unit 502
San Francisco, CA 94102
Telephone:    (303) 757-3300
Facsimile:    (720) 213-5131
Email:        ngoi@fdazar.com

PAUL R. WOOD (*pro hac vice*)
MICHAEL D. MURPHY (*pro hac vice*)
**FRANKLIN D. AZAR & ASSOCIATES, P.C.**
14426 East Evans Avenue
Aurora, CO 80014
Telephone:    (303) 757-3300
Facsimile:    (720) 213-5131
Email:        woodp@fdazar.com
Email:        murphym@fdazar.com

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| BRENDAN LUNDY, AN INDIVIDUAL AND COLORADO RESIDENT, AND MYRIAH WATKINS, AN INDIVIDUAL AND COLORADO RESIDENT, <br><br> Plaintiffs, <br><br> vs. <br><br> FACEBOOK, INC., <br><br> Defendant. | Case No.:  4:18-cv-06793-YGR <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED <br><br> (1) Violation of California Constitutional Right to Privacy <br> (2) Intrusion Upon Seclusion <br> (3) Intentional Misrepresentation and Omission <br> (4) Deceit by Concealment or Omission Cal. Civ. Code §§ 1709, 1710 <br> (5) Breach of Contract <br> (6) Breach of Implied Covenant of Good Faith and Fair Dealing <br> (7) Negligent Misrepresentation <br> (8) Unjust Enrichment |

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

JURSIDICTION AND VENUE ............................................................................... 2

PARTIES ................................................................................................................. 3

    A.    Plaintiff Lundy ..................................................................................... 3

    B.    Plaintiff Watkins .................................................................................. 4

    C.    Defendant Facebook ............................................................................ 5

FACTUAL BACKGROUND ................................................................................... 6

    A.    Facebook's Privacy Policy in Effect Prior to April 19, 2018 ............. 6

    B.    Facebook's Revised Privacy Policy in Effect as of April 19, 2018 ... 6

    C.    Facebook's Statement of Rights and Responsibilities Advised Users They Could Control How Facebook Collected and Used Their Personal Information by Adjusting the Application Settings. ........................ 8

    D.    Facebook's Privacy and Application Settings through Which Users Controlled How Facebook Could Collect and Use Their Personal Information, Including IP Address Location Information. ..................... 9

    E.    Facebook's Location History Setting Allowed Facebook to Collect and Store Users' Location History Which Users Could View. ............... 10

    F.    Facebook Surreptitiously Collected and Stored Plaintiffs' Location Data Despite Its Representations to the Contrary. ............................ 12

    G.    Facebook Collected and Stored Plaintiffs' Location Data without Permission, Then Used Enhanced Location Tracking Methodologies to More Precisely Pinpoint Plaintiffs' Locations. ........................... 14

    H.    After Improperly Collecting and Enhancing Plaintiffs' Location Information from Their IP Addresses, Facebook Bundled This Location Information with Plaintiffs' Other Personal Information and Monetized the Bundles for Targeted Advertising. ........................... 17

    I.    Facebook's Revenues Are Driven by the Sale of Targeted Advertising ........ 22

    J.    Facebook's Pattern of Disregarding Its Users' Privacy. ................... 23

**K.    The FTC's Commitment to Ensure that Companies Are Truthful and Refrain from Engaging in Deceptive or Unfair Conduct When It Comes to Tracking Consumers**................................................................... 24

    **1.    *In re Nomi Techs., Inc.*** ................................................................. 25

    **2.    *InMobi Pte Ltd.*** ............................................................................. 26

    **3.    *Turn, Inc.*** ...................................................................................... 27

    **4.    *FTC v. VIZIO, Inc.*** ...................................................................... 28

**CLASS ALLEGATIONS** ...................................................................................... 28

**CLAIMS ALLEGED ON BEHALF OF ALL CLASSES** .................................. 31

  **First Claim for Relief** ................................................................................ 31

    **(Violation of Article I, Section 1 of the California Constitution)** ................... 31

  **Second Claim for Relief** ........................................................................... 35

    **(Intrusion Upon Seclusion)** .......................................................... 35

  **Third Claim for Relief** .............................................................................. 36

    **(Intentional Misrepresentation and Omission)** ........................... 36

  **Fourth Claim for Relief** ............................................................................ 38

    **(Deceit by Concealment or Omission Cal. Civ. Code §§ 1709 & 1710)** .......... 38

  **Fifth Claim for Relief** ............................................................................... 41

    **(Breach of Contract)** .................................................................... 41

  **Sixth Claim for Relief** .............................................................................. 42

    **(Breach of Implied Covenant of Good Faith and Fair Dealing)** ................... 42

  **Seventh Claim for Relief** .......................................................................... 44

    **(Negligent Misrepresentation)** ..................................................... 44

  **Eighth Claim for Relief** ............................................................................ 45

    **(Unjust Enrichment)** .................................................................... 45

**PRAYER FOR RELIEF** ...................................................................................... 46

**JURY TRIAL DEMAND** ..................................................................................... 47

Plaintiffs Brendan Lundy and Myriah Watkins ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following against Defendant Facebook, Inc. ("Facebook), based on personal knowledge as to Plaintiffs and Plaintiffs' own acts, and on information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through Plaintiffs' undersigned counsel.

## PRELIMINARY STATEMENT

1. Between 2014 and 2018 Facebook collected, stored and sold user location data gathered through internet protocol ("IP") addresses[1] from its users' mobile devices and/or tablets even though these users opted out of location services in their Facebook mobile device application ("Facebook App") settings to prevent Facebook from doing so.

2. Facebook did so despite representing through its Facebook App settings and Privacy Policy in effect during that time period that it would not collect location information of any kind, including location information derived from IP addresses, without user permission.

3. Even though Plaintiffs did not give Facebook permission to collect their location information, Facebook nevertheless collected users' IP addresses, identified the users' locations through their IP addresses, then bundled that location information with other user information and monetized it by selling it for targeted advertising purposes.

4. Between 2014 and 2018, Plaintiffs chose mobile device and Facebook App privacy settings believing that this would prevent Facebook from tracking, collecting, storing and using their location data. Plaintiffs also turned off the Location History device setting on their respective devices, and their respective Location History files showed no location data when these settings were turned off. Thus, Plaintiffs reasonably understood that by so adjusting these settings, Facebook would not collect and use their location data.

5. Contrary to Plaintiffs' device settings selections, and contrary to Facebook's Privacy Policy in effect during the relevant time period, Facebook tracked Plaintiffs' locations

---

[1] An Internet Protocol address is a numerical label assigned to each device connected to a computer network that uses the Internet Protocol for communication. An IP address serves two main functions: host or network interface identification and location addressing. Anytime a person is connected to the internet, there's an IP address associated with that connection.

using their IP addresses and enhanced location determination techniques. Facebook bundled this location information with Plaintiffs' other personal information obtained from, *inter alia*, Facebook pages, browsing history and "likes." Facebook then monetized these bundled packages containing Plaintiffs' personal information for targeted advertising purposes, thus enriching itself to the tune of hundreds of millions of dollars from increased advertising revenue at the expense of Plaintiffs' and Facebook's other users' privacy rights.

6.      Facebook's disregard for Plaintiffs' and the putative Class members' privacy and its collection of their location data contrary to their privacy settings represents the latest chapter in its campaign of deception regarding collection and use of users' personal information without their authorization for financial gain. On July 24, 2019, the FTC levied a $5 billion fine against Facebook as part of a settlement in connection with Facebook violating consumers' privacy rights. The FTC charged that Facebook violated a 2012 FTC order by deceiving users about their ability to control the privacy of their personal information. In its Complaint, the FTC alleged that to encourage users to share information on its platform, Facebook promised users they could control the privacy of their information through Facebook's privacy settings. However, through at least June 2018, Facebook subverted users' privacy choices to serve its own business interests. The FTC further alleged that Facebook repeatedly used deceptive disclosures and settings to undermine users' privacy preferences in violation of its 2012 FTC order.[2]

7.      Accordingly, Plaintiffs seek compensatory, statutory, and punitive damages for Facebook's unauthorized use of their location data.

## JURSIDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 proposed class members,

---

[2] *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook*, FTC (July 24, 2019), https://www.ftc.gov/news-events/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions (last visited September 27, 2019).

and Facebook is a citizen of this state and at least one proposed class member is a citizen of a foreign state.

9.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Facebook is a corporation that resides in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in or emanated from this District, including the decisions made by Facebook's governance and management personnel that led to the invasions of privacy. Further, Facebook's terms of service governing users all over the world provide for venue in the Northern District of California for all claims arising out of Plaintiffs' relationships with Facebook.

## PARTIES

**A.     Plaintiff Lundy**

10.     Plaintiff Lundy is, and at all relevant times was, a citizen of the State of Colorado. Since at least 2014 and continuously to the present, Plaintiff Lundy has owned and used an Apple iPhone6, powered by iOS, with the Facebook App (available through the Apple App Store) downloaded onto the device.

11.     While using his iOS mobile device, Plaintiff Lundy never granted Facebook permission to access his location data through his Location Services or Facebook App settings. Facebook's App settings showed that Plaintiff Lundy's "Location History" was set to "off." Lundy downloaded a copy of his Facebook account's "location_history" folder using Facebook's "Download Your Information" feature, which contained no data. Thus, Plaintiff Lundy reasonably assumed that Facebook had not collected, stored and used his location information consistent with his device and app settings.

12.     However, Lundy discovered a Facebook folder labeled "Security and Login Information" which contained a sub-folder entitled "Login Protection Data" and "Where You're Logged In." That folder, compiled by Facebook without Lundy's knowledge or permission, contained multiple entries identifying Lundy's location by IP address, latitude and longitude at specific dates and times from 2014 through the present. After discovering this voluminous location data folder detailing his location on specific dates and at specific times spanning years,

Lundy felt that his privacy was significantly violated by the collection of location information without his consent.

13.   Plaintiff Lundy would not have installed or used the Facebook App had he known that Facebook would collect his location information without his permission and in violation of Facebook's Privacy Policy in effect during the relevant time period.

14.   Plaintiff Lundy's location information bundled with his other personal information has diminishing value now that Facebook has collected and sold it. On information and belief, the location information that Facebook stole, bundled with Plaintiff Lundy's other personal information, and monetized for advertising purposes, has an established market value of at least approximately $0.05 per individual (per bundle). Plaintiff Lundy did not grant Facebook permission to collect and monetize his location information for targeted advertising purposes.

**B.   Plaintiff Watkins**

15.   Plaintiff Watkins is, and at all relevant times was, a citizen of the State of Colorado. Since at least 2013 and continuously to the present, Plaintiff Watkins has owned and used various mobile devices powered by Android's operating system, developed by Google, with the third-party Facebook App (available through the Google Play Store) downloaded onto each device.

16.   While using her Android mobile device, Plaintiff Watkins never granted Facebook permission to access her location data through her Location Services or Facebook App settings. Facebook's App Settings showed that Plaintiff Watkins' "Location History" was set to "off." Plaintiff Watkins downloaded a copy of her Facebook account's "location_history" folder using Facebook's "Download Your Information" feature, which contained no data. Thus, Plaintiff Watkins reasonably assumed that Facebook had not collected, stored and used her location information consistent with her device and app settings

17.   However, Plaintiff Watkins discovered a Facebook folder labeled "Security and Login Information" which contained a sub-folder entitled "Login Protection Data" and "Where You're Logged In." That folder, compiled by Facebook without Watkins' knowledge or permission, contained multiple entries identifying Watkins' location by IP address, latitude and

1   longitude at specific dates and times from 2014 through the present. After discovering this

2   voluminous location data folder detailing her location on specific dates and at specific times

3   spanning years, Plaintiff Watkins felt that her privacy was significantly violated by the collection

4   of location information without her consent.

5          18.     Plaintiff Watkins would not have installed or used the Facebook App had she

6   known that Facebook would collect her location information without her permission and in

7   violation of Facebook's Privacy Policy in effect during the relevant time period.

8          19.     Plaintiff Watkins' location information bundled with her other personal

9   information has diminishing value now that Facebook has collected and sold it. On information

10   and belief, the location information that Facebook collected, bundled with Plaintiff Watkins'

11   other personal information, and monetized for advertising purposes, has an established market

12   value of at least approximately $0.05 per individual (per bundle). Plaintiff Watkins did not grant

13   Facebook permission to collect and monetize her location information for targeted advertising

14   purposes.

15   **C.     Defendant Facebook**

16          20.     Defendant Facebook is a California corporation with its principal place of

17   business located at 1601 Willow Road, Menlo Park, California 94025. Facebook is a leading

18   global social media and social networking company. Facebook is a Fortune 500 company with

19   an annual revenue of $55.84 billion in 2018, and a market capitalization of $517.21 billion as of

20   September 24, 2019. As part of its operations, Facebook owns and operates the website

21   www.Facebook.com, and has developed and distributed the Facebook App for Android and iOS.

22          21.     At all relevant times, Facebook was, and is, engaged in business in San Mateo

23   County and throughout the U.S. and the world.

24          22.     Wherever references made in this Amended Complaint to any representation, act,

25   omission, or transaction of Facebook, that allegation shall mean that Facebook did the act,

26   omission, or transaction through its officers, directors, employees, agents, and/or representatives,

27   subsidiaries and affiliates while they were acting within the actual or ostensible scope of their

28   authority.

1

**FACTUAL BACKGROUND**

2

    A.    **Facebook's Privacy Policy in Effect Prior to April 19, 2018**

3

    23.    Under its Privacy Policy (the "Effective Privacy Policy") in effect prior to April

4

19, 2018, Facebook represented that it would not collect device information of any kind,

5

including location data through IP addresses, unless a user expressly permitted Facebook to do

6

so.

7

    24.    Specifically, under the category "Device information," Facebook stated that "[w]e

8

collect information from or about the computers, phones, or other devices where you install or

9

access our Services, **depending on the permissions you've granted**. . . . Here are some

10

examples of the device information we **collect**:

11

        •    Attributes such as the operating system, hardware version, device settings, file

12

            and software names and types, battery and signal strength, and device identifiers.

13

        •    *Device locations*, including specific geographic locations, such as through GPS,

14

            Bluetooth, or Wi-Fi signals.

15

        •    **Connection information** such as the name of your mobile operator or ISP,

16

            browser type, language and time zone, mobile phone number and **IP address**.

17

(Emphasis added).[3]

18

    B.    **Facebook's Revised Privacy Policy in Effect as of April 19, 2018**

19

    25.    On April 19, 2018, Facebook adopted a new privacy policy, *viz*., Data Policy and

20

Privacy Basics (collectively, the "Revised Privacy Policy").[4]

21

    26.    Facebook adopted its Revised Privacy Policy in response to strict new European

22

Union data protection and privacy regulations which, among other things, defined a user's IP

23

address as personal data. Facebook's Revised Privacy Policy specifically addresses the

24

25

---

26

[3] *See* Wayback Machine, https://web.archive.org/web/20180416140205/https://www.facebook.com/about/privacy/

27

(last visited September 26, 2019). A copy of Facebook's Privacy Policy in effect during the time period relevant to Plaintiffs' Amended Complaint is attached hereto as **Ex. 1**.

28

[4] A copy of the Revised Privacy Policy is attached hereto as **Ex. 2** (Data Policy) and **Ex. 3** (Privacy Basics).

deficiencies in the prior Privacy Policy by disclosing, among other things, that Facebook will collect location data using IP addresses, even without user permission:

> **Location-related information:** We use location-related information - such as your current location, where you live, the places you like to go, and the businesses and people you're near-to provide, personalize and improve our Products, including ads, for you and others. **Location-related information can be based on things like** precise device location (if you've allowed us to collect it), **IP addresses**, and information from your and others' use of Facebook Products (such as check-ins or events you attend).

Revised Data Policy, **Ex. 2** at 5 (emphasis added).

> Location
>
> Connection information like your **IP address** or Wi-Fi connection and specific location information like your device's GPS signal help us **understand where you are.**
>
> ***
>
> You can control whether your device shares precise location information with Facebook Company Products via Location Services, a setting on your mobile device, and if you've given us permission, when you are not using Facebook Products.
>
> **We may still understand your location** using things like check-ins, events, and **information about your internet connection.**

Privacy Basics, **Ex. 3** at 2, 6-7 (emphasis added).

27.     Facebook's Revised Privacy Policy, unlike the Effective Privacy Policy, advises users that it will collect their location information, including location information derived from IP addresses without user consent, and bundle this location information, with "information about [their] interests, actions and connections," to deliver personalized advertising and sponsored content.

> • Ads and other sponsored content: We use the information we have about you-including information about your interests, actions and connections-to select and personalize ads, offers and other sponsored content that we show you.

**Ex. 2** at 6.

28.     Facebook represents that it stores data until it is no longer necessary to provide its services and Facebook Products, or until a person's account is deleted—whichever comes first.[5]

**C.  Facebook's Statement of Rights and Responsibilities Advised Users They Could Control How Facebook Collected and Used Their Personal Information by Adjusting the Application Settings.**

29.     Facebook's Statement of Rights and Responsibilities ("SRR") in effect during the relevant time period provided that it was derived from the "Facebook principles" and constituted Facebook's terms of service governing Facebook's relationship with its users who interact with Facebook.[6]

30.     In its SRR, Facebook represented to users that their privacy was very important to Facebook and encouraged users to read the data policy to make informed decisions regarding how Facebook could collect and use their content and information:

Privacy

Your privacy is very important to us. We designed our Data Policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information. We encourage you to read the Data Policy and use it to help you make informed decisions.

31.     In its SRR, Facebook also represented to users that they could control how their information was shared through their privacy and application settings.

**Sharing Your Content and Information**

You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings.

---

[5] Facebook's Memorandum of Responses to Post-Hearing Questions from the United States Senate Committee on Commerce, Science and Transportation (June 8, 2018), https://www.judiciary.senate.gov/imo/media/doc/Zuckerberg%20Responses%20to%20Commerce%20Committee%20QFRs.pdf (last visited September 27, 2019).

[6] A copy of Facebook's SRR in effect during the relevant time period is attached hereto as **Ex. 4**.

**D.** **Facebook's Privacy and Application Settings through Which Users Controlled How Facebook Could Collect and Use Their Personal Information, Including IP Address Location Information.**

32.     Facebook represented to users that they could control, through Facebook's privacy and application settings, the types of information Facebook could collect from them and use.

33.     Facebook users using Facebook's App installed on their Android Device could turn off location service by opening their Facebook App, opening settings, opening account settings, opening location, opening location services, toggling Facebook and toggling "permissions" off.

34.     Facebook users using Facebook's App installed on their iOS Device could turn off location services by opening their facebook App settings, toggling privacy, and toggling location services, scroll down to Facebook and toggle never or while using this app.

35.     Facebook users, including Plaintiffs, reasonably understood, based on Facebook's Effective Privacy Policy, SRR and App and Device settings, that it would not collect their location data, including location data obtained from IP addresses, if the location services settings on their respective devices were turned off.

36.     Facebook's pitch to advertisers was consistent with its representations in its Effective Privacy Policy. Specifically, Facebook represented: "Local awareness ads were built with privacy in mind […] People have control over the recent location information they share with Facebook and will only see ads based on their recent location if location services are enabled on their phone."[7]

37.     According to Aleksandra Korolova, an assistant professor of computer science at University of Southern California, who researches location tracking on Facebook, "this claim is false." "There is no way for people to opt out of using location for ads entirely," said a Facebook spokesperson by email. "We use city and zip level location which we collect from IP addresses

---

[7] Alex Hern, *Facebook users cannot avoid local-based ads, investigation finds* (Dec. 19, 2018), https://www.theguardian.com/technology/2018/dec/19/facebook-users-avoid-location-based-ads-settings-investigation-reveals (last visited September 27, 2019).

and other information such as check-ins and current city from your profile to ensure we are providing people with a good service—from ensuring they see Facebook in the right language, to making sure that they are shown nearby events and ads for businesses that are local to them."[8]

       **E.**      **Facebook's Location History Setting Allowed Facebook to Collect and Store Users' Location History Which Users Could View.**

      38.     The Facebook App "Privacy" setting screen contains a "Location History" setting which, in turn, contains a setting that allows users to toggle Location History "on" or "off." The Facebook App represented that turning on the Location History setting "[a]llow[s] Facebook to build a history of precise locations received through Location Services on your devices."

      39.     Facebook represents that "You can turn off Location Services at any time. When Location Services is turned off, Facebook won't add new information to your Location History, even if you've turned on Location History."

      40.     Facebook users can download their location_history. When "Location History" is set to "off" the report reads, "[y]ou have no data in this section." The Facebook App additionally provided that "[w]hen Location History is turned off, Facebook will stop adding new information to your Location History which you can view in your Location Settings. Facebook may still receive your most recent precise location so that you can, for example, post content that's tagged with your location…. Location History must be turned on for some location features to work on Facebook, including Find Wi-Fi and Nearby Friends."

      41.     Notably, Facebook represented that it collected "[d]evice information" including "[d]evice locations, including specific geographic locations, such as through GPS, Bluetooth, or Wi-Fi signals," and connection information, including IP addresses, "***depending on the permissions you've granted***." **Ex. 1** at 3. The granted permissions referred to the setting selected by users through the location services setting if using an iOS device, or the App Permissions setting if using an Android device.

---

[8] Kashmir Hill, *Turning Off Facebook Location Tracking Doesn't Stop It from Tracking Your Location*, Gizmodo (Dec. 19, 2018), https://www.gizmodo.com.au/2018/12/turning-off-facebook-location-tracking-doesnt-stop-it-from-tracking-your-location/ (last visited September 27, 2019).

42.     This ability to opt-in or opt-out of Facebook compiling and storing location information on a user's device is verified in Facebook's "Location Settings" page within the user's Facebook profiles, accessible by logging into his or her Facebook account on a computer. The "Location Settings" page specifies that "[y]ou can change your Location Settings in the app on your device," which again references the control selections on users' devices.  If a Facebook user has not expressly opted into or set the access or permissions of the Facebook application to "off" or "never" on his or her device, this page will confirm that selection by providing that "[y]our Location History is off."

43.     Facebook CEO Mark Zuckerberg reiterated this opt-in process during his April 10, 2018, Congressional testimony following Facebook's Cambridge Analytica scandal, providing the following responses to Senator Debra Fischer's (R-NE) questioning:

> FISCHER: How much do you store of that? All of it? All of it? Everything we click on, is that in storage somewhere?
>
> ZUCKERBERG: Senator, we store data about what people share on the service and information that's required to do ranking better, to show you what you care about in news feed.
>
> FISCHER: Do you — do you store text history, user content, activity, ***device location***?
>
> ZUCKERBERG: Senator, some of that content ***with people's permission, we do store***.
>
> FISCHER: Do you disclose any of that?
>
> ZUCKERBERG: Yes, it — Senator, in order to — ***for people to share that information with Facebook, I believe that almost everything that you just said would be opt in***.[9]

44.     Facebook explains under its "About Location History" setting that it "lets you explore what's around you, get more relevant ads, and help improve Facebook." Professor Korolova observed that "[g]iven that advertising is presented as one of the main use cases for

---

[9] *Transcript of Mark Zuckerberg's Senate hearing* (April 10, 2018), The Washington Post, https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing/?utm_term=.ca3abe9c3500 (emphasis added) (last visited September 27, 2019).

Location History, a reasonable Facebook user might conclude that turning off Location History and not granting Facebook the permission to access location on the mobile app will prevent the geo-targeting of ads. But that is not the case."[10]

45.     Reasonable users of Facebook would not expect Facebook to continue tracking, logging and storing private location information once they have turned Location History off. As Princeton computer scientist and former chief technologist for the Federal Communications Commission's enforcement bureau Jonathan Mayer stated in regard to similar conduct by Google, Inc., "[i]f you're going to allow users to turn off something called 'Location History,' then all the places where you maintain location history should be turned off. That seems like a pretty straightforward position to have."[11]

46.     Thus, Facebook users, including Plaintiffs, reasonably understood, based on Facebook's Effective Privacy Policy, SRR and App settings, that Facebook would not collect their location data, including location data obtained from IP addresses, if they toggled the "Location History" setting to "off" and turned off the location services settings on their respective devices.

F.     **Facebook Surreptitiously Collected and Stored Plaintiffs' Location Data Despite Its Representations to the Contrary.**

47.     Although Plaintiffs' location services and Location History settings on their respective devices were turned off, every time Plaintiffs used the Facebook App while connected to the Internet, Facebook nevertheless collected and stored their location using the IP address without their permission. "Facebook automatically logs IP addresses where a user has logged

---

[10] Aleksandra Korolova, *Facebook's Illusion of Control over Location-Related Ad Targeting*, Medium (Dec. 18, 2018), https://medium.com/@korolova/facebooks-illusion-of-control-over-location-related-ad-targeting-de7f865aee78 (last visited September 27, 2019).

[11] Ryan Nakashima, *AP Exclusive: Google tracks your movements, like it or not*, The AP (Aug. 13, 2018), https://www.apnews.com/828aefab64d4411bac257a07c1af0ecb/AP-Exclusive:-Google-tracksyour-movements,-like-it-or-not (last visited September 27, 2019).

into their Facebook account."[12]  "Location-related information can be based on things like precise device location (if a user has allowed us to collect it), IP addresses, and information from their and others' use of Facebook Products (such as check-ins or events they attend)."[13]

48.    Plaintiffs were not aware that Facebook was collecting their location data through IP addresses without their permission because their Facebook "Location History" folders showed no location data. Instead of storing their location data in the "Location History" folders, Facebook stored this data in subfiles obscurely labeled "Login Protection Data" and "Where You're Logged In" which, in turn, were located under yet another file obscurely labeled "Security and Login Information."  These files contained the IP addresses assigned by Plaintiffs' respective Internet Service Providers ("ISP") to their devices when they logged into the Facebook App, along with the precise longitude and latitude of the IP address. To illustrate, the location data provided the following IP address and location:

> Estimated location inferred from IP 32.584, -97.168
> Created Dec 16, 2017 2:32pm

49.    Unlike Facebook's Revised Disclosures, Facebook's "About Location Services" disclosures in effect before April of 2018 did not inform users that Facebook would collect and store user-specific location data based on IP addresses in files other than Location History.

50.    Facebook's conduct is contrary to users' reasonable expectations of privacy. The average consumer understands that turning Facebook's Location Services and Location History off has a purpose and an effect: to limit Facebook from tracking, logging, and storing the consumer's location information. However, as acknowledged by Facebook in the Gizmodo article cited above, this is not the case.

---

[12] *Zuckerberg Responses to Judiciary Committee QFRs* (June 8, 2018),
https://www.judiciary.senate.gov/imo/media/doc/Zuckerberg%20Responses%20to%20Judiciary%20Committee%20QFRs.pdf at 158 (last visited September 27, 2019).

[13] *Id.* at 142.

**G.     Facebook Collected and Stored Plaintiffs' Location Data without Permission, Then Used Enhanced Location Tracking Methodologies to More Precisely Pinpoint Plaintiffs' Locations.**

51.     The "Login Protection Data" and "Where You're Logged In" subfiles, located under the obscurely labeled "Security and Login Information" file, contain precise longitude and latitude coordinates inferred from IP addresses. Facebook then further refined Plaintiffs' location derived from the IP addresses using enhanced location tracking methodologies.

52.     Such enhancement techniques are used to more accurately pinpoint locations from IP addresses. These techniques encompass, among other things, empirical sampling of where the devices actually are to build the best location data base available. On information and belief, using precision location systems for mobile services, deployed on tens of millions of mobile devices worldwide, Facebook and/or its agents and/or contractors sample the location of devices using GPS, Wi-Fi and cell towers, and associates these locations with the IP address of the device.

53.     For purposes of illustration, on August 31, 2018, at 6:38 PM, Facebook logged Plaintiff Lundy's IP address as 71.209.176.35 and the geocoordinates to be 34.6, latitude, -112.28 longitude. Entering these coordinates into https://www.latlong.net/Show-Latitude-Longitude.html show that Mr. Lundy was in Prescott, Arizona at that date and time.

54.     Inputting the same IP address, *viz.*, 71.209.176.35, into other IP location service providers' websites for free to determine the location based on that IP address, reveals the following results:

| SOURCE | IP ADDRESS | LATITUDE | LONGITUDE | CITY |
|---|---|---|---|---|
| IP2Location.net | 71.209.176.35 | 33.4484 | -112.0740 | Phoenix |
| Ip.info.io | 71.209.176.35 | 33.4917 | -111.9840 | Phoenix |
| DB-IP | 71.209.176.35 | 33.4484 | -112.074 | Phoenix |
| Ipstack.com | 71.209.176.35 | 33.4917 | -111.9837 | Phoenix |
| Hackertarget.com (GeoIP) | 71.209.176.35 | 33.5007 | -111.9829 | Phoenix |
| Maxmind.com | 71.209.176.35 | 33.3504 | -111.782 | Gilbert |
| Whatismyipaddress.com | 71.209.176.35 | 33.4342 | -111.8454 | Mesa |
| Ipgeolocation.io | 71.209.176.35 | 33.44840 | -112.07400 | Phoenix |
| Ipfingerprints.com | 71.209.176.35 | 33.350399 | -111.781998 | Gilbert |
| Melissa Lookups (Melissa.com) | 71.209.176.35 | 33.504300 | -112.029000 | Phoenix |

CASE NO.: 4:18-cv-06793-YGR
FIRST AMENDED CLASS ACTION COMPLAINT
14

| Textmagic.com | 71.209.176.35 | 33°21'1"N | 111°46'55"E | Gilbert |
|---|---|---|---|---|
| Neustar (Ultratools.com) | 71.209.176.35 | 33.50938 | -112.08255 | Phoenix |
| Ip-tracker.org | 71.209.176.35 | 33.4944 | -112.2132 | Phoenix |
| Dnschecker.org | 71.209.176.35 | 33.4484 | -112.074 | Phoenix |
| Extreme-ip.lookup.com | 71.209.176.35 | 33.5038 | -112.0253 | Phoenix |

55.     The various IP location providers result in geocoordinate locations for the same IP address more than 100 miles away in the Phoenix, Arizona metropolitan area. These differences indicate that Facebook used an enhanced location determination technique based on data collected from other users instead of, or in addition to, simply plotting Plaintiff Lundy's IP address location in order to more precisely pinpoint the location of the IP address.

56.     Facebook uses multiple signals to determine (or more realistically, to estimate) a user's location. The platform may use IP address, mobile device info, a user's profile data (i.e., city listed in their profile), and sometimes a combination. They can also use info from the locations of the Facebook user's friends.[14]

57.     Facebook admitted to a reporter for the Wall Street Journal that it determines user location even for users who have opted out of location tracking, in part, by "enhancing" IP address location:

> After discussing these issues with Aleksandra Korolova, an assistant professor of computer science at University of Southern California, who researches location tracking on Facebook, *I confirmed with the company that data from other users can enhance its understanding of an IP address location*.
>
> *If someone connected to the same coffee-shop network as me has location services turned on, for instance, Facebook could pinpoint us both*. A spokeswoman said that when users have location services turned off, the company limits the location information it infers about them to the ZIP Code level. There's nothing in its privacy policy saying it won't use more specific IP-based location data in the future, however.[15]

---

[14] Lucas Elliott, *Facebook Location Targeting: A Detailed Guide* (Aug. 29, 2018), https://www.jonloomer.com/2018/08/29/facebook-location-targeting/?nabt=0&utm_referrer=https%3A%2F%2Fwww.google.com%2F (last visited September 27, 2019).

[15] Katherine Bindley, *Why Facebook Still Seems to Spy on You*, The Wall Street Journal (Feb. 28, 2019), https://www.wsj.com/articles/facebook-ads-will-follow-you-even-when-your-privacy-settings-are-dialed-up-11551362400 (last visited September 27, 2019).

CASE NO.: 4:18-cv-06793-YGR
FIRST AMENDED CLASS ACTION COMPLAINT
15

1    58.    Both Facebook's Effective Privacy Policy and Revised Privacy Policy fail to
2    disclose that it will use these enhanced location determination techniques to more accurately
3    pinpoint IP address locations.

4    59.    Facebook explains to advertisers that it learns user locations from the IP address,
5    Wi-Fi and Bluetooth data.[16] In its targeting explanation for advertisers, Facebook states that it
6    relies on things like IP addresses and Wi-Fi and Bluetooth data. According to Professor
7    Korolova, the issue is that Facebook fails to disclose that even if you exercise all provided
8    privacy controls, Facebook will continue to track your location and present you with targeted
9    advertising.[17]

10    60.    Facebook's use of enhanced location determination techniques to more accurately
11    pinpoint IP address locations is particularly problematic in view of Facebook's patent
12    applications filed with the U.S. Patent and Trademark Office for technology that uses users'
13    location data to predict where they are going and when they are going to be offline. A May 30,
14    2017, Facebook application titled "Offline Trajectories" describes a method to predict where
15    you'll go next based on your location data. The technology described in the patent would
16    calculate a "transition probability based at least in part on previously logged location data
17    associated with a plurality of users who were at the current location."[18] In other words, the
18    technology could also use the data of other people you know, as well as that of strangers, to
19    make predictions.

20
21

---

22
23    [16] Aleksandra Korolova, *Facebook's Illusion of Control over Location-Related Ad Targeting*, Medium (Dec. 18, 2018), https://medium.com/@korolova/facebooks-illusion-of-control-over-location-related-ad-targeting-de7f865aee78 (last visited September 27, 2019) (citing
24    https://www.facebook.com/business/help/1150627594978290)

25    [17] Chance Miller, *How Facebook sneakily uses IP data & more for targeted ads, even if users disable all location settings* (Dec. 18, 2018), https://9to5mac.com/2018/12/18/facebook-location-privacy-ads-settings/ (last visited
26    September 27, 2019).

27    [18] Nicole Nguyen, *Facebook Filed A Patent to Calculate Your Future Location* (Dec. 10, 2018), https://www.buzzfeednews.com/article/nicolenguyen/facebook-location-data-prediction-patent (last visited
28    September 27, 2019)

CASE NO.: 4:18-cv-06793-YGR
FIRST AMENDED CLASS ACTION COMPLAINT
16

1   61. As the patent applications reveal, Facebook is also exploring the possibility of

2 using that location data to predict and monetize users' movements over time. Facebook is

3 already recording information relevant to these applications, including data "about other devices

4 that are nearby or on their network," "nearby Wi-Fi access points, beacons, and cell towers,"

5 "signal strength," and "online and offline actions," from third-party data providers.[19] Indeed, on

6 information and belief, Facebook is collecting much of the same information it uses in

7 connection with its enhanced location determination techniques.

8   62. Put simply, Facebook goes to extraordinary lengths to obtain users' personal data,

9 particularly location data, in total disregard for its users' privacy, and even though such measures

10 appear "scary" to Facebook team members. For example, in 2015, according to leaked emails

11 published by the UK parliament, Facebook's team was particularly concerned about appearing

12 "scary" over location-based advertising that used Bluetooth "beacons" to track users' shopping

13 habits without resorting to uploading GPS data.[20]

14   **H.**  **After Improperly Collecting and Enhancing Plaintiffs' Location Information**
15     **from Their IP Addresses, Facebook Bundled This Location Information with**
     **Plaintiffs' Other Personal Information and Monetized the Bundles for**
16     **Targeted Advertising.**

17   63. After improperly collecting Plaintiffs' location information from their IP

18 addresses and enhancing the data to further pinpoint Plaintiffs' location, Facebook bundled this

19 enhanced location information with users' other personal information obtained from their

20 Facebook pages, including their browsing history, profiles and likes. Facebook then monetized

21 this bundled personal information for targeted advertising purposes.

22

23

24 [19] *Id.*

25 [20] Alex Hern, *Facebook users cannot avoid local-based ads, investigation finds* (Dec. 19, 2018),
   https://www.theguardian.com/technology/2018/dec/19/facebook-users-avoid-location-based-ads-settings-
26 investigation-reveals (last visited September 27, 2019).; *see also* Bill Woodwin & Sebastion Klovig Skelton,
   *Facebook's privacy game – how Zuckerberg backtracked on promises to protect personal data*, ComputerWeekly,
27 (July 1, 2019), https://www.computerweekly.com/feature/Facebooks-privacy-U-turn-how-Zuckerberg-backtracked-
   on-promises-to-protect-personal-data (last visited September 27, 2019) (Discussing Facebook's "Project Gravity,"
28 where Facebook began using Bluetooth beacons to track Facebook users' mobile phones as they shop).

64.    Facebook's use of location information, bundled with users' other personal information, is a large part of their advertising strategy.

65.    Facebook offers advertising services to its customers (advertisers) that include or have included at various points in time, *inter alia*, assisting customers in developing and creating advertisements and advertising strategies, obtaining information about users from Facebook's website and third-party sources, compiling user data and maintaining databases of user information, developing a marketing and advertising strategy to target and/or exclude certain groups of users from receiving advertisements, tracking and evaluating the effectiveness of advertisements and user targeting strategies, implementing advertising campaigns, and delivering advertisements to users, including via News Feed.

66.    Facebook's customers can use Facebook's advertising services to target its users with specific attributes. Facebook applies its own algorithm to categorize users and to determine which users and groups of users will be targeted to receive advertisements via its advertising platform. As touted on Facebook's website: "With our powerful audience selection tools, you can target people who are right for your business. Using what you know about your customers—like demographics, interests and behaviors—you can connect with people similar to them."

67.    More specifically, Facebook has 98 personal data points that it compiles to target advertisements to its users, and Facebook offers marketers the option to target ads according to the data points. The first listed data point is "location." The remaining 97 data points include items like age, gender, language, education level, school, ethnic affinity, income and net worth, and home ownership.[21]

68.    Facebook promotes Targeting New Audiences and explains how to create a new audience using, among other things, user locations, demographics, interests and behaviors.[22]

69.    In explaining its Detailed Targeting, Facebook states:

---

[21] Kaitlin Dewey, *98 personal data points that Facebook uses to target ads to you*, The Washington Post (Aug. 19, 2016), https://www.washingtonpost.com/news/the-intersect/wp/2016/08/19/98-personal-data-points-that-facebook-uses-to-target-ads-to-you/ (last visited September 27, 2019).

[22] Facebook, https://www.facebook.com/business/help/202297959811696 (last visited September 27, 2019)

Detailed targeting is a targeting option available in the "Audience" section of ad set creation that allows you to refine the group of people we show your ads to. You can do this with information such as additional demographics, interests and behaviors.

These detailed targeting options may be based on:

- Ads they click
- Pages they engage with
- Activities people engage in on Facebook related to things like their device usage, and travel preferences
- Demographics like age, gender and location
- The mobile device they use and the speed of their network connection

*Id.*

70.   Facebook represents to advertisers that it learns user locations from IP address, Wi-Fi and Bluetooth data. Facebook also allows advertisers to choose the locations to which their ads are delivered, providing the advertisers the following selections:

- **Everyone in this location (default option)**

- **People who live in this location**

- **People recently in this location**

- **People traveling in this location[23]**

71.   Facebook additionally allows the advertiser to choose a location radius which identifies relevant areas inside a larger geographic area or extends the advertiser's area's reach beyond its geographical boundary.

72.   Facebook further explains to its advertisers they can attain optimization through the Facebook pixel which Facebook describes as "an analytics tool that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[24] Facebook explains that using the Facebook pixel, the advertiser can see the actions

[23] Facebook, https://www.facebook.com/business/help/365561350785642?helpref=search&sr=1&query=everyone%20in%20this%20location (last visited September 27, 2019)

[24] Facebook, https://www.facebook.com/business/help/742478679120153?helpref=search (last visited September 27, 2019)

1    that its customers take and have options to reach those customers again through future Facebook

2    ads. *Id*.

3         73.    Facebook also provides detailed analytical data to advertisers on how their

4    advertisement campaigns are performing, including among certain groups of Facebook users

5    with specified attributes and characteristics that the advertiser seeks to target. By monitoring this

6    data and providing this information to its customers on an ongoing basis, Facebook captures

7    consumer behavior, profile, preferences, lifestyle, and other attributes which allows it to run

8    targeted advertisements.    This enables customers to target specific groups of users for

9    advertisements.

10        74.    On June 8, 2018, Congress released Facebook's responses to post-hearing

11   questions stemming from Facebook CEO Mark Zuckerberg's April 10, 2018, Congressional

12   testimony regarding Facebook's Cambridge Analytica scandal.[25]    Regarding how Facebook

13   constructs digital profiles for purposes of selling advertisements, Zuckerberg stated, "We use

14   data from devices (such as location data) to help advertisers reach people in particular areas. For

15   example, if people have shared their device locations with Facebook or checked into a specific

16   restaurant, we can show them organic posts from friends who have been in that location or we

17   can show them ads from an advertiser that wants to promote its services in their area or from the

18   restaurant."[26] Among the information Facebook collects from users' devices are "Network and

19   connections: information such as the name of your mobile operator or ISP, language, time zone,

20   mobile phone number, IP address, connection speed and, in some cases, information about other

21   devices that are nearby or on your network."[27]

22        75.    Targeting advertising of this nature requires Facebook to compile an enormous

23   amount of personal information from its users, including location information.  This information

---

[25] Ironically, Facebook's Revised Policies became effective eight days after Zuckerberg's testimony.

[26] *Zuckerberg Responses to Judiciary Committee QFRs* (June 8, 2018),
https://www.judiciary.senate.gov/imo/media/doc/Zuckerberg%20Responses%20to%20Judiciary%20Committee%20QFRs.pdf at 16 (last visited September 27, 2019).

[27] *Id*. at 161.

is highly valuable because the average cost per click for an online Facebook advertisement in 2017 was $1.72[28], and the average U.S. Facebook user is reportedly worth about $200 a year to Facebook.[29]

76.     In denying a motion to dismiss, the United States District Court for the Northern District of California accepted plaintiffs' allegation that call and text logs are often sold for, and have an established market value of, approximately $0.05 for individual. *See Williams v. Facebook*, Case No. 18-CV-01881-RS, Order Denying in Part and Granting in Part Motion to Dismiss (Dkt. No. 128), at 11 (N.D. Cal. Aug. 29, 2019) (rejecting Facebook's standing argument and noting plaintiffs' argument that "the information has diminished in value now that Facebook has stolen and monetized it").

77.     Location data presents one of the most valuable forms of data that Facebook collects about its users for its advertisers not only because of what the data point alone says about an individual (i.e., where he or she is at any particular point in time), but because of the massive amount of personal and private information that can be extracted from the location data (such as medical treatment, personal relationships, and private interests). The location data bundled with Plaintiffs' personal information is worth substantially more than $0.05 per individual, but instead is worth $1.72.

78.     Additionally, according to a 2015 survey by the Ponemon Institute, which asked U.S. respondents to indicate the minimum amount that they would accept as compensation in exchange for sharing different data categories, respondents, on average, believe that their physical location is worth $16.1, and their home address is worth $12.9.[30]

---

[28] Mark Irvine, *Facebook Ad Benchmarks for YOUR Industry [Data]* (last updated Aug. 27, 2019), https://www.wordstream.com/blog/ws/2017/02/28/facebook-advertising-benchmarks (last visited September 27, 2019).

[29] Sam Harnett, *Here's How Much You Are Worth to Facebook In Dollars and Cents* (April 11, 2018), https://www.kqed.org/news/11661387/heres-how-much-you-are-worth-to-facebook-in-dollars-andcents (last visited September 27, 2019).

[30] *Privacy and Security in a Connected Life: A Study of US, European and Japanese Consumers*, Ponemon Institute, (Mar. 2015), https://www.trendmicro.de/cloud-content/us/pdfs/security-intelligence/reports/rt_privacy_and_security_in_a_connected_life.pdf at 17 (last visited September 27, 2019).

I.      **Facebook's Revenues Are Driven by the Sale of Targeted Advertising**

79.     Almost the entirety of Facebook's revenue originates from the sale of targeted advertising based on the extensive data Facebook collects, analyzes, and maintains about its users. Annual Reports, Facebook, Inc.[31] According to Facebook's respective annual reports from 2015 through 2018, Facebook's annual revenue for 2015 was $17.93 billion, of which 95% originated from the sale of targeted advertising. Facebook's annual revenue for 2016 was $27.64 billion, of which 97% originated from the sale of targeted advertising. Facebook's annual revenue for 2017 was $40.65 billion, of which 98% originated from the sale of targeted advertising. In 2018, Facebook's annual revenue was $55.84 billion.

80.     In particular, Facebook targeting advertisers for its mobile users has become the Company's focus for generating advertising revenue. As of 2016, 47% of Facebook users worldwide, and 68% of Facebook users in the U.S. accessed Facebook via the Facebook mobile App.[32] Additionally, as of 2016, of the roughly two billion smartphones in use worldwide, 85% used the Facebook mobile App.[33]

81.     As of 2018, over 90% of Facebook's advertising revenue came from mobile users.[34]

---

[31] Facebook's annual SEC filings discuss its location-based advertising as follows:

> We generate substantially all of our revenue from selling advertising placements to marketers. Our ads enable marketers to reach people based on a variety of factors including age, gender, *location*, interests, and behaviors. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites.

Annual Reports, Facebook, Inc., (2015, 2016, 2017, 2018).

[32] Artyom Dogtiev, *Facebook App Statistics*, Business of Apps (Jun. 22, 2016), https://www.businessofapps.com/news/facebook-app-statistics/ (last visited September 27, 2019).

[33] *Id.*

[34] Emil Protalinski, *Over 90% of Facebook's advertising revenue now comes from mobile*, Venturebeat (Apr. 25, 2018), https://venturebeat.com/2018/04/25/over-90-of-facebooks-advertising-revenue-now-comes-from-mobile/ (last visited September 27, 2019).

J.      **Facebook's Pattern of Disregarding Its Users' Privacy.**

82.     Facebook has a long history of deceiving its users and misusing their information without their permission for its own financial gain.

83.     In 2008, a Facebook technical glitch revealed the confidential birthdates of 80 million users' profiles.[35]

84.     In 2011, the Federal Trade Commission ("FTC") filed an eight-count complaint against Facebook alleging, among other things, that it deceived consumers by representing to them they could keep their information on Facebook private, then repeatedly shared their personal information with advertisers.[36] Facebook ultimately entered into a consent decree requiring it to live up to its promises regarding privacy, including giving consumers clear and prominent notice and obtaining consumers' express consent before their information was shared beyond the privacy settings they had established.[37]

85.     After the consent decree in 2012, Facebook continued engaging in privacy violations. In 2013, Facebook disclosed a software flaw that exposed six million users' phone numbers and email addresses to unauthorized viewers for a year.[38]

86.     In September 2018, a security breach exposed the personal information of up to 50 million Facebook users.[39]  This already egregious exposure of Facebook users' personal information was exponentially worsened by Facebook's collection of location data without

[35] Munsif Vengattil, Arjun Panchadar & Paresh Dave, *Facebook says big breach exposed 50 million accounts to full takeover*, Reuters (Sept. 28, 2018), https://www.reuters.com/article/us-facebook-cyber/facebook-unearths-security-breach-affecting-50-million-users-idUSKCN1M82BK?feedType=RSS&feedName=newsOne (last visited Sept. 27, 2019)

[36]*See Settles FTC Charges That It Deceived Consumers by Failing to Keep Privacy Promises*, FTC (Nov. 29, 2011), https://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep [https://perma.cc/5FE6-VGQB] (last visited September 27, 2019).

[37] *See, e.g., FTC Approves Final Settlement with Facebook*, FTC (Aug. 10, 2012), https://www.ftc.gov/news-events/press-releases/2012/08/ftc-approves-final-settlement-facebook [https://perma.cc/AQG5-HBMX] (last visited September 27, 2019) (discussing FTC settlement terms with Facebook.

[38] *Id.*

[39] Mike Isaac & Sheera Frenkel, *Facebook Security Breach Exposes Accounts of 50 Million Users*, The New York Times (Sept. 28, 2018), https://www.nytimes.com/2018/09/28/technology/facebook-hack-data-breach.html (last visited September 27, 2019).

CASE NO.: 4:18-cv-06793-YGR
FIRST AMENDED CLASS ACTION COMPLAINT
23

users' consent.  The breach allowed hackers to gain access to, and potentially take control of, user accounts which, given the troubling data practices alleged herein, included detailed location history that users had not consented to Facebook having – much less hackers.[40]

87.    On July 24, 2019, the FTC levied a $5 billion fine against Facebook as part of a settlement in connection with Facebook violating consumers' privacy rights. The settlement stems from Facebook's role in the Cambridge Analytical Scandal whereby Facebook allowed for the personal data of up to 87 million user profiles to be harvested by Cambridge Analytica.[41] This scandal was significant for inciting a public discussion on the ethical standards of data collection by social media companies, resulting in a call for greater consumer protection over users' right to privacy in online media and eventually leading to Facebook CEO Mark Zuckerberg's testimony before Congress.[42]

88.    The $5 billion fine is 200 times the size of the previous record 2012 FTC fine, but given that Facebook reported nearly $56 billion in revenue in 2018, critics say the measure is merely a wrist-slap. Indeed, "[t]he reported $5 billion penalty is barely a tap on the wrist, not even a slap," according to Sen. Richard Blumenthal (D-Conn.) in a media statement.[43]

### K.    The FTC's Commitment to Ensure that Companies Are Truthful and Refrain from Engaging in Deceptive or Unfair Conduct When It Comes to Tracking Consumers.

89.    In releasing for public comment proposed principles (the "Principles") designed to serve as the basis for industry self-regulatory efforts to address privacy concerns in the area of data collected for behavioral advertising, the FTC observed that "with the development of new and more sophisticated technologies, it likely will become easier to identify an individual

---

[40] *Id.*

[41] Cecilia Kang & Sheera Frenkel, *Facebook Says Cambridge Analytica Harvested Data of Up to 87 Million Users*, The New York Times (April 4, 2018), https://www.nytimes.com/2018/04/04/technology/mark-zuckerberg-testify-congress.html (last visited September 27, 2019).

[42] *See id.*

[43] Tara Seals, *Privacy Experts: Facebook's $5B Fine Unlikely to Do Much* (July 15, 2019), https://threatpost.com/privacy-experts-facebooks-5b-fine/146478/ (last visited September 27, 2019)

consumer based on information traditionally considered to be non-PII. For instance, although industry has traditionally considered most IP addresses to be non-PII, it soon may be possible to link more IP addresses to specific individuals." The FTC stated that the best approach is to include within the Principles' scope any data collected for online behavioral advertising that reasonably could be associated with a particular consumer or with a particular computer or device."[44]

90.     In its FTC Cross-Device Tracking Workshop, November 16, 2015, Edith Ramirez made it abundantly clear that "[n]o matter what the technology, [the FTC] [is] committed to ensuring that companies are truthful and refrain from engaging in deceptive or unfair conduct when it comes to tracking consumers."[45]

91.     Along these lines, the FTC has pursued numerous actions against companies under Section 5 of the FTC Act in connection with deceptive and/or unfair location tracking, including location tracking through IP addresses, and entered into consent decrees with these companies. *See*, *e.g.*, *In re Nomi Techs., Inc.*, No. C-4538, 2015 WL 5304114 (F.T.C. Aug. 28, 2015); *United States v. InMobi Pte Ltd.*, No. 3:16-cv-3474 (N.D. Cal. June 22, 2016); *In re Turn, Inc.*, No. 152-3099, 2016 WL 7448417 (F.T.C. Dec. 14, 2016); and *FTC v. VIZIO, Inc.*, No. 2:17-cv-00758 (D.N.J. Feb. 6, 2017).

### 1.     *In re Nomi Techs., Inc.*

92.     In its enforcement action against Nomi Techs., Inc., the FTC alleged that Nomi used, among other things, the stores' Wi-Fi routers and Wi-Fi signal strength to track customers' activity which Nomi collected and analyzed to provide aggregate analytics to the participating retail store clients. The complaint alleged that Nomi's business practices were deceptive because Nomi's technology tracked devices across retail locations and over time without the device

---

[44] FTC Staff Report: Self-Regulatory Principles for Online Behavioral Advertising at 20-25 (Feb. 2009), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-staff-report-self-regulatory-principles-online-behavioral-advertising/p085400behavadreport.pdf (last visited September 27, 2019) [hereinafter Self-Regulatory Principles].

[45] FTC Cross-Device Tracking Workshop (Nov. 16, 2015), https://www.ftc.gov/system/files/documents/videos/cross-device-tracking-part-1/ftc_cross-device_tracking_workshop_-_transcript_segment_1.pdf (last visited September 27, 2019).

1   owner receiving notice or providing consent. The FTC settled the case with Nomi. *See, e.g.,*

2   Decision and Order, *In re Nomi Techs., Inc.*, No. C-4538, 2015 WL 5304114, at *4 (F.T.C. Aug.

3   28, 2015) (ordering Nomi not to "misrepresent in any manner" customers' notice and choices).

4        **2.    *InMobi Pte Ltd.***

5        93.    In its enforcement action against InMobi Pte Ltd., the FTC alleged that InMobi

6   marketed a software development kit ("SDK") that could be integrated into mobile applications

7   to enable the delivery of advertisements within the mobile app environment. A developer looking

8   to monetize a new app could incorporate this SDK into its app to deliver ads to app users. The

9   InMobi SDK enabled ads to target consumers based on geolocation data. Unless disabled, the

10  InMobi SDK would access the device's geolocation application programming interface

11  ("Geolocation API") and use that data to target ads delivered through the InMobi

12  SDK. Consistent with requirements by both Android and iOS, after installing apps with the

13  InMobi SDK embedded, device users were prompted to grant the app access to the Geolocation

14  API. By disabling the Geolocation API, neither the Android nor iOS device would make

15  geolocation data available to the InMobi SDK.

16       94.    However, the InMobi SDK also collected data about the Wi-Fi networks to which

17  the devices were connected. For users who did not disable the Geolocation API, InMobi

18  simultaneously collected both latitude and longitude through the Geolocation API *and* details

19  about the Wi-Fi network to which each device was connected at that moment. With these two

20  data sets, InMobi was able to populate a database that mapped each Wi-Fi network to the latitude

21  and longitude that the Geolocation API delivered. Consequently, the locations of app users *who*

22  had disabled access to the Geolocation API could nevertheless be pinpointed by merely looking

23  up the location of the Wi-Fi network they were using. InMobi targeted ads to users based on the

24  location they derived through this Wi-Fi network lookup process. The FTC's complaint alleged

25  that InMobi's practices were deceptive because InMobi tracked geolocation without the device

26  owner's actual notice or consent.

27       95.    As a result of the FTC enforcement action, InMobi agreed to pay $950,000 in

28  civil penalties and to implement a comprehensive privacy program which included a prohibition

against collecting consumers' location information without their affirmative express consent as well as requirements that InMobi honor consumers' location privacy settings and for the program to be independently audited every two years for the next 20 years.[46]  InMobi was further required to delete all of the consumers' location information that it had collected without their consent and was prohibited from further misrepresenting its privacy practices.[47]

### 3. *Turn, Inc.*

96.    In its enforcement action against Turn, Inc., the FTC alleged that Turn offered a digital marketing platform ("DMP") designed to allow advertisers to target consumers across devices. The DMP used various identifiers and techniques to try to connect user activity across the Internet and across devices to personalize the advertising delivered to particular users, including cookies and device advertising identifiers. Turn also collected another type of identifier called a Unique Identifier Header ("UIHD") from those using the Verizon Wireless network. The UIHD encoded web traffic by Verizon Wireless network users and allegedly mapped its UIHD data to device advertising identifiers and cookies. Thus, if a user of the Verizon Wireless network attempted to stop efforts to track cross-device activity by deleting cookies and resetting device advertising identifiers, Turn could read the UIHD on later device activity and know which cookies to replace in the user's browsers and connect the reset device advertising identifier to the existing profile.

97.    The FTC alleged that Turn voluntarily posted privacy guidelines which provided that users could opt-out of tracking by opting out of accepting cookies. The Complaint alleged that this was deceptive because doing so would not ultimately disable tracking for those using the Verizon Wireless network. The enforcement action was settled, and Turn entered into a consent order with the FTC, whereby Turn was ordered not to misrepresent the extent to which it collected, used, disclosed, retained, or shared Covered Information. Covered Information, in

---

[46] *Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission*, FTC (June 22, 2016), https://www.ftc.gov/news-events/press-releases/2016/06/mobile-advertising-network-inmobi-settles-ftc-charges-it-tracked (last visited September 27, 2019).

[47] *Id.*

turn, included, among other things, an IP address. Agreement Containing Consent Order, *In re Turn Inc.*, No. 152-3099, 2016 WL 7448417 (F.T.C. Dec. 20, 2016).

### 4.   *FTC v. VIZIO, Inc.*

98.     On February 6, 2017, acting jointly with the New Jersey Attorney General, the FTC filed its privacy enforcement case against Smart TV manufacturer VIZIO, Inc. The Complaint alleged that VIZIO paired viewing data with device IP addresses, and that IP addresses were sometimes used to (1) enhance data with demographic information to allow for richer analysis, and (2) match TVs to other devices for ad retargeting and other analytical purposes. Count 1 of the Complaint alleged a cause of action under Section 5 unfairness for "unfair tracking." This allegation showed that an IP address can be treated as personally-identifiable or that, at the very least, the data associated with IP addresses is still in need of privacy protections even if it is not directly personally-identifiable. The case resulted in a Stipulated Order in which VIZIO agreed to a new set of notice-and-choice ground rules for the collection and use of information relating to television viewing content. Stipulated Order at 4, *VIZIO*, No. 2:17-cv-00758 (D.N.J. Feb. 14, 2017).

## CLASS ALLEGATIONS

99.     Pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs, individually and on behalf of all others similarly situated, bring this lawsuit on behalf of themselves and as a class action on behalf of the following Class:

> **Nationwide Class**: All natural persons residing in the United States who were users of Facebook prior to April 19, 2018 who did not give Facebook permission to collect and use their location information, but whose location information was nevertheless collected by Facebook from their IP Addresses and used for advertising purposes.

100.     Excluded from the Class is Facebook and any entities in which Facebook or its subsidiaries or affiliates have a controlling interest, as well as Facebook's officers, agents, and employees. Also excluded from the Class are the judge assigned to this action, members of the judge's staff, and any member of the judge's immediate family.  Plaintiffs reserve the right to

amend the definitions of the Class if discovery and further investigation reveal that they should be expanded or otherwise modified.

101.   **Numerosity**: The members of the Class are so numerous that joinder of all members of the Class would be impracticable. Plaintiffs reasonably believe that Class members number hundreds of thousands of people or more in the aggregate.  As of 2018, Facebook had approximately 169.5 million users in the U.S., more than half of the U.S. population.[48] The names and addresses of Class members are identifiable through documents maintained by Facebook.

102.   **Commonality and Predominance**: This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

    a.   Whether Facebook represented that it would not collect, store, use, and exploit location information from Plaintiffs' and Class members' IP addresses if they did not give Facebook permission to do;

    b.   Whether Facebook violated its Effective Privacy Policy by collecting, storing, and using for targeted advertising purposes Plaintiffs' and Class members' location information derived from their IP addresses after the location services and location history settings were turned off on their respective devices;

    c.   Whether Facebook violated the terms of its SRR by collecting, storing, and using for targeted advertising purposes Plaintiffs' and Class members' location information derived from their IP addresses after the location services and location history settings were turned off on their respective devices;

    d.   Whether Facebook breached its terms of service by collecting and exploiting for its own gain Plaintiffs' and Class members' location data through IP addresses without their permission;

---

[48] Rimma Kats, *Who Is Using Facebook in the US?*, eMarketer (Oct. 23, 2018), https://www.emarketer.com/content/the-social-series-who-s-using-facebook (last visited September 27, 2019).

e.      Whether Facebook intentionally intruded on and into Plaintiffs' and the other Class members' solitude, seclusion, or private affairs by the conduct alleged herein;

f.      Whether Facebook was unjustly enriched by the conduct alleged herein;

g.      Whether Facebook, in engaging in the conduct alleged herein, made negligent or intentional misrepresentations and/or omissions to Plaintiffs and the other Class members;

h.      Whether Facebook's alleged misconduct amounts to egregious breaches of social norms; and

i.      Whether Facebook intentionally violated the privacy rights of Plaintiffs and Class members by the conduct alleged herein.

103.   Facebook engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the Class members.  Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous common questions that dominate this action.

104.   As further indication of the common questions of law, Facebook's terms of service require users to agree that the laws of California, excluding California's choice of law rules, will apply to any disputes between users and Facebook.

105.   **Typicality**: Plaintiffs' claims are typical of the claims of the other Class members because Plaintiffs and Class members were injured through the substantially uniform misconduct by Facebook.  Plaintiffs are advancing the same claims on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiffs.  The claims of Plaintiffs and those of other Class members arise from the same operative facts and are based on the same legal theories.

106.   **Adequacy of Representation**: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class members they seek to represent; they have retained counsel competent and experienced in complex class action

1 litigation; and they will prosecute this action vigorously. The interests of Class members will be

2 fairly and adequately protected by Plaintiffs and their counsel.

3      107. **Superiority**: A class action is superior to any other available means for the fair

4 and efficient adjudication of this controversy, and no unusual difficulties are likely to be

5 encountered in the management of this matter as a class action.  The damages, harm, or other

6 financial detriment suffered individually by Plaintiffs and the other Class members are relatively

7 small compared to the burden and expense that would be required to litigate their claims on an

8 individual basis against Facebook, making it impracticable for Class members to individually

9 seek redress for Facebook's wrongful conduct.  Even if Class members could afford individual

10 litigation, the court system could not.  Individualized litigation would create a potential for

11 inconsistent or contradictory judgments and increase the delay and expense to all parties and the

12 court system.  By contrast, the class action device presents far fewer management difficulties and

13 provides the benefits of single adjudication, economies of scale, and comprehensive supervision

14 by a single court.

### CLAIMS ALLEGED ON BEHALF OF ALL CLASSES

**First Claim for Relief**
**(Violation of Article I, Section 1 of the California Constitution)**

18      108. Plaintiffs hereby repeat, reallege, and incorporate by reference each and every

19 allegation contained above as though the same were fully set forth herein.

20      109. Plaintiffs assert this Claim individually and on behalf of the Class.

21      110. Facebook's terms of service provide that the laws of California will apply to any

22 disputes between Facebook and its users, including Plaintiffs and Class members.

23      111. The California Constitution expressly provides for a right to privacy: "All people

24 are by nature free and independent and have inalienable rights. Among these are enjoying and

25 defending life and liberty, acquiring, possessing, and protecting property, and pursuing and

26 obtaining safety, happiness, and privacy." Cal. Const., art. I, § 1.

112.   Plaintiffs and the other Class members have a legally protected privacy interest in their data and their personal information which Facebook collects, stores, and monetizes for targeted advertising purposes.

113.   Plaintiffs and the other Class members have reasonable expectations of privacy in their location data and their personal information which Facebook collects, stores, and monetizes for targeted advertising purposes.

114.   Facebook represented in the Effective Privacy Policy that it would not collect location information, including location information derived from IP addresses, without user permission.

115.   Facebook also represented in its SRR that privacy was very important to Facebook and encouraged users to read the data policy to make informed decisions regarding how Facebook could collect and use their content and information.

116.   In its SRR, Facebook also represented to users that they could control how their information was shared through their privacy and application settings.

117.   Plaintiffs and the other Class members reasonably expected that Facebook would not collect and store their location information, including location information derived from their IP addresses, without their permission and contrary to Facebook's representations in the Effective Privacy Policy and SRR.

118.   Plaintiffs and the other Class members also reasonably expected that Facebook would not then enhance their location information which Facebook improperly collected and stored, bundle this location information with their other personal information, and sell the bundled information to third parties for targeted advertising purposes.

119.   Plaintiffs and the Class members have a privacy interest in preventing the unauthorized collection and misuse of their location information bundled with their other personal information and sold for targeted advertising purposes.

120.   Plaintiffs and the Class members have a privacy interest in the conduct of their personal activities and private affairs without intrusion or interference, including the right to not be monitored by the surreptitious tracking of their location without their permission, and not to

have their location information and other personal information collected, bundled with their other personal information and sold for targeted advertising purposes, at the expense of their own interests. Their private affairs include their behavior on their devices as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by location tracking.

121.    Contrary to Plaintiffs' device settings selections, and contrary to Facebook's SRR and Effective Privacy Policy, Facebook intentionally violated the privacy interests of Plaintiffs and the Class members by tracking their locations, without their permission, using their IP addresses and enhanced location determination techniques, and collecting and storing this information. Facebook bundled this location information with Plaintiffs' other personal information obtained from, *inter alia*, Facebook pages, browsing history and "likes." Facebook then sold these bundled packages containing Plaintiffs' personal information to third parties for targeted advertising purposes, thus enriching itself to the tune of hundreds of millions of dollars from increased advertising revenue at the expense of Plaintiffs' and Facebook's other users' privacy rights while subjecting Plaintiffs and other Class members to unwanted targeted advertising.

122.    Facebook's violation of Plaintiffs' and the Class members' privacy interest were a serious invasion, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

123.    Not only did Facebook intrude upon and disclose a vast array of location information bundled with personal information regarding Plaintiffs and the Class members, Facebook did so in contravention of Plaintiffs' and Class members' express election that it not do so.

124.    Facebook's conduct is especially offensive and egregious, in that Facebook misrepresented its practices and policies regarding its collection and use of such data, and omitted material information concerning Plaintiffs' and Class members' ability to control Facebook's collection and use of their location information through privacy settings.

125.    In this regard, Facebook not only committed privacy violations, but also affirmatively misled Plaintiffs and Class members into believing that they could control what location information Facebook could collect, that Facebook would not enhance the location information it improperly collected, that Facebook would not bundle the location information with Plaintiffs' and the Class members' other personal information, that Facebook would not sell this personal information to third parties in connection with targeted advertising, and that Facebook would respect and safeguard their choices regarding privacy. Moreover, Facebook violated the privacy interests of Plaintiffs and the Class members for its own commercial benefit – to increase its growth and to attract and obtain advertising revenue.

126.    Moreover, these intrusions are highly offensive to a reasonable person because they disclosed sensitive and confidential location tracking information, constituting an egregious breach of social norms.  This is evidenced by, *inter alia*, Supreme Court precedent (most recently and forcefully articulated in the *Carpenter v. United States,* 138 S. Ct. 2206 (2018) opinion), legislation enacted by Congress, rules promulgated and enforcement actions undertaken by the FTC, and countless studies, op-eds, and articles decrying unauthorized location tracking. Further, the extent of the intrusion cannot be fully known, as the nature of privacy invasion involves sharing Plaintiffs' and the other Class members' location information with potentially countless third-parties, known and unknown, for undisclosed and potentially unknowable purposes, in perpetuity.

127.    Facebook was aware that Plaintiffs and the Class members were vulnerable to having their location information and other personal information collected and misused, and Facebook intended for these privacy violations to occur without Plaintiffs' and the Class members' knowledge or consent. Had Plaintiffs and the other Class members known the manner and extent to which Facebook allowed their location information to be collected and misused by Facebook, Plaintiffs and the other Class members would not have used Facebook to the same extent they did, if at all.

128.    Plaintiffs and the Class members did not consent to Facebook's violations of their privacy interest.

129.   Plaintiffs and the other Class members were harmed by the intrusion into their private affairs as detailed herein.

130.   Facebook's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and the other Class members.

131.   Plaintiffs and the Class members seek appropriate relief for these injuries including, but not limited to, damages that will reasonably compensate Plaintiffs and the Class members for the harm to their privacy interest, risk of future invasions of privacy, and the mental emotional distress caused by Facebook's invasions of privacy, as well as disgorgement of profits made by Facebook as a result of its privacy violations. Plaintiffs and the other Class members also seek punitive damages to deter Facebook from engaging in future misconduct because Facebook's actions were malicious, oppressive, and willful and calculated to injure Plaintiffs and the other Class members and done in conscious disregard of their rights and wishes.

**<u>Second Claim for Relief</u>**
**(Intrusion Upon Seclusion)**

132.   Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

133.   Plaintiffs and the other Class members have reasonable expectations of privacy in their location data and their personal information which Facebook collects, stores, and monetizes for targeted advertising purposes.

134.   Facebook intentionally intruded on and into Plaintiffs' and the other Class members' solitude, seclusion, or private affairs by intentionally tracking their locations, without their permission, using their IP addresses and enhanced location determination techniques; and collecting and storing this information. Facebook bundled this location information with Plaintiffs' other personal information obtained from, *inter alia*, Facebook pages, browsing history and "likes." Facebook then sold these bundled packages containing Plaintiffs' personal information to third parties for targeted advertising purposes, thus enriching itself to the tune of hundreds of millions of dollars from increased advertising revenue at the expense of Plaintiffs'

and Facebook's other users' privacy rights while subjecting Plaintiffs and other Class members to unwanted targeted advertising.

135.    These intrusions are highly offensive to a reasonable person and constitute an egregious breach of social norms. This is evidenced by, *inter alia*, Supreme Court precedent (most recently and forcefully articulated in *Carpenter*, legislation enacted by Congress, rules promulgated and enforcement actions undertaken by the FTC, and countless studies, op-eds, and articles decrying location tracking.  Moreover, Facebook engaged in true tracking of location information deceptively and in direct contradiction of the express instructions of Plaintiffs and the other Class members, contrary to Plaintiffs' device settings selections, and contrary to Facebook's SRR and Effective Privacy Policy. Also supporting the highly offensive nature of Facebook's conduct is the fact that their principal goal was to surreptitiously monitor Plaintiffs and the other Class members and to allow third-parties to do the same.

136.    Plaintiffs and the other Class members were harmed by the intrusion into their private affairs as detailed herein.

137.    Facebook's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and the other Class members.

138.    As a result of Facebook's actions, Plaintiffs and the other Class members seek damages and punitive damages in an amount to be determined at trial.  They seek punitive damages because Facebook's actions – which were malicious, oppressive, and willful – were calculated to injure Plaintiffs and the other Class members and made in conscious disregard of their rights and wishes.  Punitive damages are warranted to deter Facebook from engaging in future misconduct.

**Third Claim for Relief**
**(Intentional Misrepresentation and Omission)**

139.    Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

140.    The Facebook App represented to users that they could control, through Facebook's privacy and application settings, the types of location information Facebook could

collect from them and use. Specifically, Facebook users using Facebook's mobile app installed on their mobile devices could turn off location service by opening their Facebook App, opening settings, opening account settings, opening location, opening location services, toggling Facebook and toggling "permissions" off. The Facebook App disclosures were false and misleading because they did not inform users that Facebook would continue to track their location through collection of IP addresses even if the location information permission in the App was turned off.

141.    Facebook's Effective Privacy Policy and SRR also was false and misleading. In its SRR, Facebook represented to users that they could control how their information was shared through their privacy and application settings, but failed to disclose to Plaintiffs and other Class members that Facebook would continue to collect location information from IP addresses even if the location information permission in the App was turned off.

142.    Facebook's statements that it would not collect and use Plaintiffs' and Class members' location information, including location information derived from IP addresses, and Facebook's statements that Plaintiffs and Class members could control how their information was shared through their privacy and application settings was false because Facebook knowingly and intentionally tracked their locations, without their permission, using their IP addresses and enhanced location determination techniques, and collected and stored this information. Facebook concealed that it would then bundle this location information with Plaintiffs' other personal information obtained from, *inter alia*, Facebook pages, browsing history and "likes." Facebook also concealed that it would sell these bundled packages containing Plaintiffs' personal information to third parties for targeted advertising purposes, thus enriching itself to the tune of hundreds of millions of dollars from increased advertising revenue at the expense of Plaintiffs' and Facebook's other users' privacy rights while subjecting Plaintiffs and other Class members to unwanted targeted advertising.

143.    Facebook's App settings concealed from Plaintiffs and Class members that even if their location settings and location history settings were turned off in their respective devices, Facebook would nevertheless track their locations, without their permission, using their IP

addresses and enhanced location determination techniques, and collect and store this information. Facebook's App settings concealed that it would then bundle this location information with Plaintiffs' other personal information obtained from, *inter alia*, Facebook pages, browsing history and "likes." Facebook's App settings also concealed that Facebook would sell these bundled packages containing Plaintiffs' personal information to third parties for targeted advertising purposes, thus enriching itself to the tune of hundreds of millions of dollars from increased advertising revenue at the expense of Plaintiffs' and Facebook's other users' privacy rights.

144.    Facebook's misrepresentations and omissions were made intentionally knowing they would create a false impression for Facebook users, including Plaintiffs and Class members, regarding their ability to control access to their location information.

145.    Facebook knew its misrepresentations and omissions were material. Facebook acknowledged in its SRR that privacy was very important to Facebook and encouraged users to read the data policy to make informed decisions regarding how Facebook could collect and use their content and information.

146.    Plaintiffs and the Class members justifiably relied on Facebook's omissions in its App settings and/or its Effective Privacy Policy and SRR and acted in reliance on those omissions by connecting to Facebook using the Facebook App.

147.    Plaintiffs and Class members suffered injury-in-fact and lost property as a proximate result of Facebook's intentional misrepresentations and omissions.

148.    As a direct and proximate result of Facebook's intentional misrepresentations and omissions, Plaintiffs and Class members suffered injuries, damages, losses and harm, including, but not limited to, annoyance, interference, concern, lost time, and the loss of personal property, justifying an award of compensatory general damages, special damages, and punitive damages.

**Fourth Claim for Relief**
**(Deceit by Concealment or Omission Cal. Civ. Code §§ 1709 & 1710)**

149.    Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

150.    Under California law, a plaintiff may assert a claim for deceit by concealment based on "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." Cal. Civ. Code § 1710(3).

151.    Facebook has committed "deceit" under Cal. Civ.Code § 1710 because Facebook suppressed facts in its app settings, its Effective Privacy Policy and its SRR that it was duty-bound to disclose, namely that Facebook would collect, store and sell Plaintiffs' and Class members' location data through IP addresses even if Plaintiffs' and Class members toggled "permissions" off in the Facebook App privacy and location settings. Facebook further committed deceit by concealment by failing to disclose in its App settings, its Effective Privacy Policy and its SRR that Facebook would then bundle this location information with Plaintiffs' and Class members' other personal information and sell these bundled packages containing Plaintiffs' and Class members' personal information to third parties for targeted advertising purposes, thus enriching itself to the tune of hundreds of millions of dollars from increased advertising revenue at the expense of Plaintiffs' and Class members' and other users' privacy rights while subjecting Plaintiffs and other Class members to unwanted targeted advertising.

152.    Facebook had a duty to disclose the full extent to which it collected and sold Plaintiffs' location data to targeted advertisers and marketers because it promised in its contracts that it would not share users' content and information with advertisers without their consent. Facebook's duty also arose from its affirmative representations that (1) Plaintiffs could control their content and information, and (2) third parties could not access personal data absent users' consent.

153.    Facebook intentionally concealed and omitted material information regarding how it would collect, store and sell Plaintiffs' and Class members' location information derived from IP addresses in an effort to create a false sense of security and privacy for Plaintiffs. Facebook did this because they wanted Plaintiffs and Class members to provide more detailed content and information, whose value would be increased by that additional detail when combined with the

location information derived from their IP addresses. Third parties would thereby pay a higher price for access to that content and information, increasing Facebook's revenue.

154.    Had Plaintiffs and Class members been aware of the full extent of how Facebook collected and used their location information derived from IP addresses and how Facebook bundled this information with their other personal information and monetized this information through targeted advertising, they would not have used Facebook or shared their content and information on their devices on the Facebook platform.

155.    Plaintiffs suffered injury as a direct result of Facebook's deceit. Plaintiffs conferred a benefit on Facebook. Their information and content were used and aggregated by Facebook and by advertisers without their consent, and Facebook received substantial advertising revenues as a benefit. Had Plaintiffs known the extent and degree to which their location information derived from their IP addresses and bundled with their other personal information was provided to third parties, they would have required compensation for this use of their content and information.

156.    Plaintiffs suffered economic injury as a result of Facebook's fraud. Plaintiffs have an economic interest in their location information derived from IP addresses bundled with their other personal information, which has value outside of the Facebook platform.

157.    As a result, Facebook has been unjustly enriched by its deceit, and Plaintiffs and Class members are entitled to disgorgement.

158.    For all types of fraudulent omissions complained of here, Plaintiffs seek damages, including disgorgement of Facebook's profits that were made with the use of Plaintiffs' and Class members' location information derived from IP addresses bundled with their other personal information and monetized for targeted advertising purposes. Disgorgement is appropriate because Facebook profited from Plaintiffs' location information derived from IP addresses bundled with their other personal information and monetized for targeted advertising purposes wrongfully. Disgorgement is necessary in order to deter future unauthorized use of Plaintiffs' and Class members' location information bundled with their other personal information. Disgorgement is also necessary to the extent that the value of Plaintiffs' and Class

members' location information bundled with their other personal information cannot be assessed by ordinary tort damages. Public policy supports the use of disgorgement here to disincentivize the type of deception that Facebook used in exploiting Plaintiffs' location information bundled with their other personal information.

## Fifth Claim for Relief
### (Breach of Contract)

159.    Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

160.    At all relevant times, Facebook and Plaintiffs and the Class members mutually assented to, and therefore were bound by, the version of Facebook's SRR and Effective Privacy Policy that was operative during the Class Period. Throughout the Class Period, Facebook represented to users in its SRR that their privacy was very important to Facebook and encouraged users to read the data policy to make informed decisions regarding how Facebook could collect and use their content and information.

161.    Throughout the class period, Facebook represented to users that they could control how their information was shared through their privacy and application settings.

162.    Throughout the Class Period, Facebook affirmatively represented in its Effective Privacy Policy that it would not collect location information, including location information from IP addresses, without permission.

163.    The contracts did not authorize Facebook to collect, store and use their location information derived from IP addresses, bundle this information with their other personal information, and monetize this information through targeted advertising.

164.    During the Class Period, Facebook failed to honor its promise to respect users' privacy settings and not to collect, store and sell Plaintiffs' and Class members' location data derived from their IP addresses for targeted advertising.

165.    Plaintiffs' and Class members' location information derived from their IP addresses and bundled with their other personal information is of considerable value as

demonstrated by Facebook's calculation of the average revenue per user. There is an active market for the content and information generated by Facebook users, both individually and especially in the aggregate. Facebook generates billions of dollars in revenues to targeted advertising, curated to the collection and aggregation of Facebook's user data, including location information derived from IP addresses. On information and belief, there is also an active black market for user location information derived from IP addresses bundled with other personal information.

166.    As a result of the breach, Plaintiffs and Class members have been harmed and suffered damages by losing the value of their content and information.

## Sixth Claim for Relief
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

167.    Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

168.    Under California law, there is in every contract or agreement an implied promise of good faith and fair dealing. Such a duty is read into contracts and functions as a supplement to the express contractual covenants, in order to prevent a transgressing party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefit of the contract. Thus any claim on the part of Facebook that technically it was permitted to collect, store and use for targeted advertising purposes Plaintiffs' location information derived from their IP addresses and bundled with their other personal information, must be read in the context of, and give way to, those users' rights to the benefit of the contract, including the terms strictly delimiting such activity.

169.    Facebook entered into a contract, the SRR, with Plaintiffs and Class members.

170.    A covenant of good faith and fair dealing attaches to Facebook's SRR contract with Plaintiffs and Class members.

171.     In its SRR, Facebook promised Plaintiffs that their privacy was very important to Facebook and encouraged users to read the data policy to make informed decisions regarding how Facebook could collect and use their content and information.

172.     In its SRR, Facebook promised Plaintiffs that they could control how their information was shared through their privacy and application settings.

173.     In its Effective Privacy Policy, Facebook promised that it would not collect and use Plaintiffs' location data derived from their IP addresses without their authorization.

174.     Plaintiffs did all they were required to do under these contractual provisions.

175.     Under the terms of the SRR, Plaintiffs were entitled to receive the benefits promised to them by Facebook, including that Facebook would not, without Plaintiffs' permission, collect, store and use Plaintiffs' location data derived from their IP addresses, bundle this location information with their other personal information, and monetize this bundled information for targeted advertising purposes.

176.     Facebook surreptitiously collected, stored and used Plaintiffs' location information derived from their IP addresses, bundled this location information with Plaintiffs' other personal information, and sold these bundled packages for targeted advertising purposes.

177.     Facebook engaged in the foregoing conduct without regard to Plaintiffs' privacy settings and in violation of its own Effective Privacy Policy.

178.     By engaging in the foregoing conduct, Facebook deprived Plaintiffs of the benefits of their agreements.

179.     As set forth therein, Plaintiffs' and Class members' location information derived from their IP addresses and bundled with their other personal information is of considerable value as demonstrated by Facebook's calculation of the average revenue per user that calculates. There is an active market for the content and information generated by Facebook users, both individually and especially in the aggregate. Facebook generates billions of dollars in revenues to targeted advertising, curated to the collection and aggregation of Facebook's user data, including location information derived from IP addresses. On information and belief, there is also an active

black market for user location information derived from IP addresses bundled with other personal information.

180.   As a result of the breach of the covenant of good faith and fair dealing, Plaintiffs and Class members have been harmed and suffered damages by losing the value of their content and information.

### Seventh Claim for Relief
### (Negligent Misrepresentation)

181.   Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

182.   Plaintiffs assert this claim individually and on behalf of the Class members under California law.

183.   Facebook negligently represented and/or negligently omitted material facts regarding its collection of location information derived from IP addresses, and specifically that Facebook would not collect, store and use such information for targeted advertising purposes without user authorization.

184.   As alleged herein, in its SRR, Facebook repeatedly assured Plaintiffs and Class members that their privacy was very important to Facebook and encouraged users to read the data policy to make informed decisions regarding how Facebook could collect and use their content and information.

185.   Throughout the class period, Facebook represented to users that they could control how their information was shared through their privacy and application settings.

186.   Throughout the Class Period, Facebook affirmatively represented in its Effective Privacy Policy that it would not collect location information, including location information from IP addresses, without permission.

187.   At the time Facebook made these representations, it knew or should have known if these representations were false.

188.   Facebook made the representations without knowledge of their truth or veracity. At a minimum, Facebook negligently misrepresented and/or negligently omitted material facts concerning its commitment to privacy.

189.   The negligent misrepresentations and omissions made by Facebook were intended to induce reliance by Plaintiffs and Class members, who reasonably and justifiably relied on the misrepresentations.

190.   As a result of Facebook's negligent misrepresentations and omissions, Plaintiffs and the Class members have suffered damages in an amount to be proven at trial.

**Eighth Claim for Relief**
**(Unjust Enrichment)**

191.   Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

192.   Facebook's terms of service provide that the laws of California will apply to any disputes between users, including Plaintiffs and Class members, and Facebook.

193.   Plaintiffs bring this claim for unjust enrichment (alternative to its breach of contract claim) against Facebook as a quasi-contractual claim seeking disgorgement. California law permits a standalone claim for unjust enrichment, allowing the court to construe the cause of action as a quasi-contract claim. *E.g., Astiana v. Hain Celestial Group, Inc.,* 783 F.3d 753, 756 (9th Cir. 2015).

194.   By collecting, storing and using for targeted advertising Plaintiffs' and Class members' location information derived from their IP addresses and bundled with their other personal information, without their permission and contrary to their App settings, Facebook was unjustly enriched at the expense of Plaintiffs and the Class members. It would be inequitable and unconscionable for Facebook to retain the profit, benefit, and other compensation it obtained from using Plaintiffs' and Class members' location data derived from their IP addresses and bundled with their other personal information for targeted advertising purposes.

195.   Plaintiffs and the Class members seek an order from this Court requiring Facebook to disgorge all proceeds, profits, benefits, and other compensation obtained by

1 | Facebook from its improper and unlawful collection, storage and use of their location information

2 | bundled with their other personal information for targeted advertising purposes.

3 | 196. In the alternative, Plaintiffs and the Class members seek compensatory damages

4 | in the form of the commercial value of the data Facebook improperly collected, stored and used,

5 | which can be reasonably ascertained using documents maintained by Facebook.

6 | **PRAYER FOR RELIEF**

7 | WHEREFORE, Plaintiffs, individually and on behalf of the other Class members,

8 | respectfully request that this Court enter an Order:

9 | A. Certifying the Class and appointing Plaintiffs as Class Representatives;;

10 | B. Appointing Franklin D. Azar & Associates as Class counsel;

11 | C. Awarding monetary damages including, but not limited to, compensatory,

12 | incidental and consequential damages commensurate with proof at trial for the acts

13 | complained of herein;

14 | D. Awarding punitive damages in an amount consistent with applicable statutes and

15 | precedent for those causes of action that permit such recovery;

16 | E. For equitable relief requiring disgorgement of the revenues retained as a result of

17 | Facebook's wrongful conduct;

18 | F. Appropriate declaratory relief against Facebook;

19 | G. Awarding attorneys' fees, where applicable;

20 | H. Awarding costs;

21 | I. Awarding of pre- and post-judgment interest on any amounts awarded; and

22 | J. For any and all other relief, the Court deems just and appropriate.

23

24

25

26

27

28

1

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

DATED:  September 27, 2019                    Respectfully submitted,

                                              */s/ Paul R. Wood*
                                              Paul R. Wood (*pro hac vice*)
                                              Michael D. Murphy (*pro hac vice*)
                                              Franklin D. Azar & Associates, P.C.
                                              14426 E. Evans Avenue
                                              Aurora, CO  80014
                                              Telephone: 303-757-3300
                                              Facsimile:  720-213-5131
                                              Email:  ngoi@fdazar.com
                                              Email:  woodp@fdazar.com
                                              Email:  murphym@fdazar.com

                                              Ivy T. Ngo (249860)
                                              Franklin D. Azar & Associates, P.C.
                                              388 Fulton Avenue, Unit 502
                                              San Francisco, CA 94102
                                              Telephone:    (303) 757-3300
                                              Facsimile:    (720) 213-5131
                                              Email:        ngoi@fdazar.com

                                              *Counsel for Plaintiffs*

CASE NO.: 4:18-cv-06793-YGR
FIRST AMENDED CLASS ACTION COMPLAINT
47

1

## CERTIFICATE OF SERVICE

2      I, Paul R. Wood, hereby certify that on September 27, 2019, I authorized the electronic

3  filing of the foregoing, FIRST AMENDED CLASS ACTION COMPLAINT using the CM/ECF

4  system, which will send notification of such filing to the e-mail addresses denoted on the

5  Electronic Mail Notice List maintained by this Court.

6      I certify under penalty of perjury under the laws of the United States of America that the

7  foregoing is true and correct. Executed on September 27, 2019, at Aurora, Colorado

8

9

10                          By:     */s/ Paul R. Wood*
                                    Paul R. Wood
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28