FRANKLIN D. AZAR (*pro hac vice*)
azarf@fdazar.com
PAUL R. WOOD (*pro hac vice*)
woodp@fdazar.com
MICHAEL D. MURPHY (*pro hac vice*)
murphym@fdazar.com
FRANKLIN D. AZAR & ASSOCIATES, P.C.
14426 East Evans Avenue
Aurora, CO 80014
Telephone:    (303) 757-3300
Facsimile:    (720) 213-5131
Email:      azarf@fdazar.com
Email:      woodp@fdazar.com
Email:      murphym@fdazar.com

*Attorneys for Plaintiffs Brendan Lundy,
Elizabeth Childers, Michelle Agnitti, Robin
Hodge, William Jolly and the Proposed Class*

IVY T. NGO (SBN 249860)
ingo@rcfllp.com
ROCHE CYRULNIK FREEDMAN LLP
200 S Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 971-5943
Facsimile: (646) 392-8842

*Attorney for Plaintiff Myriah Watkins and the
Proposed Class*

BARRETT J. VAHLE (*pro hac vice*)
vahle@stuevesiegel.com
JILLIAN R. DENT (*pro hac vice*)
dent@stuevesiegel.com
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
Facsimile: (816) 714 7101

SABITA J. SONEJI (SBN 224262)
ssoneji@tzlegal.com
KATHERINE M. AIZPURU (*pro hac vice*)
kaizpuru@tzlegal.com
TYCKO & ZAVAREEI LLP
The Tower Building
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

*Attorneys for all Plaintiffs and the Proposed
Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BRENDAN LUNDY, AN INDIVIDUAL AND COLORADO RESIDENT, MYRIAH WATKINS, AN INDIVIDUAL AND COLORADO RESIDENT, ELIZABETH CHILDERS, AN INDIVIDUAL AND CALIFORNIA RESIDENT, MICHELLE AGNITTI, AN INDIVIDUAL AND SOUTH CAROLINA RESIDENT, ROBIN HODGE, AN INDIVIDUAL AND GEORGIA RESIDENT AND WILLIAM JOLLY, AN INDIVIDUAL AND TEXAS RESIDENT,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>　　　　Defendant. | Case No.: 4:18-cv-06793-JD<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>(1) Breach of Contract<br>(2) Breach of Implied Covenant of Good Faith and Fair Dealing<br>(3) Unjust Enrichment<br>(4) Intentional Misrepresentation and Omission<br>(5) Cal. Civ. Code §§ 1709, 1710 |

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

JURSIDICTION AND VENUE ............................................................................. 4

PARTIES ............................................................................................................. 4

    A.    Plaintiff Lundy ........................................................................................ 4

    B.    Plaintiff Watkins ..................................................................................... 6

    C.    Plaintiff Childers .................................................................................... 7

    D.    Plaintiff Agnitti ...................................................................................... 8

    E.    Plaintiff Hodge ....................................................................................... 9

    F.    Plaintiff Jolly ......................................................................................... 11

    G.    Defendant Facebook .............................................................................. 11

FACTUAL BACKGROUND ................................................................................. 12

    A.    Facebook's Effective Privacy Policy from January 30, 2015 to April 19, 2018 ........................................................................................................ 12

        1.    Facebook's SRR, effective January 30, 2015, informed users that they could control how Facebook collected and used their personal information by adjusting the Location Services setting on their devices ................................................................................. 12

        2.    Facebook's Data Policies in effect from January 30, 2015 to April 19, 2018, provided that Facebook would not collect location information, including location information derived from IP addresses, without user authorization. ..................................... 13

        3.    The SRR and its incorporated Data Policies constitute a contract under which Facebook promised that it would not collect and use location data derived from users' IP addresses without their authorization. ................................................................... 14

    B.    Facebook Adopted a Revised Privacy Policy on April 19, 2018 that Disclosed for the First Time that It Will Collect Location Information Derived from Users' IP addresses - Even Without User Permission.................... 16

    C.    Facebook's Privacy Settings Falsely Represented that Users Could Control Whether It Could Collect and Use Their Location Information, Including IP Addresses.................................................................................................. 17

D.    Facebook's Location History Setting Misleadingly Led Users to Believe that Facebook Was Not Collecting Their Location Information Via Their IP Addresses........................................................................................... 18

E.    Facebook Surreptitiously Collected and Stored Plaintiffs' and Class Members' Location Data Despite Its Representations to the Contrary. .............. 21

F.    Facebook Collected and Stored Plaintiffs' and Class Members' Location Data without Their Permission, Then Used Enhanced Location Tracking Methodologies to More Precisely Pinpoint Their Locations. ............................. 22

G.    Facebook Bundled the Location Information It Improperly Collected from Plaintiffs and Class Members with Their Other Personal Information and Monetized Those Bundles for Targeted Advertising........................................... 26

H.    Facebook Relies on the Sale of Targeted Advertising to Drive its Revenues ....................................................................................................... 30

I.    Facebook Has a Pattern of Disregarding Its Users' Privacy............................... 31

J.    The FTC's Commitment to Ensure that Companies Are Truthful and Refrain from Engaging in Deceptive or Unfair Conduct When It Comes to Tracking Consumers. ....................................................................................... 33

        1.    *In re Nomi Techs., Inc.*.............................................................. 34

        2.    *InMobi Pte Ltd.* ........................................................................ 35

        3.    *Turn, Inc.*................................................................................. 36

        4.    *FTC v. VIZIO, Inc.* ................................................................... 37

CLASS ALLEGATIONS .......................................................................................... 37

CLAIMS ALLEGED ON BEHALF OF THE CLASSES............................................. 40

    First Claim for Relief (Breach of Contract - on Behalf of Plaintiffs and the Nationwide Class).................................................................................... 40

    Second Claim for Relief (Breach of Implied Covenant of Good Faith and Fair Dealing - on Behalf of Plaintiffs and the Nationwide Class)................................ 44

    Third Claim for Relief (Unjust Enrichment - Pleaded in the Alternative on Behalf of Plaintiffs and the Nationwide Class) ................................................ 47

    Fourth Claim for Relief (Intentional Misrepresentation and Omission - on Behalf of Plaintiffs Agnitti, Hodge, and Jolly and the Nationwide Subclass) ................ 49

Fifth Claim for Relief (Deceit by Concealment or Omission Cal. Civ. Code §§ 1709 & 1710 - on Behalf of Plaintiffs Agnitti, Hodge, and Jolly and the Nationwide Subclass)................................................................................................. 53

PRAYER FOR RELIEF ............................................................................................... 56

JURY TRIAL DEMAND .............................................................................................. 57

Plaintiffs Brendan Lundy, Myriah Watkins, Elizabeth Childers, Michelle Agnitti, Robin Hodge, and William Jolly ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following against Defendant Facebook, Inc. ("Facebook"), based on personal knowledge as to Plaintiffs and Plaintiffs' own acts, and on information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through Plaintiffs' undersigned counsel.

## PRELIMINARY STATEMENT

1.      Facebook, in violation of its own Privacy Policy which was in effect between January 30, 2015 and April 18, 2018 (hereinafter "Effective Privacy Policy"), collected, stored and monetized for targeted advertising Plaintiffs' and Class Members' location data even after their Location Services settings were turned off on their devices to prevent Facebook from doing so.[1]

2.      Facebook's Effective Privacy Policy is comprised of Facebook's Statement of Rights and Responsibilities ("SRR"), effective January 30, 2015, and its Data Policies effective January 30, 2015 and September 29, 2016, respectively.[2]

3.      The SRR, a contract between Facebook and its users which outlines commitments to which users and Facebook must abide, provided that it was derived from the "Facebook principles" and constituted Facebook's terms of service governing its relationship with its users who interact with Facebook.

4.      In its SRR, Facebook represented to users that their privacy was very important to

---

[1] This complaint is brought on behalf of a Nationwide Class and a Nationwide Subclass. Unless otherwise specified, the term "Class members" refers to members of both classes.

[2] A copy of Facebook's SRR, effective January 30, 2015, is attached hereto as **Ex. 1**. *See* Wayback Machine, https://web.archiv.org/web/2020*http://facebook.com/terms.php (last visited Jan. 13, 2021). A copy of Facebook's Data Policy, effective January 30, 2015, is attached hereto as **Ex. 2.** *See* Wayback Machine, https://web.archiv.org/web/2020*http://facebook.com/about/privacy (last visited Jan. 13, 2021). A copy of Facebook's Data Policy, effective September 29, 2016, is attached hereto as **Ex. 3**. *See* Wayback Machine, https://web.archiv.org/web/2020*http://facebook.com/about/privacy (last visited Jan. 13, 2021).

Facebook and encouraged users to read the Data Policy to make informed decisions regarding how Facebook could collect and use their content and information:

1. **Privacy**

Your privacy is very important to us. We designed our Data Policy to make important disclosures about how you can use Facebook to share with others and how we collect and can use your content and information. We encourage you to read the Data Policy, and to use it to help you make informed decisions.

**Ex. 1**, at 1.

5.      As depicted in the preceding paragraph, the SRR incorporated Facebook's Data Policy, effective January 30, 2015, and later Facebook's Data Policy, effective September 29, 2016, and contained a hyperlink directly linking, and guiding the user to, the respective incorporated Data Policy.

6.      As alleged more fully herein, in both of its incorporated Data Policies, Facebook represented that it would not collect device information of any kind, including location data through IP addresses[3], unless a user expressly permitted Facebook to do so.[4]

7.      Notwithstanding its express promise and representation in its Effective Privacy Policy not to collect location data derived through users' IP addresses unless they expressly permitted Facebook to do so, Facebook collected their location data regardless of their consent.

8.      Plaintiffs and Class members did not give Facebook permission to collect or use their location information derived from their IP addresses and indeed, the Location Services setting on their smart phones or tablets (hereinafter "device") was set to prevent Facebook from doing so. Nevertheless, Facebook collected their IP addresses; identified their location through

---

[3] An IP address is a numerical label assigned to each device connected to a computer network that uses the Internet Protocol for communication. An IP address serves two main functions: host or network interface identification and location addressing. Anytime a person is connected to the internet, there is an IP address associated with that connection.

[4] The above-referenced representations made by Facebook in its SRR and Data Policy are set forth in detail herein and are referred to herein as Facebook's "Location Tracking Representations."

those IP addresses; further pinpointed their location using enhanced location determination techniques; bundled their location information with their other personal information obtained from, *inter alia*, Facebook pages, browsing history and "likes"; and monetized that information for targeted advertising.

9.      In addition to violating its own Effective Privacy Policy by representing that it would not collect users' location information without their authorization and then doing so anyway, Facebook misled Plaintiffs and Class members into believing that it would not collect location information without their authorization when the Location History setting, a setting on the Facebook App installed on their device, was turned off. Specifically, when the Location History setting was turned off, Plaintiffs' and Class members' respective Location History files showed that Facebook did not collect their location data. Thus, Plaintiffs and Class members reasonably understood that when the Location History setting was turned off, Facebook would not collect and use their location data in any form, including IP addresses. Facebook, however, collected their location data derived from their IP addresses even when Plaintiffs and Class members' Location History setting was turned off.

10.      By improperly collecting and monetizing Plaintiffs' and Class members' location data derived from their IP addresses in violation of its Effective Privacy Policy, Facebook enriched itself to the tune of hundreds of millions of dollars from increased advertising revenue at the expense of Plaintiffs' and Class members' privacy rights.

11.      Facebook's collection of Plaintiffs' and Class members' location data contrary to its own Effective Privacy Policy and in disregard of Plaintiffs' and Class members' privacy settings reflects the latest chapter in its campaign of deception regarding the collection and use of its users' personal information without their authorization for its own financial gain.

12.      Most recently, on July 24, 2019, the Federal Trade Commission ("FTC") levied a $5 billion fine against Facebook as part of a settlement involving its violation of consumers' privacy rights. The FTC charged that Facebook violated a 2012 FTC order by deceiving users about their ability to control the privacy of their personal information. In its Complaint, the FTC alleged that to encourage users to share information on its platform, Facebook promised users

they could control the privacy of their information through Facebook's privacy settings. However, through at least June 2018, Facebook subverted users' privacy choices to serve its own business interests. The FTC further alleged that Facebook repeatedly used deceptive disclosures and settings to undermine users' privacy preferences in violation of its 2012 FTC order.[5]

13.     Accordingly, Plaintiffs seek compensatory damages, disgorgement of Facebook's profits (or alternatively nominal damages), and statutory and punitive damages for Facebook's unauthorized collection and use of their location data derived from their IP addresses in violation of its Effective Privacy Policy.

## JURSIDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 proposed class members, and Facebook is a citizen of this state and at least one proposed class member is a citizen of a foreign state.

15.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Facebook is a corporation that resides in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in or emanated from this District, including the decisions made by Facebook's governance and management personnel that led to the invasions of privacy and breach of contract. Further, Facebook's terms of service governing users all over the world provide for venue in the Northern District of California for all claims arising out of Plaintiffs' relationships with Facebook.

## PARTIES

### A.  Plaintiff Lundy

16.     Plaintiff Brendan Lundy is, and at all relevant times was, a citizen of the State of Colorado. Since at least 2014 and continuously to the present, Plaintiff Lundy has owned and

---

[5] *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook*, FTC (July 24, 2019), https://www.ftc.gov/news-events/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions.

used an Apple iPhone, powered by iOS, with the Facebook App (available through the Apple App Store) downloaded onto the device.

17.     While using his device, Plaintiff Lundy's Location Services setting on his device and the Location History setting on his Facebook App was turned off. Lundy downloaded a copy of his Facebook account's "location_history" folder using Facebook's "Download Your Information" feature, which contained no data. Thus, Plaintiff Lundy reasonably assumed that Facebook had not collected, stored and used his location information consistent with his device and app settings.

18.     However, in November 2018, Lundy learned about a Facebook folder labeled "Security and Login Information" which contained a sub-folder entitled "Login Protection Data" and "Where You're Logged In." That folder, compiled by Facebook without Lundy's knowledge or permission, contained multiple entries identifying Lundy's location by IP address, latitude and longitude at specific dates and times from 2014 through the present. After discovering this voluminous location data folder detailing his location on specific dates and at specific times spanning years, Lundy felt that his privacy was significantly violated by the collection of location information without his consent.

19.     Plaintiff Lundy would not have used the Facebook App had he known that Facebook would collect his location information without his permission and in violation of Facebook's Effective Privacy Policy. Since learning in November 2018 that Facebook will continue tracking him regardless of whether he turns off Location Services and/or Location History, Plaintiff Lundy does not use Facebook when he does not want Facebook to know his location, including his location derived from his IP address.

20.     Plaintiff Lundy's location information, bundled with his other personal information, has diminished value now that Facebook has collected and monetized it for targeted advertising. On information and belief, the location information that Facebook improperly collected, bundled with Plaintiff Lundy's other personal information, and monetized for targeted advertising, has an established market value of at least approximately $0.05 per individual (per

bundle). Plaintiff Lundy did not grant Facebook permission to collect and monetize his location information for targeted advertising.

**B. Plaintiff Watkins**

21.    Plaintiff Myriah Watkins is, and at all relevant times was, a citizen of the State of Colorado. Since at least 2013 and continuously to the present, Plaintiff Watkins has owned and used various mobile devices powered by Android's operating system, developed by Google, with the third-party Facebook App (available through the Google Play Store) downloaded onto each device.

22.    While using her device, Plaintiff Watkins turned off the App Permissions setting on her device.[6] Facebook's Location History Setting showed that Plaintiff Watkins' "Location History" was set to "off." Plaintiff Watkins downloaded a copy of her Facebook account's "location_history" folder using Facebook's "Download Your Information" feature, which contained no data. Thus, Plaintiff Watkins reasonably assumed that Facebook had not collected, stored and used her location information consistent with her device and App settings

23.    However, in November 2018, Plaintiff Watkins learned about a Facebook folder labeled "Security and Login Information" which contained a sub-folder entitled "Login Protection Data" and "Where You're Logged In." That folder, compiled by Facebook without Watkins' knowledge or permission, contained multiple entries identifying Watkins' location by IP address, latitude and longitude at specific dates and times from 2014 through the present. After discovering this voluminous location data folder detailing her location on specific dates and at specific times spanning years, Plaintiff Watkins felt that her privacy was significantly violated by the collection of location information without her consent.

24.    Plaintiff Watkins would not have installed or used the Facebook App had she known that Facebook would collect her location information without her permission and in violation of Facebook's Effective Privacy Policy. Since learning in November 2018 that

---

[6] The Location Services setting on the iPhone Device and the App Permissions setting on the Android Device are collectively referred to herein as the "Location Services" setting.

Facebook will continue tracking her regardless of whether she turns off Location Services and/or Location History, Plaintiff Watkins does not use Facebook when she does not want Facebook to know her location, including her location derived from her IP address.

25.     Plaintiff Watkins' location information, bundled with her other personal information, has diminished value now that Facebook has collected and monetized it for targeted advertising. On information and belief, the location information that Facebook improperly collected, bundled with Plaintiff Watkins' other personal information, and monetized for advertising purposes, has an established market value of at least approximately $0.05 per individual (per bundle). Plaintiff Watkins did not grant Facebook permission to collect and monetize her location information for targeted advertising purposes.

**C. Plaintiff Childers**

26.     Plaintiff Elizabeth Childers (née Pomiak) is, and at all relevant times was, a citizen of the State of California. Plaintiff Childers owns and uses an iPhone, powered by iOS, with the Facebook App downloaded onto the device, and has owned an iPhone consistently throughout the years.[7] To the best of her recollection, Plaintiff Childers has had a Facebook account since 2006 or 2007 and has had the Facebook application on her phone since sometime around 2011.

27.     While using her device, Plaintiff Childers did not grant Facebook permission to access her location data through her Location setting on her device. Facebook's Location History setting showed that Plaintiff Childers' "Location History" was set to "off."

28.     In the spring of 2020, Plaintiff Childers learned about a Facebook folder labeled "Security and Login Information" which contained a sub-folder entitled "Login Protection Data" and "Where You're Logged In." The sub-folder entitled "Login Protection Data," compiled by Facebook without Childers' knowledge or permission, contained multiple entries identifying Childers' location by IP address, latitude and longitude at specific dates and times from 2012 through the present, and the "Where You're Logged In" folder stretched back to 2018. After

---

[7] Excepting a short window in 2012 during which she owned an Android for several days.

discovering this location data folder detailing her location on specific dates and at specific times spanning years, Plaintiff Childers felt that her privacy was significantly violated by the collection of location information without her consent.

29.     Plaintiff Childers would not have installed or used the Facebook App had she known that Facebook would collect her location information without her permission and in violation of Facebook's Effective Privacy Policy.

30.     Plaintiff Childers' location information, bundled with her other personal information, has diminished value now that Facebook has collected and monetized it for targeted advertising. On information and belief, the location information that Facebook improperly collected, bundled with Plaintiff Childers' other personal information, and monetized for advertising purposes, has an established market value of at least approximately $0.05 per individual (per bundle). Plaintiff Childers did not grant Facebook permission to collect and monetize her location information for targeted advertising purposes.

**D.  Plaintiff Agnitti**

31.     Plaintiff Michelle Agnitti is, and at all relevant times was, a citizen of the State of South Carolina. Since in or about 2008, when Facebook launched its device App, and continuously to the present, Plaintiff Agnitti has owned and used either an iPhone or Android, powered by iOS and, respectively, with the Facebook App (available through the Apple App Store and/or Google Play Store, respectively) downloaded onto her device.

32.     In February 2015, Plaintiff Agnitti read Facebook's SRR and Data Policy, effective January 30, 2015, including the Location Tracking Representations contained therein. In or about the beginning of October 2016, Ms. Agnitti also read Facebook's Data Policy effective September 29, 2016.

33.     In reliance on the Location Tracking Representations Facebook made in the "Effective Privacy Policy," Plaintiff Agnitti regularly adjusted her Location Services and Location History setting on her device so that Facebook would not access her location data, including her location data derived from her IP address.

34.     On or about January 19, 2021, Plaintiff Agnitti downloaded a copy of her

Facebook account's "Location_History" folder using Facebook's "Download Your Information" feature, which contained no data. Thus, Plaintiff Agnitti reasonably assumed that Facebook had not collected, stored or used her location information consistent with her device and app settings.

35.     On or about January 19, 2021, Plaintiff Agnitti learned about a Facebook folder labeled "Security and Login Information" which contained a sub-folder entitled "Login Protection Data" and "Where You're Logged In." That folder, compiled by Facebook without Plaintiff Agnitti's knowledge or permission, contained multiple entries identifying Plaintiff Agnitti's location by IP address, latitude and longitude at specific dates and times from 2011 through the present. After discovering this voluminous location data folder detailing her location on specific dates and at specific times spanning years, Plaintiff Agnitti felt that her privacy was significantly violated by the collection of her location information without her consent.

36.     Plaintiff Agnitti would not have used the Facebook App between January 30, 2015 and April 18, 2018 had she known that Facebook was collecting her location data even though she had turned off the Location Services setting on her device and the Location History setting on her Facebook App.

37.     Since learning on January 19, 2021 that Facebook will continue tracking her regardless of whether she turns off Location Services and/or Location History setting, Plaintiff Agnitti does not use the Facebook App when she does not want Facebook to know her location, including her location derived from her IP address.

38.     Plaintiff Agnitti's location information, bundled with her other personal information, has diminished value now that Facebook has collected and monetized it for targeted advertising. On information and belief, the location information that Facebook improperly collected, bundled with Plaintiff Agnitti's other personal information, and monetized for targeted advertising, has an established market value of at least approximately $0.05 per individual (per bundle). Plaintiff Agnitti did not grant Facebook permission to collect and monetize her location information for targeted advertising.

**E. Plaintiff Hodge**

39.     Plaintiff Robin Hodge is, and at all relevant times was, a citizen of the State of Georgia. From at least 2015 to 2016, Plaintiff Hodge owned and used an iPhone, powered by

iOS, with the Facebook App (available through the Apple App Store) downloaded onto the device.

40.     In or about February 2015, Plaintiff Hodge read Facebook's Effective Privacy Policy, including the Location Tracking Representations contained therein.

41.     In reliance on Facebook's representations made in the Effective Privacy Policy, Plaintiff Hodge adjusted her Location Services setting on her device so that Facebook would not access her location data, including her location data derived from her IP address.

42.     In 2016, Plaintiff Hodge noticed that she was receiving Facebook targeted advertisements using her location. For example, when Plaintiff Hodge would travel to different locations, she would notice that she would receive Facebook advertisements relevant to those locations.

43.     Plaintiff Hodge felt that her privacy was significantly violated by the collection of location information without her consent. Thereafter, Plaintiff Hodge deleted the Facebook App from her iPhone because Facebook was continuing to track her location even after she turned off the Location Services setting, contrary to her understanding of Facebook's representations in its Effective Privacy Policy,

44.     Plaintiff Hodge would not have used the Facebook App during the times she had turned off the Location Services setting on her device had she known that Facebook would collect her location information without her permission and in violation of Facebook's  Effective Privacy Policy.

45.     Plaintiff Hodge's location information bundled with her other personal information has diminished value now that Facebook has collected and monetized it for targeted advertising. On information and belief, the location information that Facebook improperly collected, bundled with Plaintiff Hodge's other personal information, and monetized for advertising, has an established market value of at least approximately $0.05 per individual (per bundle). Plaintiff Hodge did not grant Facebook permission to collect and monetize her location information for targeted advertising purposes.

**F. Plaintiff Jolly**

46.     Plaintiff William Jolly is, and at all relevant times was, a citizen of the State of Texas. From at least 2008 to present, Plaintiff Jolly owned and used a mobile device powered by Android's operating system, developed by Google, with the third-party Facebook App (available through the Google Play Store) downloaded onto each device.

47.     In or about February 2017, Plaintiff Jolly read Facebook's Effective Privacy Policy.

48.     In reliance on Facebook's representations made in the Effective Privacy Policy, Plaintiff Jolly regularly adjusted his Location Services setting on his device so that Facebook would not access his location data, including his location data derived from his IP address.

49.     Since learning on or around January 18, 2021 that Facebook will continue tracking his location regardless of whether he turns off Location Services, Plaintiff Jolly does not use the Facebook App when he does not want Facebook to know his location, including his location derived from his IP address.

50.     Plaintiff Jolly would not have used the Facebook App between 2015 and January 18, 2021, had he known that Facebook was collecting his location data even though he had turned off the Location Services setting on his device.

51.     Plaintiff Jolly's location information, bundled with his other personal information, has diminished value now that Facebook has collected and monetized it for targeted advertising. On information and belief, the location information that Facebook improperly collected, bundled with Plaintiff Jolly's other personal information, and monetized for targeted advertising, has an established market value of at least approximately $0.05 per individual (per bundle). Plaintiff Jolly did not grant Facebook permission to collect and monetize his location information for targeted advertising.

**G. Defendant Facebook**

52.     Defendant Facebook is a California corporation with its principal place of business located at 1601 Willow Road, Menlo Park, California 94025. Facebook is a leading global social media and social networking company. Facebook is a Fortune 500 company with

an annual revenue of $55.84 billion in 2018, and a market capitalization of $517.21 billion as of September 24, 2019. As part of its operations, Facebook owns and operates the website www.Facebook.com, and has developed and distributed the Facebook App for Android and iOS.

54.     At all relevant times, Facebook was, and is, engaged in business in San Mateo County and throughout the U.S. and the world.

55.     Wherever references are made to any representation, act, omission, or transaction of Facebook in this complaint, that allegation shall mean that Facebook did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives, subsidiaries and affiliates while they were acting within the actual or ostensible scope of their authority.

## FACTUAL BACKGROUND

**A. Facebook's Effective Privacy Policy from January 30, 2015 to April 19, 2018.**

   **1.  Facebook's SRR, effective January 30, 2015, informed users that they could control how Facebook collected and used their personal information by adjusting the Location Services setting on their devices.**

56.     Facebook's SRR, effective January 30, 2015, is a contract between Facebook and its users because it outlines commitments to which both Facebook and users agree.

57.     Facebook's SRR provided that it was derived from the "Facebook principles" and constituted Facebook's terms of service governing Facebook's relationship with its users who interact with Facebook.

58.     In its SRR, Facebook represented to users that their privacy was very important to Facebook and encouraged users to read the Data Policy to make informed decisions regarding how Facebook could collect and use their content and information:

   1. **Privacy**

      Your privacy is very important to us. We designed our Data Policy to make important disclosures about how you can use Facebook to share with others and how we collect and use your content and information. We encourage you to read the Data Policy, and to use it to help you make informed decisions.

**Ex. 1** at 1, *supra*.

59.     In its SRR, Facebook also represented to users that they could control how their information was shared through their privacy and application settings.

**Sharing Your Content and Information**

You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings.

*Id.*

60.     The SRR specifically referred and incorporated Facebook's Data Policy and contained a hyperlink directly linking, and guiding the user to the Data Policy.

**2.  Facebook's Data Policies in effect from January 30, 2015 to April 19, 2018, provided that Facebook would not collect location information, including location information derived from IP addresses, without user authorization.**

61.     Under its Data Policy effective January 30, 2015, Facebook represented it would not collect device information of any kind, including location data through IP addresses, unless a user expressly permitted Facebook to do so.

62.     Specifically, under the category "Device information," Facebook stated that "[w]e collect information from or about the computers, phones, or other devices where you install or access our Services, **depending on the permissions you've granted**…. Here are some examples of the device information we **collect**:

- Attributes such as the operating system, hardware version, device settings, file and software names and types, battery and signal strength, and device identifiers.

- **Device locations**, including specific geographic locations, such as through GPS, Bluetooth, or Wi-Fi signals.

- **Connection information** such as the name of your mobile operator or ISP, browser type, language and time zone, mobile phone number and **IP address**.

Data Policy, **Ex. 2** at 2, *supra* (emphasis added).

63.     This Court found that "[a] typical Facebook user would reasonably conclude from these statements that Facebook would not collect device locations or IP address without user consent. Otherwise, the phrase 'depending on the permissions you've granted' would be

misleading in itself." Order Re Motions to Dismiss, at 14, entered December 24, 2020 (ECF 130).

64.     Facebook thereafter implemented its Data Policy, effective September 29, 2016. **Ex. 3**, *supra*. This Data Policy contains the identical above-quoted representations contained in the Data Policy, effective January 30, 2015.

### 3. The SRR and its incorporated Data Policies constitute a contract under which Facebook promised that it would not collect and use location data derived from users' IP addresses without their authorization.

65.     As alleged above, Facebook's SRR encouraged users to read the Data Policy to make informed decisions regarding how Facebook could collect and use their content and information and contained a hyperlink directly linking, and guiding the reader to, Facebook's effective Data Policies. Consequently, the SRR and its incorporated Data Policies constitute a contract between Facebook and its users. Under this contract, Facebook promised that it would not collect and use location data derived from users' IP addresses without their authorization in consideration for users using its product and providing it other personal information.

66.     "Facebook is not cost-free. The user incurs the cost of having his information mined and shared. Even if this is not a monetary charge, the user still incurs this burden."[8]

67.     Facebook's Effective Privacy Policy was a binding agreement between Plaintiffs and Facebook under which Plaintiffs agreed to provide sensitive personal information to Facebook, including their names, likes, friends, occupations, and connections, in exchange for use of Facebook and Facebook's promise that it would not collect and use their location information, including location information derived from their IP addresses, without their authorization. Facebook built its business model in large part on its users' personal information. Facebook sought Plaintiffs' and Class members' personal information as Facebook's benefit of the bargain. Plaintiffs' and Class members' personal information was the primary benefit Facebook bargained for, and is something of value and constitutes good and valuable consideration exchanged for access to Facebook and Facebook's privacy promises.

---

[8] *Bass v. Facebook, Inc*., 394 F. Supp. 3d 1024, 1037-38 (N.D. Cal. 2019).

68.     Facebook previously has taken the position that its SRR, effective November 15, 2013, was a contract with Facebook users, and that because the SRR incorporated Facebook's Data Policy, the Data Policy was also part of Facebook's contract with its users. *See* Facebook's Motion to Dismiss, *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, Case No. 3:18-MD-02843-VC, Dkt. No. 261-1 at 44 ("[Plaintiff's breach of the implied covenant claim] also fails because the alleged wrongful actions were expressly covered by the Data Use Policy, which was part of Facebook's contract with users").[9]

69.     The U.S. District Court for the Northern District of California, Hon. Vince Chhabria presiding, agreed with Facebook's position and ruled that Facebook's Data Policy is incorporated into the SRR and therefore part of that contract. *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 792 (N.D. Cal. 2019). Facebook is judicially estopped from arguing that the SRR does not incorporate the Data Policies effective January 30, 2015 and September 29, 2016, respectively, or that these Data Policies are not part of the SRR contract between Facebook and its users.[10]

70.     Thus, unlike the SRR in *In re Facebook, Inc. Internet Tracking Litig.*, Facebook's January 30, 2015 SRR specifically incorporates the January 30, 2015 and September 29, 2016 Data Policies, and the commitments contained in the Data Policies are therefore contractual obligations.[11]

---

[9] In *In re Facebook, Inc.*, Facebook further argued that "Plaintiffs assert they are not bound by Facebook's Data Use Policy. But they concede they *are* bound by Facebook's SRR, which incorporates the Data Use Policy by reference by informing users at sign-up that they should read that policy and that it explains 'how we collect and can use your content and information.'" *Id.* at 25. A copy of Facebook's motion to dismiss filed in *In re Facebook, Inc.* is attached hereto as **Ex. 7**.

[10] *Morales v. Ocwen Loan Servicing, LLC*, No. 3:17-cv-00979-JD, 2018 WL 3093440, at *2 (N.D. Cal. June 22, 2018) ("Judicial estoppel operates to 'bar litigants from making incompatible statements in two different cases.'").

[11] In *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 610 (9th Cir. 2020) the court held that during the Class Period, Facebook changed the title of its "Privacy Policy" to "Data Use Policy" and made adjustments to its content. Although the relevant SRR directed readers to the Privacy Policy, plaintiffs relied on the latest version of this document, titled "Data Use

**B. Facebook Adopted a Revised Privacy Policy on April 19, 2018 that Disclosed for the First Time that It Will Collect Location Information Derived from Users' IP addresses - Even Without User Permission.**

71.     On April 19, 2018, Facebook adopted a new privacy policy, consisting of Terms of Service, Data Policy and Privacy Basics (collectively the "Revised Privacy Policy").[12]

72.     Facebook adopted its Revised Privacy Policy in response to strict new European Union data protection and privacy regulations, which, among other things, defined a user's IP address as personal data. Facebook's Revised Privacy Policy specifically addresses the deficiencies in the prior Effective Privacy Policy by disclosing, for the first time, that Facebook will collect location data using IP addresses, even without user permission:

> **Location-related information:** We use location-related information - such as your current location, where you live, the places you like to go, and the businesses and people you're near-to provide, personalize and improve our Products, including ads, for you and others. **Location-related information can be based on things like** precise device location (if you've allowed us to collect it), **IP addresses**, and information from your and others' use of Facebook Products (such as check-ins or events you attend).

Revised Data Policy**, Ex. 5**, at 4 (emphasis added).

> Location
>
> Connection information like your **IP address** or Wi-Fi connection and specific location information like your device's GPS signal help us **understand where you are**.
>
> ***
>
> You can control whether your device shares precise location information with Facebook Products via Location Services, a setting on your mobile device, and if you've given us permission, when you are not using Facebook Products.

---

Policy," last revised September 7, 2011. *Id*. The court found that the SRR did not reference a Data Use Policy and thus, it did not guide the reader to the incorporated document on which plaintiffs relied. *Id*. Thus, the court found that, as a matter of law, any promise not to track logged-out users therein was not incorporated. *Id*.

[12] A copy of the Revised Privacy Policy is attached hereto as **Ex. 4** (Terms of Service), Ex. **5** (Data Policy) and **Ex. 6** (Privacy Basics).

> **We may still understand your location** using things like check-ins, events, and **information about your internet connection.**

Privacy Basics, **Ex. 6**, at 1, 5-6 (emphasis added).

73.     Facebook's Revised Privacy Policy, unlike the Effective Privacy Policy, also advises users, for the first time, that it will bundle this location information, with "information about [their] interests, actions and connections," to deliver personalized advertising and sponsored content.

> • Ads and other sponsored content: We use the information we have about you-including information about your interests, actions and connections-to select and personalize ads, offers and other sponsored content that we show you….

**Ex. 5**, at 5 (emphasis added).

74.     Facebook represents that it stores data until it is no longer necessary to provide its services and Facebook Products, or until a person's account is deleted—whichever comes first.[13]

**C.  Facebook's Privacy Settings Falsely Represented that Users Could Control Whether It Could Collect and Use Their Location Information, Including IP Addresses.**

75.     Between January 30, 2015 and April 18, 2018, Facebook represented to users that they could control, through Facebook's privacy and application settings, the types of information Facebook could collect from them and use.

76.     Facebook users, including Plaintiffs and Class members, reasonably understood, based on the Effective Privacy Policy, that Facebook would not collect their location data, including location data obtained from IP addresses, if the Location Services setting on their devices were turned off.

77.     Facebook's representations to advertisers were consistent with its representations in its Effective Privacy Policy. Specifically, Facebook represented: "Local awareness ads were built with privacy in mind […] People have control over the recent location information they

---

[13] *Zuckerberg Responses to Judiciary Committee QFRs* (June 8, 2018),
https://www.judiciary.senate.gov/imo/media/doc/Zuckerberg%20Responses%20to%20Judiciary%20Committee%20QFRs.pdf.

share with Facebook and will only see ads based on their recent location if location services are enabled on their phone."[14]

78.   According to Aleksandra Korolova, an assistant professor of computer science at the University of Southern California, who researches location tracking on Facebook, "this claim is false."[15] "There is no way for people to opt out of using location for ads entirely," said a Facebook spokesperson by email. "We use city and zip level location which we collect from IP addresses and other information such as check-ins and current city from your profile to ensure we are providing people with a good service—from ensuring they see Facebook in the right language, to making sure that they are shown nearby events and ads for businesses that are local to them."[16]

D.   **Facebook's Location History Setting Misleadingly Led Users to Believe that Facebook Was Not Collecting Their Location Information Via Their IP Addresses.**

79.   Between January 30, 2015 and April 18, 2018, the Facebook App "Privacy" setting screen contained a "Location History" setting, which, in turn, contained a setting that allowed users to toggle Location History "on" or "off." The Facebook App represented that turning on the Location History setting "[a]llow[ed] Facebook to build a history of precise locations received through Location Services on your devices."

80.   Facebook also represented that "You can turn off Location Services at any time. When Location Services is turned off, Facebook won't add new information to your Location History, even if you've turned on Location History."

---

[14] Alex Hern, *Facebook users cannot avoid local-based ads, investigation finds*, The Guardian, (Dec. 19, 2018), https://www.theguardian.com/technology/2018/dec/19/facebook-users-avoid-location-based-ads-settings-investigation-reveals.

[15] Aleksandra Korolova, *Facebook's Illusion of Control over Location-Related Ad Targeting*, Medium, (Dec. 18, 2018) https://medium.com/@korolova/facebooks-illusion-of-control-over-location-related-ad-targeting-de7f865aee78.

[16] Kashmir Hill, *Turning Off Facebook Location Tracking Doesn't Stop It from Tracking Your Location*, Gizmodo, (Dec. 19, 2018), https://www.gizmodo.com.au/2018/12/turning-off-facebook-location-tracking-doesnt-stop-it-from-tracking-your-location/.

81.     Facebook users can download their location_history. When "Location History" is set to "off" the report reads, "[y]ou have no data in this section." The Facebook App additionally provided that "[w]hen Location History is turned off, Facebook will stop adding new information to your Location History which you can view in your Location Settings. Facebook may still receive your most recent precise location so that you can, for example, post content that's tagged with your location…. Location History must be turned on for some location features to work on Facebook, including Find Wi-Fi and Nearby Friends."

82.     In its Effective Privacy Policy, Facebook represented that it collected "[d]evice information" including "[d]evice locations, including specific geographic locations, such as through GPS, Bluetooth, or Wi-Fi signals," and connection information, including IP addresses, "***depending on the permissions you've granted***." **Ex. 2** at 2.

83.     The granted permissions referred to the setting selected by users through the Location Services.

84.     This ability to opt-in or opt-out of Facebook compiling and storing location information on a user's device is verified in Facebook's "Location Settings" page within the user's Facebook profiles, accessible by logging into his or her Facebook account on a computer. The "Location Settings" page specifies that "[y]ou can change your Location Settings in the app on your device," which again references the control selections on users' devices. If a Facebook user has not expressly opted into or set the access or permissions of the Facebook application to "off" or "never" on his or her device, this page will confirm that selection by providing that "[y]our Location History is off."

85.     Facebook CEO Mark Zuckerberg confirmed this opt-in process under the Effective Privacy Policy during his April 10, 2018,[17] Congressional testimony in connection with Facebook's Cambridge Analytica scandal, providing the following responses to Senator Debra Fischer's (R-NE) questioning:

---

[17] The Revised Privacy Policy became effective April 18, 2018.

FISCHER: How much do you store of that? All of it? All of it? Everything we click on, is that in storage somewhere?

ZUCKERBERG: Senator, we store data about what people share on the service and information that's required to do ranking better, to show you what you care about in news feed.

FISCHER: Do you — do you store text history, user content, activity, **device location**?

ZUCKERBERG: Senator, some of that content **with people's permission, we do store**.

FISCHER: Do you disclose any of that?

ZUCKERBERG: Yes, it — Senator, in order to — **for people to share that information with Facebook, I believe that almost everything that you just said would be <u>opt in</u>**.[18]

86.    Facebook explains under its "About Location History" setting that it "lets you explore what's around you, get more relevant ads, and help improve Facebook." Professor Korolova observed that "[g]iven that advertising is presented as one of the main use cases for Location History, a reasonable Facebook user might conclude that turning off Location History and not granting Facebook the permission to access location on the mobile app will prevent the geo-targeting of ads. But that is not the case."[19]

87.    Reasonable users of Facebook would not expect Facebook to continue tracking, logging and storing private location information under the Effective Privacy Policy once they have turned Location History off. As Princeton computer scientist and former chief technologist for the Federal Communications Commission's enforcement bureau, Jonathan Mayer, stated in regard to similar conduct by Google, Inc., "[i]f you're going to allow users to turn off something called 'Location History,' then all the places where you maintain location history should be

---

[18] *Transcript of Mark Zuckerberg's Senate hearing* (April 10, 2018), The Washington Post, https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing/?utm_term=.ca3abe9c3500 (emphasis added).

[19] Korolova, *supra*.

turned off. That seems like a pretty straightforward position to have."[20]

88.     Thus, Facebook users, including Plaintiffs and Class members, reasonably understood, based on Facebook's Location History setting in the Facebook App and Facebook's Effective Privacy Policy that Facebook would not collect their location data, including location data obtained from IP addresses, if they toggled the "Location History" setting to "off."

**E.     Facebook Surreptitiously Collected and Stored Plaintiffs' and Class Members' Location Data Despite Its Representations to the Contrary.**

89.     Although Plaintiffs' and Class members had their Location Services and Location History settings turned off on their respective devices, every time they used the Facebook App between January 30, 2015 and April 18, 2018 while connected to the Internet, Facebook nevertheless collected and stored their location using the IP address without their knowledge or permission. "Facebook automatically logs IP addresses where a user has logged into their Facebook account."[21] "Location-related information can be based on things like precise device location (if a user has allowed us to collect it), IP addresses, and information from their and others' use of Facebook Products (such as check-ins or events they attend)." [22]

90.     Plaintiffs were not aware that Facebook was collecting their location data through IP addresses without their permission because their Facebook "Location History" folders showed no location data. Instead of storing their location data in the "Location History" folders, Facebook stored this data in subfiles obscurely labeled "Login Protection Data" and "Where You're Logged In" which, in turn, were located under yet another file obscurely labeled "Security and Login Information". These files contained the IP addresses assigned by Plaintiffs'

---

[20] Ryan Nakashima. *AP Exclusive: Google tracks your movements, like it or not.* The AP (Aug. 13, 2018), https://www.apnews.com/828aefab64d4411bac257a07c1af0ecb/AP-Exclusive:-Google-tracksyour-movements,-like-it-or-not.

[21] *Zuckerberg Responses to Judiciary Committee QFRs* (June 8, 2018), https://www.judiciary.senate.gov/imo/media/doc/Zuckerberg%20Responses%20to%20Judiciary%20Committee%20QFRs.pdf at 158.

[22] *Id.* at 142.

respective Internet Service Providers ("ISP") to their device when they logged into the Facebook App, along with the precise longitude and latitude of the IP address. To illustrate, the location data provided the following IP address and location:

> Estimated location inferred from IP 32.584, -97.168
>
> Created Dec 16, 2017 2:32pm

91.     Unlike Facebook's disclosures in its Revised Privacy Policy, Facebook's "About Location Services" disclosures in effect before April 19, 2018 did not inform users that Facebook would collect and store user-specific location data based on IP addresses in files other than Location History.

92.     Facebook's conduct is contrary to users' reasonable expectations of privacy. The average consumer understands that turning Facebook's Location History off has a purpose and an effect: to limit Facebook from tracking, logging, and storing the consumer's location information. However, as acknowledged by Facebook in the Gizmodo article cited above, this is not the case.

93.     Moreover, Location History setting aside, as alleged above with respect to Facebook's Effective Privacy Policy, a typical user would reasonably conclude from the statements contained in the Effective Privacy Policy that Facebook would not collect device locations or IP addresses without user consent.

**F.      Facebook Collected and Stored Plaintiffs' and Class Members' Location Data without Their Permission, Then Used Enhanced Location Tracking Methodologies to More Precisely Pinpoint Their Locations.**

94.     The "Login Protection Data" and "Where You're Logged In" subfiles, located under the obscurely labeled "Security and Login Information" file, contain precise longitude and latitude coordinates inferred from IP addresses. Facebook then further refined Plaintiffs' in Class members' locations derived from their IP addresses using enhanced location tracking methodologies.

95.     Such enhancement techniques are used to more accurately pinpoint locations from IP addresses. These techniques encompass, among other things, empirical sampling of where the devices are to build the best location database available. On information and belief, using

precision location systems for mobile services, deployed on tens of millions of mobile devices worldwide, Facebook and/or its agents and/or contractors sample the location of devices using GPS, Wi-Fi and cell towers, and associates these locations with the IP address of the device.

96.     For purposes of illustration, on August 31, 2018, at 6:38 PM, Facebook logged Plaintiff Lundy's IP address as 71.209.176.35 and the geocoordinates to be 34.6, latitude, -112.28 longitude. Entering these coordinates into https://www.latlong.net/Show-Latitude-Longitude.html show that Mr. Lundy was in Prescott, Arizona at that date and time.

97.     Inputting the same IP address, *viz.*, 71.209.176.35, into other IP location service providers' websites for free to determine the location based on that IP address, reveals the following results:

| SOURCE | IP ADDRESS | LATITUDE | LONGITUDE | CITY |
|---|---|---|---|---|
| IP2Location.net | 71.209.176.35 | 33.4484 | -112.0740 | Phoenix |
| Ip.info.io | 71.209.176.35 | 33.4917 | -111.9840 | Phoenix |
| DB-IP | 71.209.176.35 | 33.4484 | -112.074 | Phoenix |
| Ipstack.com | 71.209.176.35 | 33.4917 | -111.9837 | Phoenix |
| Hackertarget.com (GeoIP) | 71.209.176.35 | 33.5007 | -111.9829 | Phoenix |
| Maxmind.com | 71.209.176.35 | 33.3504 | -111.782 | Gilbert |
| Whatismyipaddress.com | 71.209.176.35 | 33.4342 | -111.8454 | Mesa |
| Ipgeolocation.io | 71.209.176.35 | 33.44840 | -112.07400 | Phoenix |
| Ipfingerprints.com | 71.209.176.35 | 33.350399 | -111.781998 | Gilbert |
| Melissa Lookups (Melissa.com) | 71.209.176.35 | 33.504300 | -112.029000 | Phoenix |
| Textmagic.com | 71.209.176.35 | 33°21'1"N | 111°46'55"E | Gilbert |
| Neustar (Ultratools.com) | 71.209.176.35 | 33.50938 | -112.08255 | Phoenix |
| Ip-tracker.org | 71.209.176.35 | 33.4944 | -112.2132 | Phoenix |
| Dnschecker.org | 71.209.176.35 | 33.4484 | -112.074 | Phoenix |
| Extreme-ip.lookup.com | 71.209.176.35 | 33.5038 | -112.0253 | Phoenix |

98.     The various IP location providers result in geocoordinate locations for the same IP address more than 100 miles away in the Phoenix, Arizona metropolitan area. These differences indicate that Facebook used an enhanced location determination technique based on data collected from other users instead of, or in addition to, simply plotting Plaintiff Lundy's IP address location in order to more precisely pinpoint the location of the IP address.

99.     Facebook uses multiple signals to determine (or more realistically, to estimate) a user's location. The platform may use IP address, mobile device info, a user's profile data (i.e.,

CASE NO.: 4:18-cv-06793-JD
SECOND AMENDED CLASS ACTION COMPLAINT
23

city listed in their profile), and sometimes a combination. They can also use info from the locations of the Facebook user's friends.[23]

100.    Facebook admitted to a reporter for the Wall Street Journal that it determines user location even for users who have opted out of location tracking, in part, by "enhancing" IP address location:

> After discussing these issues with Aleksandra Korolova, an assistant professor of computer science at University of Southern California, who researches location tracking on Facebook*, I confirmed with the company that data from other users can enhance its understanding of an IP address location*.
>
> *If someone connected to the same coffee-shop network as me has location services turned on, for instance, Facebook could pinpoint us both*. A spokeswoman said that when users have location services turned off, the company limits the location information it infers about them to the ZIP Code level. There's nothing in its privacy policy saying it won't use more specific IP-based location data in the future, however.[[24]]

101.    Both Facebook's Effective Privacy Policy and Revised Privacy Policy fail to disclose that it will use these enhanced location determination techniques to more accurately pinpoint IP address locations.

102.    Facebook explains to advertisers that it learns user locations from the IP address, Wi-Fi and Bluetooth data.[25] In its targeting explanation for advertisers, Facebook states that it relies on things like IP addresses and Wi-Fi and Bluetooth data. According to Professor Korolova, the issue is that Facebook fails to disclose that even if you exercise all provided

---

[23] Lucas Elliott, *Facebook Location Targeting: A Detailed Guide* (Aug. 29, 2018) https://www.jonloomer.com/2018/08/29/facebook-location-targeting/?nabt=0&utm_referrer=https%3A%2F%2Fwww.google.com%2F.

[24] Katherine Bindley, *Why Facebook Still Seems to Spy on You*, The Wall Street Journal(Feb. 28, 2019), https://www.wsj.com/articles/facebook-ads-will-follow-you-even-when-your-privacy-settings-are-dialed-up-11551362400

[25] Korolova, *supra* (citing https://www.facebook.com/business/help/1150627594978290)

privacy controls, Facebook will continue to track your location and present you with targeted advertising.[26]

103.    Facebook's use of enhanced location determination techniques to more accurately pinpoint IP address locations is particularly problematic in view of Facebook's patent applications filed with the U.S. Patent and Trademark Office for technology that uses users' location data to predict where they are going and when they are going to be offline. A May 30, 2017, Facebook application titled "Offline Trajectories" describes a method to predict where you will go next based on your location data. The technology described in the patent would calculate a "transition probability based at least in part on previously logged location data associated with a plurality of users who were at the current location." In other words, the technology could also use the data of other people you know, as well as that of strangers, to make predictions."[27]

104.    As the patent applications reveal, Facebook is also exploring the possibility of using that location data to predict and monetize users' movements over time. Facebook is already recording information relevant to these applications, including data "about other devices that are nearby or on their network," "nearby Wi-Fi access points, beacons, and cell towers," "signal strength," and "online and offline actions," from third-party data providers.[28] Indeed, on information and belief, Facebook is collecting much of the same information it uses in connection with its enhanced location determination techniques.

105.    Put simply, Facebook goes to extraordinary lengths to obtain users' personal data, particularly location data, in total disregard for its users' privacy, and even though such measures appear "scary" to Facebook team members. For example, in 2015, according to leaked emails published by the UK parliament, Facebook's team was particularly concerned about appearing

---

[26] Chance Miller, *How Facebook sneakily uses IP data & more for targeted ads, even if users disable all location settings* (Dec. 18, 2018), https://9to5mac.com/2018/12/18/facebook-location-privacy-ads-settings/

[27] Nicole Nguyen, *Facebook Filed A Patent to Calculate Your Future Location* (Dec. 10, 2018), https://www.buzzfeednews.com/article/nicolenguyen/facebook-location-data-prediction-patent.

[28] *Id.*

"scary" over location-based advertising that used Bluetooth "beacons" to track users' shopping habits without resorting to uploading GPS data.[29]

### G. Facebook Bundled the Location Information It Improperly Collected from Plaintiffs and Class Members with Their Other Personal Information and Monetized Those Bundles for Targeted Advertising.

106.    After improperly collecting Plaintiffs' and Class members' location information from their IP addresses and enhancing the data to precisely pinpoint their locations, Facebook bundled this enhanced location information with their other personal information obtained from their Facebook pages, including their browsing history, profiles and likes. Facebook then monetized this bundled personal information for targeted advertising.

107.    Facebook's use of Plaintiffs' and Class members' location information, bundled with their other personal information, is a large part of Facebook's advertising strategy.

108.    Facebook offers advertising services to its customers (advertisers) that include or have included at various points in time, *inter alia*, assisting customers in developing and creating advertisements and advertising strategies, obtaining information about users from Facebook's website and third-party sources, compiling user data and maintaining databases of user information, developing a marketing and advertising strategy to target and/or exclude certain groups of users from receiving advertisements, tracking and evaluating the effectiveness of advertisements and user targeting strategies, implementing advertising campaigns, and delivering advertisements to users, including via News Feed.

109.    Facebook's customers can use Facebook's advertising services to target its users with specific attributes. Facebook applies its own algorithm to categorize users and to determine which users and groups of users will be targeted to receive advertisements via its advertising platform. As touted on Facebook's website during the relevant time period: "With our powerful audience selection tools, you can target people who are right for your business. Using what you

---

[29] Hern, *supra*; *see also* Bill Woodwin & Sebastion Klovig Skelton, *Facebook's privacy game – how Zuckerberg backtracked on promises to protect personal data*, ComputerWeekly, (Jul 1, 2019) (Discussing Facebook's "Project Gravity," where Facebook began using Bluetooth beacons to track Facebook users' mobile phones as they shop).

know about your customers—like demographics, interests and behaviors—you can connect with people similar to them."

110.    More specifically, Facebook has 98 personal data points that it compiles to target advertisements to its users, and Facebook offers marketers the option to target ads according to the data points. The first listed data point is "location." The remaining 97 data points include items like age, gender, language, education level, school, ethnic affinity, income and net worth, and home ownership.[30]

111.    Facebook promotes Targeting New Audiences and explains how to create a new audience using, among other things, user locations, demographics, interests and behaviors.[31]

112.    In explaining its Detailed Targeting, Facebook states:

> Detailed targeting is a targeting option available in the "Audience" section of ad set creation that allows you to refine the group of people we show your ads to. You can do this with information such as additional demographics, interests and behaviors.
>
> These detailed targeting options may be based on:
>
> - Ads they click
> - Pages they engage with
> - Activities people engage in on Facebook related to things like their device usage, and travel preferences
> - Demographics like age, gender and location
> - The mobile device they use and the speed of their network connection[32]

113.    Facebook represents to advertisers that it learns user locations from IP address, Wi-Fi and Bluetooth data. Facebook also allows advertisers to choose the locations to which their ads are delivered, providing the advertisers the following selections:

---

[30] Kaitlin Dewy, *98 personal data points that Facebook uses to target ads to you*, The Washington Post, (Aug. 19, 2016), https://www.washingtonpost.com/news/the-intersect/wb/2016/08/19/98-personal-data-points-that-facebook-uses-to-target-ads-to-you/.

[31] Facebook, https://www.facebook.com/business/help/202297959811696 (last visited January 13, 2021).

[32] Facebook, https://www.facebook.com/business/help/182371508761821?id=176276233019487 (last visited January 13, 2021).

- **Everyone in this location (default option)**
- **People who live in this location**
- **People recently in this location**
- **People traveling in this location**[33]

114.   Facebook additionally allows the advertiser to choose a location radius which identifies relevant areas inside a larger geographic area or extends the advertiser's area's reach beyond its geographical boundary.

115.   Facebook further explains to its advertisers they can attain optimization through the Facebook pixel which it describes as "an analytics tool that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[34] Facebook explains that using the Facebook pixel, the advertiser can see the actions that its customers take and have options to reach those customers again through future Facebook ads. *Id*.

116.   Facebook also provides detailed analytical data to advertisers on how their advertisement campaigns are performing, including among certain groups of Facebook users with specified attributes and characteristics that the advertiser seeks to target. By monitoring this data and providing this information to its customers on an ongoing basis, Facebook captures consumer behavior, profile, preferences, lifestyle, and other attributes which allows it to run targeted advertisements. This enables customers to target specific groups of users for advertisements.

117.   On June 8, 2018, Congress released Facebook's responses to post-hearing questions stemming from Facebook CEO Mark Zuckerberg's April 10, 2018, Congressional

---

[33] Facebook, https://www.facebook.com/business/help/365561350785642?helpref=search&sr=1&query=everyone%20in%20this%20location (last visited September 27, 2019).

[34] Facebook, https://www.facebook.com/business/help/742478679120153?helpref=search (last visited January 13, 2021).

testimony regarding Facebook's Cambridge Analytica scandal.[35] Regarding how Facebook constructs digital profiles for purposes of selling advertisements, Zuckerberg stated, "We use data from devices (such as location data) to help advertisers reach people in particular areas. For example, if people have shared their device locations with Facebook or checked into a specific restaurant, we can show them organic posts from friends who have been in that location or we can show them ads from an advertiser that wants to promote its services in their area or from the restaurant."[36] Among the information Facebook collects from users' devices are "Network and connections: information such as the name of your mobile operator or ISP, language, time zone, mobile phone number, IP address, connection speed and, in some cases, information about other devices that are nearby or on your network."[37]

118. Targeted advertising of this nature requires Facebook to compile an enormous amount of personal information from its users, including location information. This information is highly valuable because the average cost per click for an online Facebook advertisement in 2017 was $1.72[38], and the average U.S. Facebook user is reportedly worth about $200 a year to Facebook.[39]

119. In denying a motion to dismiss, the United States District Court for the Northern District of California accepted plaintiffs' allegation that call and text logs are often sold for, and have an established market value of, approximately $0.05 per individual. *See Williams v.*

---

[35] Ironically, Facebook's Revised Policies became effective eight days after Zuckerberg's testimony.

[36] *Zuckerberg Responses to Judiciary Committee QFRs* (June 8, 2018), https://www.judiciary.senate.gov/imo/media/doc/Zuckerberg%20Responses%20to%20Judiciary%20Committee%20QFRs.pdf at 16.

[37] *Id.* at 161.

[38] Mark Irvine, *Facebook Ad Benchmarks for YOUR Industry [Data]* (last updated Aug. 27, 2019), https://www.wordstream.com/blog/ws/2017/02/28/facebook-advertising-benchmarks

[39] Sam Harnett, *Here's How Much You Are Worth to Facebook In Dollars and Cents* (April 11, 2018), https://www.kqed.org/news/11661387/heres-how-much-you-are-worth-to-facebook-in-dollars-andcents

*Facebook*, Case No. 18-CV-01881-RS, Order Denying in Part and Granting in Part Motion to Dismiss (Dkt. No. 128), at 11 (N.D. Cal. Aug. 29, 2019), attached hereto as **Ex. 8** (rejecting Facebook's standing argument and noting plaintiffs' argument that "the information has diminished in value now that Facebook has stolen and monetized it.").

120.    Location data presents one of the most valuable forms of data that Facebook collects about its users for its advertisers not only because of what the data point alone says about an individual (i.e., where he or she is at any particular point in time), but because of the massive amount of personal and private information that can be extracted from the location data (such as medical treatment, personal relationships, and private interests). The location data bundled with Plaintiffs' personal information is worth substantially more than $0.05 per individual – indeed, it is worth at least $1.72.

121.    Additionally, according to a 2015 survey by the Ponemon Institute, which asked U.S. respondents to indicate the minimum amount that they would accept as compensation in exchange for sharing different data categories, respondents, on average, believe that their physical location is worth $16.1, and their home address is worth $12.9.[40]

### H.    Facebook Relies on the Sale of Targeted Advertising to Drive its Revenues

122.    Almost the entirety of Facebook's revenue originates from the sale of targeted advertising based on the extensive data Facebook collects, analyzes, and maintains about its users. Annual Reports, Facebook, Inc.[41] According to Facebook's respective annual reports from

---

[40] *Privacy and Security in a Connected Life: A Study of US, European and Japanese Consumers*, Ponemon Institute, (Mar. 2015), https://www.trendmicro.de/cloud-content/us/pdfs/security-intelligence/reports/rt_privacy_and_security_in_a_connected_life.pdf at 17.

[41] Facebook's annual SEC filings discuss its location-based advertising as follows:

> We generate substantially all of our revenue from selling advertising placements to marketers. Our ads enable marketers to reach people based on a variety of factors including age, gender, *location*, interests, and behaviors. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites.

Annual Reports, Facebook, Inc. (2015, 2016, 2017, 2018) (emphasis added).

2015 through 2018, Facebook's annual revenue for 2015 was $17.93 billion, of which 95% originated from the sale of targeted advertising. Facebook's annual revenue for 2016 was $27.64 billion, of which 97% originated from the sale of targeted advertising. Facebook's annual revenue for 2017 was $40.65 billion, of which 98% originated from the sale of targeted advertising. In 2018, Facebook's annual revenue was $55.84 billion.

123.    In particular, Facebook targeting advertisers for its mobile users has become the Company's focus for generating advertising revenue. As of 2016, 47% of Facebook users worldwide, and 68% of Facebook users in the U.S. accessed Facebook via the Facebook mobile App.[42] Additionally, as of 2016, of the roughly 2 billion smartphones in use worldwide, 85% used the Facebook mobile app.[43]

124.    As of 2018, over 90% of Facebook's advertising revenue came from mobile users.[44]

### I.    Facebook Has a Pattern of Disregarding Its Users' Privacy.

125.    Facebook has a long history of deceiving its users and misusing their information without their permission for its own financial gain.

126.    In 2008, a Facebook technical glitch revealed the confidential birthdates of 80 million users' profiles.[45]

127.    In 2011, the FTC filed an eight-count complaint against Facebook alleging, among other things, that it deceived consumers by representing to them they could keep their

---

[42] Artyom Dogtiev, *Facebook App Statistics*, Business of Apps (Jun. 22, 2016), https://www.businessofapps.com/news/facebook-app-statistics/.

[43] *Id.*

[44] Emil Protalinski, *Over 90% of Facebook's advertising revenue now comes from mobile*, Venturebeat (Apr. 25, 2018), https://venturebeat.com/2018/04/25/over-90-of-facebooks-advertising-revenue-now-comes-from-mobile/.

[45] Munsif Vengattil, Arjun Panchadar & Paresh Dave, *Facebook says big breach exposed 50 million accounts to full takeover*, Reuters (September 28, 2018), https://www.reuters.com/article/us-facebook-cyber/facebook-unearths-security-breach-affecting-50-million-users-idUSKCN1M82BK?feedType=RSS&feedName=newsOne .

information on Facebook private, then repeatedly shared their personal information with advertisers.[46] Facebook ultimately entered into a consent decree requiring it to live up to its promises regarding privacy, including giving consumers clear and prominent notice and obtaining consumers' express consent before their information was shared beyond the privacy settings they had established.[47]

128.   After the consent decree in 2012, Facebook continued engaging in privacy violations. In 2013, Facebook disclosed a software flaw that exposed six million users' phone numbers and email addresses to unauthorized viewers for a year.[48]

129.   In September 2018, a security breach exposed the personal information of up to 50 million Facebook users.[49] This already egregious exposure of Facebook users' personal information was exponentially worsened by Facebook's collection of location data without users' consent. The breach allowed hackers to gain access to, and potentially take control of, user accounts which, given the troubling data practices alleged herein, included detailed location history that users had not consented to Facebook having – much less hackers.[50]

130.   On July 24, 2019, the FTC levied a $5 billion fine against Facebook as part of a settlement in connection with Facebook violating consumers' privacy rights. The settlement stems from Facebook's role in the Cambridge Analytical Scandal whereby Facebook allowed for

---

[46]*See Facebook Settles FTC Charges That It Deceived Consumers by Failing to Keep Privacy Promises*, FTC (Nov. 29, 2011), https://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep [https://perma.cc/5FE6-VGQB].

[47] *See, e.g., FTC Approves Final Settlement with Facebook*, FTC (Aug. 10, 2012), https://www.ftc.gov/news-events/press-releases/2012/08/ftc-approves-final-settlement-facebook [https://perma.cc/AQG5-HBMX] (discussing FTC settlement terms with Facebook).

[48] *Id.*

[49]Mike Isaac & Sheera Frenkel, *Facebook Security Breach Exposes Accounts of 50 Million Users*, The New York Times (Sept. 28, 2018), https://www.nytimes.com/2018/09/28/technology/facebook-hack-data-breach.html.

[50] *Id.*

the personal data of up to 87 million user profiles to be harvested by Cambridge Analytica.[51] This scandal was significant for inciting a public discussion on the ethical standards of data collection by social media companies, resulting in a call for greater consumer protection over users' right to privacy in online media and eventually leading to Facebook CEO Mark Zuckerberg's testimony before Congress.[52]

131.    The $5 billion fine is 200 times the size of the previous record 2012 FTC fine, but given that Facebook reported nearly $56 billion in revenue in 2018, critics say the measure is merely a wrist-slap. Indeed, "[t]he reported $5 billion penalty is barely a tap on the wrist, not even a slap," according to Sen. Richard Blumenthal (D-Conn.) in a media statement.[53]

**J.    The FTC's Commitment to Ensure that Companies Are Truthful and Refrain from Engaging in Deceptive or Unfair Conduct When It Comes to Tracking Consumers.**

132.    In releasing for public comment proposed principles (the "Principles") designed to serve as the basis for industry self-regulatory efforts to address privacy concerns in the area of data collected for behavioral advertising, the FTC observed that "with the development of new and more sophisticated technologies, it likely will become easier to identify an individual consumer based on information traditionally considered to be non-PII. For instance, although industry has traditionally considered most IP addresses to be non-PII, it soon may be possible to link more IP addresses to specific individuals." The FTC stated that "[t]he best approach is to include within the Principles' scope any data collected for online behavioral advertising that

---

[51] Cecilia Kang & Sheera Frenkel, *Facebook Says Cambridge Analytica Harvested Data of Up to 87 Million Users*, The New York Times (April 4, 2018), https://www.nytimes.com/2018/04/04/technology/mark-zuckerberg-testify-congress.html.

[52] *See id.*

[53] Tara Seals, *Privacy Experts: Facebook's $5B Fine Unlikely to Do Much* (July 15, 2019), https://threatpost.com/privacy-experts-facebooks-5b-fine/146478/.

reasonably could be associated with a particular consumer or with a particular computer or device."[54]

133.    In its FTC Cross-Device Tracking Workshop, November 16, 2015, Edith Ramirez made it abundantly clear that "no matter what the technology, [the FTC] [is] committed to ensuring that companies are truthful and refrain from engaging in deceptive or unfair conduct when it comes to tracking consumers."[55]

134.    Along these lines, the FTC has pursued numerous actions against companies under Section 5 of the FTC Act in connection with deceptive and/or unfair location tracking, including location tracking through IP addresses, and entered into consent decrees with these companies. *See*, *e.g.*, *In re Nomi Techs., Inc.*, No. C-4538, 2015 WL 5304114 (F.T.C. Aug. 28, 2015); *United States v. InMobi Pte Ltd.*, No. 3:16-cv-3474 (N.D. Cal. June 22, 2016); *In re Turn, Inc.*, No. 152-3099, 2016 WL 7448417 (F.T.C. Dec. 14, 2016); and *FTC v. VIZIO, Inc.*, No. 2:17-cv-00758 (D.N.J. Feb. 6, 2017)

1.    *In re Nomi Techs., Inc.*

135.    In its enforcement action against Nomi Techs., Inc., the FTC alleged that Nomi used, among other things, the stores' Wi-Fi routers and Wi-Fi signal strength to track customers' activity which Nomi collected and analyzed to provide aggregate analytics to the participating retail store clients. The complaint alleged that Nomi's business practices were deceptive because Nomi's technology tracked devices across retail locations and over time without the device owner receiving notice or providing consent. The FTC settled the case with Nomi. *See, e.g.*, Decision and Order at 2, *In re* Nomi Techs., Inc., No. C-4538, 2015 WL 5304114 (F.T.C. Aug. 28, 2015) (ordering Nomi not to "misrepresent in any manner" customers' notice and choices).

---

[54] FTC Staff Report: Self-Regulatory Principles for Online Behavioral Advertising at 20-25 (Feb. 2009), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-staff-report-self-regulatory-principles-online-behavioral-advertising/p085400behavadreport.pdf [hereinafter Self-Regulatory Principles].

[55] FTC Cross-Device Tracking Workshop (Nov. 16, 2015), https://www.ftc.gov/system/files/documents/videos/cross-device-tracking-part-1/ftc_crossdevice_tracking_workshop_-_transcript_segment_1.pdf.

1         **2.**     ***InMobi Pte Ltd.***

2        136.    In its enforcement action against InMobi Pte Ltd., the FTC alleged that InMobi

3 marketed a software development kit ("SDK") that could be integrated into mobile applications

4 to enable the delivery of advertisements within the mobile app environment. A developer looking

5 to monetize a new app could incorporate this SDK into its app to deliver ads to app users. The

6 InMobi SDK enabled ads to target consumers based on geolocation data. Unless disabled, the

7 InMobi SDK would access the device's geolocation application programming interface

8 ("Geolocation API") and use that data to target ads delivered through the InMobi

9 SDK. Consistent with requirements by both Android and iOS, after installing apps with the

10 InMobi SDK embedded, device users were prompted to grant the app access to the Geolocation

11 API. By disabling the Geolocation API, neither the Android nor iOS device would make

12 geolocation data available to the InMobi SDK.

13        137.    However, the InMobi SDK also collected data about the Wi-Fi networks to which

14 the devices were connected. For users who did not disable the Geolocation API, InMobi

15 simultaneously collected both latitude and longitude through the Geolocation API *and* details

16 about the Wi-Fi network to which each device was connected at that moment. With these two

17 data sets, InMobi was able to populate a database that mapped each Wi-Fi network to the latitude

18 and longitude that the Geolocation API delivered. Consequently, the locations of app users *who*

19 had disabled access to the Geolocation API could nevertheless be pinpointed by merely looking

20 up the location of the Wi-Fi network they were using. InMobi targeted ads to users based on the

21 location they derived through this Wi-Fi network lookup process. The FTC's complaint alleged

22 that InMobi's practices were deceptive because InMobi tracked geolocation without the device

23 owner's actual notice or consent.

24        138.    As a result of the FTC enforcement action, InMobi agreed to pay $950,000 in

25 civil penalties and to implement a comprehensive privacy program which included a prohibition

26 against collecting consumers' location information without their affirmative express consent as

27 well as requirements that InMobi honor consumers' location privacy settings and for the program

28

1  to be independently audited every two years for the next 20 years.[56] InMobi was further required

2  to delete all of the consumers' location information that it had collected without their consent

3  and was prohibited from further misrepresenting its privacy practices.[57]

4        **3.**    ***Turn, Inc.***

5        139.    In its enforcement action against Turn, Inc., the FTC alleged that Turn offered a

6  digital marketing platform ("DMP") designed to allow advertisers to target consumers across

7  devices. The DMP used various identifiers and techniques to try to connect user activity across

8  the Internet and across devices to personalize the advertising delivered to particular users,

9  including cookies and device advertising identifiers. Turn also collected another type of

10  identifier called a Unique Identifier Header ("UIHD") from those using the Verizon Wireless

11  network. The UIHD encoded web traffic by Verizon Wireless network users and allegedly

12  mapped its UIHD data to device advertising identifiers and cookies. Thus, if a user of the

13  Verizon Wireless network attempted to stop efforts to track cross-device activity by deleting

14  cookies and resetting device advertising identifiers, Turn could read the UIHD on later device

15  activity and know which cookies to replace in the user's browsers and connect the reset device

16  advertising identifier to the existing profile.

17        140.    The FTC alleged that Turn voluntarily posted privacy guidelines which provided

18  that users could opt-out of tracking by opting out of accepting cookies. The Complaint alleged

19  that this was deceptive because doing so would not ultimately disable tracking for those using

20  the Verizon Wireless network. The enforcement action was settled, and Turn entered into a

21  consent order with the FTC, whereby Turn was ordered not to misrepresent the extent to which it

22  collected, used, disclosed, retained, or shared Covered Information. Covered Information, in

23  turn, included, among other things, an IP address. Agreement Containing Consent Order, *In re*

24  *Turn Inc.*, No. 152-3099, 2016 WL 7448417 (F.T.C. Dec. 20, 2016).

---

25

26  [56] *Mobile Advertising Network InMobi Settles FTC Charges It Tracked Hundreds of Millions of Consumers' Locations Without Permission*, FTC (June 22, 2016), https://www.ftc.gov/news-events/pressreleases/2016/06/mobile-advertising-network-inmobi-settles-ftc-charges-it-tracked.

27

28  [57] *Id.*

1

4.      *FTC v. VIZIO, Inc.*

2       141.    On February 6, 2017, acting jointly with the New Jersey Attorney General, the

3  FTC filed its privacy enforcement case against Smart TV manufacturer VIZIO, Inc. The

4  Complaint alleged that VIZIO paired viewing data with device IP addresses, and that IP

5  addresses were sometimes used to (1) enhance data with demographic information to allow for

6  richer analysis, and (2) match TVs to other devices for ad retargeting and other analytical

7  purposes. Count 1 of the Complaint alleged a cause of action under Section 5 unfairness for

8  "unfair tracking." This allegation showed that an IP address can be treated as personally-

9  identifiable or that, at the very least, the data associated with IP addresses is still in need of

10 privacy protections even if it is not directly personally-identifiable. The case resulted in a

11 Stipulated Order in which VIZIO agreed to a new set of notice-and-choice ground rules for the

12 collection and use of information relating to television viewing content. Stipulated Order at

13 4, *VIZIO*, No. 2:17-cv-00758 (D.N.J. Feb. 14, 2017).

14                          **<u>CLASS ALLEGATIONS</u>**

15      142.    Pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure,

16 Plaintiffs, individually and on behalf of all others similarly situated, bring this lawsuit on behalf

17 of themselves and as a class action on behalf of the following Class and Subclass:

18
**Nationwide Class**: All natural persons residing in the United States who used
19      Facebook after January 30, 2015, whose Location Services was turned off on
        their devices, but whose location information was nevertheless collected by
20      Facebook via their IP Addresses and used for advertising purposes.

21      **Nationwide Subclass**: All natural persons residing in the United States who
        used Facebook after January 30, 2015, whose Location Services was turned
22      off on their devices after reading the Location Tracking Representations
        contained in Facebook's Effective Privacy Policy, but whose location
23      information was nevertheless collected by Facebook via their IP Addresses
        and used for advertising purposes.
24

25      143.    Excluded from the Class and Subclass is Facebook and any entities in which

26 Facebook or its subsidiaries or affiliates have a controlling interest, as well as Facebook's

27 officers, agents, and employees. Also excluded from the Class and Subclass are the judge

28 assigned to this action, members of the judge's staff, and any member of the judge's immediate

family. Plaintiffs reserve the right to amend the definitions of the Class and Subclass if discovery and further investigation reveal that they should be expanded or otherwise modified.

144.    **Numerosity**: The members of the Class and Subclass are so numerous that joinder of all members of the Class and Subclass would be impracticable. Plaintiffs reasonably believe that Class and Subclass members number hundreds of thousands of people or more in the aggregate. As of 2018, Facebook had approximately 169.5 million users in the U.S., more than half of the U.S. population.[58] The names and addresses of Class and Subclass members are identifiable through documents maintained by Facebook.

145.    **Commonality and Predominance**: This action involves common questions of law or fact, which predominate over any questions affecting individual Class and Subclass members, including:

a.    Whether Facebook represented under the Effective Privacy Policy that it would not collect, store, use, and exploit location information from Plaintiffs' and Class members' IP addresses if they did not give Facebook permission to do so;

b.    Whether Facebook's Effective Privacy Policy constitutes a contract with Plaintiffs and Class members where Plaintiffs and Class members agreed to use the product and provide some data to Facebook in exchange for Facebook refraining from collecting their location information;

c.    Whether Facebook violated its Effective Privacy Policy by collecting, storing, and using for targeted advertising purposes Plaintiffs' and Class members' location information derived from their IP addresses after the Location Services were turned off on their respective devices;

d.    Whether Facebook breached its contract with Plaintiffs and Class members by collecting and exploiting for its own gain Plaintiffs' and Class members' location data derived through their IP addresses without their permission;

---

[58] Rimma Kats, *Who Is Using Facebook in the US?*, eMarketer, (Oct. 23, 2018), https://www.emarketer.com/content/the-social-series-who-s-using-facebook.

e.     Whether Facebook was unjustly enriched by the conduct alleged herein;

f.     Whether Facebook, in engaging in the conduct alleged herein, made intentional misrepresentations and/or omissions to Plaintiffs and the Class members; and

g.     Whether Plaintiffs and the Class Members were damaged as a result of Facebook's collection of their location data without their consent.

146.   Facebook engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous common questions that dominate this action.

147.   As further indication of the common questions of law, Facebook's terms of service require users to agree that the laws of California, excluding California's choice of law rules, will apply to any disputes between users and Facebook.

148.   **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class and Subclass because Plaintiffs and Class and Subclass members were injured through the substantially uniform misconduct by Facebook. Plaintiffs are advancing the same claims on behalf of themselves and all other Class and Subclass members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class and Subclass members arise from the same operative facts and are based on the same legal theories.

149.   **Adequacy of Representation**: Plaintiffs are adequate representatives of the Class and Subclass because their interests do not conflict with the interests of the Class and Subclass members they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and they will prosecute this action vigorously. The interests of Class and Subclass members will be fairly and adequately protected by Plaintiffs and their counsel.

150.   **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other

financial detriment suffered individually by Plaintiffs and the Class and Subclass members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Facebook, making it impracticable for Class and Subclass members to individually seek redress for Facebook's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CLAIMS ALLEGED ON BEHALF OF THE CLASSES

### First Claim for Relief
### (Breach of Contract - on Behalf of Plaintiffs and the Nationwide Class)

151.   Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

152.   At all relevant times, Facebook, on the one hand, and Plaintiffs and Class members, on the other hand, mutually assented to, and therefore were bound by, the Effective Privacy Policy that was operative during the Class Period. The Effective Privacy Policy includes the January 30, 2015 SRR and the Data Policies, effective January 30, 2015 and September 29, 2016, respectively.

153.   "Facebook is not cost-free. The user incurs the cost of having his information mined and shared. Even if this is not a monetary charge, the user still incurs this burden."[59]

154.   Facebook's Effective Privacy Policy was a binding agreement between Plaintiffs and Facebook under which Plaintiffs agreed to provide sensitive personal information to Facebook, including their names, likes, friends, occupations, and connections, in exchange for use of Facebook and Facebook's promise that it would not collect and use their location information, including location information derived from their IP addresses, without their

---

[59] *Bass*, 394 F. Supp. 3d at 1037-38.

authorization. Facebook built its business model in large part on its users' personal information. Facebook sought Plaintiffs' and Class members' personal information as Facebook's benefit of the bargain. Plaintiffs' and Class members' personal information was the primary benefit Facebook bargained for, and is something of value and constitutes good and valuable consideration exchange for access to Facebook and Facebook's privacy promises.

155.    Thus, Facebook's SRR was a contract between Facebook and its users which outlined commitments to which both Facebook and its users agreed.

156.    The SRR specifically referred to Facebook's Data Policies, effective January 30, 2015 and September 29, 2016, respectively encouraged users to read the Data Policies and contained a hyperlink directly linking, and guiding the user to, the Facebook incorporated Data Policies. Thus, the SRR incorporated the Data Policies as part of the contract.

157.    Facebook previously successfully asserted before this Court that the SRR and the incorporated Data Policy are contracts. *See In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 792 (N.D. Cal. 2019). Thus, Facebook is judicially estopped from arguing that the SRR does not incorporate the Data Policies effective January 30, 2015 and September 29, 2016, respectively, or that these Data Policies are not part of the SRR contract between Facebook and its users.

158.    Throughout the Class Period, Facebook represented to users in its SRR that their privacy was very important to Facebook and encouraged users to read the Data Policy to make informed decisions regarding how Facebook could collect and use their content and information.

159.    Throughout the Class Period, Facebook represented to users in its SRR that they could control how their information was shared through their privacy and application settings.

160.    Throughout the Class Period, Facebook affirmatively represented in its Data Policies that it would not collect its users' location information, including location information derived from their IP addresses, without their permission.

161.    The Effective Privacy Policy did not authorize Facebook to collect and store its Plaintiffs' and Class members' location information derived from IP addresses; bundle this

location information with their other personal information; and monetize this information through targeted advertising.

162. During the Class Period, Facebook breached its contractual obligation to respect Plaintiffs' and Class members' privacy settings and not to collect, store and use and monetize their location data derived from their IP addresses in connection with targeted advertising.

163. Plaintiffs' and Class members' location information derived from their IP addresses and bundled with their other personal information is of considerable value as reflected in Facebook's calculation of the average revenue per user. There is an active market for the content and information generated by Facebook users, both individually and especially in the aggregate. Facebook generates billions of dollars in revenues to targeted advertising, curated to the collection and aggregation of Facebook's user data, including location information derived from IP addresses. On information and belief, there is also an active black market for user location information derived from IP addresses bundled with other personal information.

164. Facebook's conduct diminishes the market value of Plaintiffs' and Class members' location data. Facebook has increased its revenues and profits by sharing Plaintiffs' and Class members' location information without their consent or authorization and using this information for targeted advertising.

165. As a result of Facebook's breach, Plaintiffs and Class members have been harmed and suffered damages by losing the value of their content and information.

166. Plaintiffs and Class members seek the actual damages resulting from Facebook's breach.

167. If it is determined that actual damages are difficult to prove or that Plaintiffs have suffered no economic harm, Plaintiffs and Class members alternatively seek disgorgement of profits as is appropriate to compensate them for the intangible harm caused by Facebook's collection and use of Plaintiffs' and Class members' location information without their authorization in breach of the Effective Privacy Policy.

168. "[U]nder California law, a defendant's unjust enrichment can satisfy the 'damages' element of a breach of contract claim, such that disgorgement is a proper remedy."[60]

169. Facebook obtained the benefit it would not have otherwise obtained and profited from that benefit without providing a corresponding benefit to Plaintiffs and Class members.

170. Plaintiffs and Class members retain a stake in the profits garnered by Facebook.

171. Plaintiffs and Class members are also entitled to disgorgement of Facebook's profits under Restatement (Third) of Restitution § 39(1) because of Facebook's opportunistic breach of the Effective Privacy Policy by using Plaintiffs' and Class members' location information without their authorization.

172. Restatement (Third) of Restitution § 39(1) has formulated a general rule in synthesizing breach of contract cases allowing recovery of a defendant's profits, and provides that liability in restitution with disgorgement of profits is an alternative to liability for contract damages measured by injury to the promisee.

173. Restatement (Third) of Restitution § 39 states, in pertinent part:

> (1) If a deliberate breach of contract results in profit to the defaulting promisor and the available damage remedy affords inadequate protection to the promisee's contractual entitlement, the promisee has a claim to restitution of the profit realized by the promisor as a result of the breach. Restitution by the rule of this section is an alternative to a remedy in damages.

174. The Supreme Court of the United States endorsed a disgorgement remedy for breach of an agreement between two states as a matter of federal common law, with extensive reference to section 39 of the Restatement. *Kansas v. Nebraska*, 135 S.Ct. 1042, 1056-58 (2015).

175. Plaintiffs and Class members alternatively seek as damages nominal damages for the detriment caused by Facebook's breach of the Effective Privacy Policy and its use of Plaintiffs' and Class members' location information without their authorization.

---

[60]*Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 F. App'x 665, 669 (9th Cir. 2010) (citing *Ajaxo Inc. v. E*Trade Grp., Inc.*, 135 Cal. Rptr. 3d 221, 247-49 (Cal. 6th Dist. Ct. App. 2005)).

176.     Under California law, "[t]he failure to perform a duty required by contract is a legal wrong, independently of actual damage sustained by the party to whom performance is due."[61]

177.     Under California law, "[n]ominal damages are properly awarded ... [w]here there is no loss or injury to be compensated but where the law still recognizes a technical invasion of a plaintiff's rights or a breach of a defendant's duty."[62]

178.     Under California law, "[n]ominal damages are properly awarded . . . although there have been real, actual injury and damages suffered by a plaintiff, the extent of plaintiff's injury and damages cannot be determined from the evidence presented."[63]

179.     Pursuant to California Civil Code § 3360, "a plaintiff who proves a 'breach of duty' (including breach of contract) but fails to show any 'appreciable detriment'—i.e., damages—nevertheless 'may ... recover' nominal damages.'"[64]

180.     Thus, Plaintiffs and the Class members are alternatively entitled to nominal damages resulting from Facebook's breach of contract if there is no loss or injury to be compensated, but there is a technical invasion of their rights or a breach of Facebook's duty; or because Plaintiffs and Class members have suffered real, actual injury and damages, but the extent of their injury and damages cannot be determined from the evidence presented.

## Second Claim for Relief
### (Breach of Implied Covenant of Good Faith and Fair Dealing - on Behalf of Plaintiffs and the Nationwide Class)

181.     Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

---

[61] *In re Google Referrer Header Privacy Litig.*, 465 F. Supp. 3d 999, 1011 (N.D. Cal. 2020) (citation omitted).

[62] *Id.* (quoting *Avina v. Spurlock*, 28 Cal. App. 3d 1086, 1088, 105 Cal. Rptr. 198 (Ct. App. 1972)).

[63] *Avina*, 28 Cal. App. 3d at 1088.

[64] *In re Google Referrer Header Privacy Litig.*, 465 F. Supp. 3d at 1011 (citations omitted).

182.     At all relevant times, Facebook, on the one hand, and Plaintiffs and Class members, on the other hand, mutually assented to, and therefore were bound by, the Effective Privacy Policy that was operative during the Class Period. The Effective Privacy Policy includes the January 30, 2015 SRR and the Data Policies, effective January 30, 2015 and September 29, 2016, respectively.

183.     Facebook's SRR is a contract between Facebook and its users and outlines commitments to which both Facebook and users agree.

184.     The SRR specifically referred to Facebook's Data Policies, effective January 30, 2015, and September 29, 2016, respectively, and contained a hyperlink directly linking, and guiding the user to, the Facebook incorporated Data Policies. Thus, the SRR and the incorporated Data Policies constitute a contract.

185.     Throughout the Class Period, Facebook represented to users in its SRR that their privacy was very important to Facebook and encouraged users to read the Data Policy to make informed decisions regarding how Facebook could collect and use their content and information.

186.     Throughout the Class Period, Facebook represented to users in its SRR that they could control how their information was shared through their privacy and application settings.

187.     Throughout the Class Period, Facebook affirmatively represented in its Data Policies that it would not collect location information, including location information from IP addresses, without permission.

188.     The Effective Privacy Policy did not authorize Facebook to collect and store Plaintiffs' and Class members' location information derived from their IP addresses; bundle their location information with their other personal information; and monetize this location information through targeted advertising.

189.     Under California law, there is in every contract or agreement an implied promise of good faith and fair dealing. Such a duty is read into contracts and functions as a supplement to the express contractual covenants, in order to prevent a transgressing party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefit of the contract.

190.    Thus, any claim on the part of Facebook that technically it was permitted to collect, store and use for targeted advertising Plaintiffs' and Class members' location information derived from their IP addresses and bundled with their other personal information, must be read in the context of, and give way to, their rights to the benefit of the contract, including the terms strictly delimiting such activity.

191.    A covenant of good faith and fair dealing attaches to Facebook's Effective Privacy Policy, a contract between Plaintiffs and Class members.

192.    Plaintiffs and Class members did all they were required to do under these contractual provisions in the Effective Privacy Policy.

193.    Under the terms of the Effective Privacy Policy, Plaintiffs and Class members were entitled to receive the benefits promised to them by Facebook, including that Facebook would not, without their permission, collect, store and use their location data derived from their IP addresses, bundle this location information with their other personal information, and monetize this bundled information for targeted advertising purposes.

194.    Facebook surreptitiously collected and stored Plaintiffs' and Class members' location information derived from their IP addresses, bundled this location information with their other personal information, and monetized these bundled packages for targeted advertising.

195.    Facebook engaged in the foregoing conduct without regard to Plaintiffs' and the Class members' privacy settings and in violation of its own Effective Privacy Policy.

196.    By engaging in the foregoing conduct, Facebook deprived Plaintiffs and Class members of the benefits of their agreements.

197.    As set forth therein, Plaintiffs' and Class members' location information derived from their IP addresses and bundled with their other personal information is of considerable value as demonstrated by Facebook's calculation of the average revenue per user. There is an active market for the content and information generated by Facebook users, both individually and in the aggregate. Facebook generates billions of dollars in revenues to targeted advertising, curated to the collection and aggregation of Facebook's user data, including location information

derived from IP addresses. On information and belief, there is also an active black market for user location information derived from IP addresses bundled with other personal information.

198.     Facebook's conduct diminishes the sale and market value of Plaintiffs' and the Class members' location data. Facebook has increased its revenues and profits by sharing its users' location information without their consent or authorization and using this information for targeted advertising.

199.     As a result of Facebook's breach of the covenant of good faith and fair dealing, Plaintiffs and Class members have been harmed and suffered damages by losing the value of their content and information.

200.     Plaintiffs and the Class members seek the actual damages resulting from Facebook's breach.

201.     For the reasons set forth in the First Claim for Relief, if it is determined that actual damages are difficult to prove or that Plaintiffs have suffered no economic harm, Plaintiffs and Class members alternatively seek disgorgement of profits as is appropriate to compensate them for the intangible harm caused by Facebook's collection and use of their location information without their authorization in breach of the covenant of good faith and fair dealing and its opportunistic breach of the Effective Privacy Policy.

202.     For the reasons set forth in the First Claim for Relief, Plaintiffs and the Class members alternatively seek as damages nominal damages for the detriment caused by Facebook's breach of the covenant of good faith and fair dealing through its use of Plaintiffs' and Class members' location information without their authorization.

### Third Claim for Relief
**(Unjust Enrichment - Pleaded in the Alternative on Behalf of Plaintiffs and the Nationwide Class)**

203.     Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

204.     As an alternative to their breach of contract claim and breach of the covenant of good faith and fair dealing claim set forth in the first and second claims for relief, *supra*, respectively, Plaintiffs and Class members bring this claim against Facebook for unjust

enrichment, a quasi-contractual claim seeking disgorgement if the Court determines the SRR is not a binding contract between Facebook and Plaintiffs.

205.    The Effective Privacy Policy provides that the laws of California will apply to any disputes between users, including Plaintiffs and Class members, and Facebook.

206.    California law permits a standalone claim for unjust enrichment, allowing the court to construe the cause of action as a quasi-contract claim.[65]

207.    California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss.[66]

208.    California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable.[67]

209.    Under California law, a stake in unjustly earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable.[68]

210.    Plaintiffs and Class members retain a stake in the profits garnered from their location information because the circumstances are such that, as between Plaintiffs and Class members, on the one hand, and Facebook, on the other hand, it is unjust for Facebook to retain these profits.

211.    By collecting, storing and using for targeted advertising Plaintiffs' and Class members' location information derived from their IP addresses and bundled with their other personal information, without their permission and contrary to the Location Services settings, Facebook generated revenues and was unjustly enriched at the expense of Plaintiffs and the Class

---

[65] *E.g.*, *Astiana v. Hain Celestial Group, Inc.,* 783 F.3d 753, 756 (9th Cir. 2015).

[66] *In re Facebook, Inc. Internet Tracking Litig.,* 956 F.3d 589, 599 (9th Cir. 2020).

[67] *Id.*

[68] *Id.*

members. It would be inequitable and unconscionable for Facebook to retain the profit, benefit, and other compensation it obtained from using Plaintiffs' and Class members' location data derived from their IP addresses and bundled with their other personal information for targeted advertising.

212.    Plaintiffs and the Class members seek an order from this Court requiring Facebook to disgorge all proceeds, profits, benefits, and other compensation obtained by Facebook from its improper and unlawful collection, storage and use of their location information bundled with their other personal information for targeted advertising.

213.    In the alternative, Plaintiffs and the Class members seek compensatory damages in the form of the commercial value of the data Facebook improperly collected, stored and used, which can be reasonably ascertained using documents maintained by Facebook.

### Fourth Claim for Relief
**(Intentional Misrepresentation and Omission - on Behalf of Plaintiffs Agnitti, Hodge, and Jolly and the Nationwide Subclass)**

214.    Plaintiffs Agnitti, Hodge, and Jolly hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

215.    Facebook's Effective Privacy Policy was false and misleading. In its SRR, Facebook represented to users that they could control how their information was shared through their privacy and application settings, but failed to disclose to Plaintiffs Agnitti, Hodge, and Jolly and Subclass members that Facebook would continue to collect location information from IP addresses even if Facebook users' Location Services was turned off on their respective devices.

216.    In its Data Policies incorporated into its SRR, Facebook represented that it would not collect and use Plaintiffs Agnitti, Hodge, and Jolly and Subclass members' location information, including location information derived from their IP addresses, without their authorization.

217.    A typical user, including Plaintiffs Agnitti, Hodge, and Jolly and Subclass members, would reasonably conclude from the foregoing Facebook representations that Facebook would not collect device locations or IP address without user consent. Otherwise, the

phrase "depending on the permissions you've granted" would be misleading in itself. Order Re

Motions to Dismiss, at 14, entered December 24, 2020 (ECF 130).

218. Facebook also failed to disclose that it uses enhanced location determination techniques to more accurately pinpoint IP address locations.

219. Facebook's statements that it would not collect and use Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' location information, including location information derived from their IP addresses, and Facebook's statements that Plaintiffs Agnitti, Hodge, and Jolly and Subclass members could control how their information was shared through their privacy and application settings was false because Facebook knowingly and intentionally tracked their locations, without their permission, using their IP addresses and enhanced location determination techniques, and collected and stored this information. Facebook also concealed that it would then bundle this location information with Plaintiffs Agnitti, Hodge, and Jolly's other personal information obtained from, *inter alia*, Facebook pages, browsing history and "likes." Moreover, Facebook concealed that it would use and monetize these bundled packages containing Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' personal information, including their location information derived from their IP addresses, for targeted advertising purposes, thus enriching itself to the tune of hundreds of millions of dollars from increased advertising revenue at the expense of Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' privacy rights while subjecting Plaintiffs and Subclass members to unwanted targeted advertising.

220. Facebook's location history setting also concealed from Plaintiffs Agnitti, Hodge, and Jolly and Subclass members that even if their location history setting was turned off on their respective devices, Facebook would nevertheless track their locations, without their permission, using their IP addresses and enhanced location determination techniques, and collect and store this information. Facebook's location history setting concealed that it would then bundle this location information with Plaintiffs Agnitti, Hodge, and Jolly's other personal information obtained from, *inter alia*, Facebook pages, browsing history and "likes." Facebook's location history setting also concealed that Facebook would use and monetize these bundled packages containing Plaintiffs Agnitti, Hodge, and Jolly and Subclass members' personal information for

targeted advertising, thus enriching itself to the tune of hundreds of millions of dollars from increased advertising revenue at the expense of Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' privacy rights.

221.   Facebook's misrepresentations and omissions were made intentionally knowing they would create a false impression for Facebook users, including Plaintiffs Agnitti, Hodge, and Jolly and Subclass members, regarding their ability to control access to their location information.

222.   Facebook knew its misrepresentations and omissions were material. Facebook acknowledged in its SRR that privacy was very important to Facebook and encouraged users to read the Data Policy to make informed decisions regarding how Facebook could collect and use their content and information. Facebook represented in the Data Policy that would not collect and use Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' location information, including location information derived from their IP addresses, without their authorization.

223.   Plaintiffs Agnitti, Hodge, and Jolly and the Subclass members read the Effective Privacy Policy, *viz.*, the SRR and the incorporated Data Policies, and reasonably and justifiably relied on Facebook's representations that it would not collect and use their location information, including location information derived from their IP addresses, without their authorization.

224.   Specifically, Plaintiffs Agnitti, Hodge, and Jolly and the Subclass members adjusted the Location Services settings on their devices to prevent Facebook from collecting and using their location information, including their location information derived from their IP addresses. Plaintiffs Agnitti, Hodge, and Jolly and the Subclass members also relied on the omissions in the Location History setting and turned their Location History setting off to prevent Facebook from collecting and using their location information, including location information derived from their IP addresses. Plaintiffs Agnitti, Hodge, and Jolly and the Subclass members then used Facebook from their devices with the understanding that Facebook would not collect and use their location information, including location information derived from their IP addresses.

225.    Plaintiffs Agnitti, Hodge, and Jolly and the Subclass members would not have used the Facebook App during the times they turned off the Location Services setting on their devices had they known that Facebook would collect their location information without their permission and in violation of Facebook's Privacy Policy in effect during the relevant time period.

226.    After learning that Facebook will continue tracking them regardless of whether they turn off Location Services or Location History, Plaintiffs Agnitti and Jolly and the Subclass members have not used Facebook when they do not want Facebook to know their location, including their location derived from their IP addresses. After learning that Facebook continued tracking her regardless of whether she turned off Location Services, Plaintiff Hodge removed the Facebook App from her device.

227.    Facebook's actions were malicious, oppressive, and willful and calculated to injure Plaintiffs Agnitti, Hodge, and Jolly and the Subclass members and done in conscious disregard of their rights and wishes.

228.    As a proximate result of Facebook's intentional misrepresentations and omissions, Plaintiffs Agnitti, Hodge, and Jolly and the Subclass members suffered actual damages and the diminished market value of their location data.

229.    As a direct and proximate result of Facebook's intentional misrepresentations and omissions, Plaintiffs Agnitti, Hodge, and Jolly and the Subclass members also suffered injuries, damages, losses and harm, including, but not limited to, annoyance, interference, concern, lost time, and the loss of personal property, justifying an award of compensatory general damages, special damages, and punitive damages.

230.    Plaintiffs Agnitti, Hodge, and Jolly and Subclass members also seek disgorgement of Facebook's profits that were made with the use of Plaintiffs Agnitti, Hodge, and Jolly's and Sublass members' location information derived from their IP addresses and bundled with their other personal information and monetized for targeted advertising. Disgorgement is appropriate because Facebook wrongfully profited from its collection and monetization of Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members location information derived from their IP addresses

1    and bundled with their other personal information. Disgorgement is necessary in order to deter

2    future unauthorized use and monetization of Plaintiffs Agnitti, Hodge, and Jolly and Subclass

3    members' location information bundled with their other personal information. Disgorgement is

4    also necessary to the extent that the value of Plaintiffs Agnitti, Hodge, and Jolly's and Subclass

5    members' location information bundled with their other personal information cannot be assessed

6    by ordinary tort damages. Public policy supports the use of disgorgement here to disincentivize

7    the type of deception that Facebook used in exploiting Plaintiffs Agnitti, Hodge, and Jolly's and

8    Subclass members' location information bundled with their other personal information.

9    
10    **Fifth Claim for Relief**
**(Deceit by Concealment or Omission Cal. Civ. Code §§ 1709 & 1710 - on Behalf of**
**Plaintiffs Agnitti, Hodge, and Jolly and the Nationwide Subclass)**

11        231.    Plaintiffs Agnitti, Hodge, and Jolly hereby repeat, reallege, and incorporate by

12    reference each and every allegation contained above as though the same were fully set forth

13    herein.

14        232.    Under California law, a plaintiff may assert a claim for deceit by concealment

15    based on "[t]he suppression of a fact, by one who is bound to disclose it, or who gives

16    information of other facts which are likely to mislead for want of communication of that fact."

17    Cal. Civ. Code § 1710(3).

18        233.    Facebook has committed "deceit" under Cal. Civ. Code § 1710 because

19    Facebook failed to disclose facts in its Effective Privacy Policy and in its Location History

20    settings, that it was duty-bound to disclose, namely that Facebook would collect, store and use

21    Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' location data derived from their IP

22    addresses even if Plaintiffs and Subclass members turned off the Location Services setting on

23    their devices. Additionally, Facebook improperly collected, stored, and used Plaintiffs Agnitti,

24    Hodge, and Jolly's and Subclass members' location data even after they turned off the Location

25    History setting. Facebook further committed deceit by concealment by failing to disclose in its

26    Effective Privacy Policy and in its Location History setting that Facebook would then bundle this

27    location information with Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' other

28    personal information and use and monetize these bundled packages containing Plaintiffs Agnitti,

Hodge, and Jolly's and Subclass members' personal information for targeted advertising purposes, thus enriching itself to the tune of hundreds of millions of dollars from increased advertising revenue at the expense of Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' privacy rights, while subjecting Plaintiffs Agnitti, Hodge, and Jolly and Subclass members to unwanted targeted advertising.

234.    Facebook had a duty to disclose the full extent to which it collected, used and monetized Plaintiffs Agnitti, Hodge, and Jolly and Subclass members' location data for targeted advertising because it promised in its Effective Privacy Policy that it would not share users' content and information with advertisers without their consent. Facebook's duty also arose from its affirmative representations that (1) Plaintiffs Agnitti, Hodge, and Jolly and Subclass members could control how their information was shared through their privacy and application settings, and (2) Facebook would not collect and use their location information, including location information derived from their IP addresses, without their authorization.

235.    Facebook intentionally concealed and omitted material information regarding how it would collect, store and use Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' location information derived from IP addresses in an effort to create a false sense of security and privacy for Plaintiffs Agnitti, Hodge, and Jolly and Subclass members. Facebook did this because they wanted Plaintiffs Agnitti, Hodge, and Jolly and Subclass members to continue to use the Facebook App so that Facebook could collect and monetize their location information without their consent.

236.    Had Plaintiffs Agnitti, Hodge, and Jolly and Subclass members been aware of the full extent of how Facebook collected and used their location information derived from IP addresses and how Facebook bundled this information with their other personal information and monetized this information through targeted advertising, they would not have used Facebook when they did not want Facebook to track their location and collect and use their location information. Nor would they have shared all of their content and information on their devices on the Facebook platform.

237.     Plaintiffs Agnitti, Hodge, and Jolly and Subclass members suffered injury as a direct result of Facebook's deceit. Plaintiffs Agnitti, Hodge, and Jolly and Subclass members conferred a benefit on Facebook. Their location information was used and aggregated by Facebook and by advertisers without their consent, and Facebook received substantial advertising revenues as a benefit. Had Plaintiffs Agnitti, Hodge, and Jolly and Subclass members known the extent and degree to which their location information derived from their IP addresses and bundled with their other personal information was collected and monetized by Facebook for targeted advertising they would have required compensation for this use of their content and information or would not have used Facebook when they did not want to be tracked and did not want Facebook to collect and use their location information.

238.     Plaintiffs Agnitti, Hodge, and Jolly and Subclass members suffered economic injury as a result of Facebook's fraud. Plaintiffs Agnitti, Hodge, and Jolly and Subclass members have an economic interest in their location information derived from their IP addresses bundled with their other personal information, which has value outside of the Facebook platform.

239.     As a result, Facebook has been unjustly enriched by its deceit, and Plaintiffs and Subclass members are entitled to disgorgement.

240.     For all types of fraudulent omissions complained of here, Plaintiffs Agnitti, Hodge, and Jolly and Subclass members seek damages, including disgorgement of Facebook's profits that were made with the use of Plaintiffs Agnitti, Hodge, and Jolly's and Sublass members' location information derived from their IP addresses and bundled with their other personal information and monetized for targeted advertising. Disgorgement is appropriate because Facebook wrongfully profited from its collection and monetization of Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' location information derived from their IP addresses and bundled with their other personal information. Disgorgement is necessary in order to deter future unauthorized use and monetization of Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' location information bundled with their other personal information. Disgorgement is also necessary to the extent that the value of Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' location information bundled with their other personal information cannot be assessed

by ordinary tort damages. Public policy supports the use of disgorgement here to disincentivize the type of deception that Facebook used in exploiting Plaintiffs Agnitti, Hodge, and Jolly's and Subclass members' location information bundled with their other personal information.

241.    As a direct and proximate result of Facebook's omissions, Plaintiffs Agnitti, Hodge, and Jolly and Subclass members also suffered injuries, damages, losses and harm including, but not limited to, annoyance, interference, concern, lost time, and the loss of personal property, justifying an award of compensatory, incidental and consequential damages, disgorgement, special damages, and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class and Subclass members, respectfully request that this Court enter an Order:

A.    Certifying the Classes and appointing Plaintiffs as Class Representatives;

B.    Appointing Plaintiffs' counsel as Class counsel;

C.    Awarding monetary damages, including, but not limited to, compensatory, incidental and consequential damages commensurate with proof at trial for the acts complained of herein;

D.    Alternatively, awarding nominal damages for the harm caused by Facebook's misconduct and breach;

E.    Awarding punitive damages in an amount consistent with applicable statutes and precedent for those causes of action that permit such recovery;

F.    Awarding disgorgement of the profits retained as a result of Facebook's wrongful conduct;

G.    Appropriate declaratory relief against Facebook;

H.    Awarding attorneys' fees, where applicable;

I.    Awarding costs;

J.    Awarding of pre- and post-judgment interest on any amounts awarded; and

K.    For any and all other relief, the Court deems just and appropriate.

# JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

DATED: January 21, 2021

Respectfully submitted,

**FRANKLIN D. AZAR & ASSOCIATES, P.C.**

*/s/Michael D. Murphy*
Michael D. Murphy (*pro hac vice*)
Franklin D. Azar (*pro hac vice*)
Paul R. Wood (*pro hac vice*)
14426 East Evans Avenue
Aurora, CO 80014
Telephone:     (303) 757-3300
Facsimile:     (720) 213-5131
Email:         azarf@fdazar.com
Email:         woodp@fdazar.com
Email:         murphym@fdazar.com

*Attorneys for Plaintiffs Brendan Lundy, Elizabeth Childers, Michelle Agnitti, Robin Hodge, William Jolly and the Proposed Class*

Ivy T. Ngo (SBN 249860)
ingo@rcfllp.com
ROCHE CYRULNIK FREEDMAN LLP
200 S Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 971-5943
Facsimile: (646) 392-8842

*Attorney for Plaintiff Myriah Watkins and the Proposed Class*

Barrett J. Vahle (*pro hac vice*)
vahle@stuevesiegel.com
Jillian R. Dent (*pro hac vice*)
dent@stuevesiegel.com
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
Facsimile: (816) 714 7101

Sabita J. Soneji (SBN 224262)
ssoneji@tzlegal.com

CASE NO.: 4:18-cv-06793-JD
SECOND AMENDED CLASS ACTION COMPLAINT
57

Katherine M. Aizpuru (*pro hace vice*)
kaizpuru@tzlegal.com
TYCKO & ZAVAREEI LLP
The Tower Building
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

*Attorneys for all Plaintiffs and the Proposed Class*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Michael D. Murphy, hereby certify that on January 21, 2021, I authorized the electronic filing of the foregoing, CLASS ACTION SECOND AMENDED COMPLAINT using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List maintained by this Court.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 21, 2021, at Aurora, Colorado

By:     */s/ Michael D. Murphy*
        Michael D. Murphy