ROSEMARIE T. RING, SBN 220769
rring@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

CHRISTOPHER CHORBA, SBN 216692
cchorba@gibsondunn.com
ANDREW M. KASABIAN, SBN 313210
akasabian@gibsondunn.com
ADRIENNE LIU, SBN 331262
aliu@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

*Attorneys for Defendant Meta Platforms, Inc. (formerly known as Facebook, Inc.)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BRENDAN LUNDY, MYRIAH WATKINS, ELIZABETH CHILDERS, MICHELLE AGNITTI, and ROBIN HODGE,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | CASE NO. 3:18-cv-06793-JD<br><br>**PUTATIVE CLASS ACTION**<br><br>**DEFENDANT'S STATEMENT IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge:         Hon. James Donato<br>Courtroom: 11<br>Date:          October 19, 2023<br>Time:          10:00 a.m. |

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Am. Color Graphics Inc. v. Travelers Prop. Cas. Ins.*,
  2007 WL 832935 (N.D. Cal. Mar. 19, 2007) ................................................................. 5

*Avina v. Spurlock*,
  28 Cal. App. 3d 1086 (1972) ......................................................................................... 5

*Dennis v. Kellogg Co.*,
  697 F.3d 858 (9th Cir. 2012) ......................................................................................... 7

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012) ....................................................................................... 10

*Nachshin v. AOL, LLC*,
  663 F.3d 1034 (9th Cir. 2011) ....................................................................................... 7

*United States v. Forrester*,
  512 F.3d 500 (9th Cir. 2008) ......................................................................................... 2

## I.   INTRODUCTION

Pursuant to Civil Local Rule 7-3(b), Defendant Meta Platforms, Inc. submits this statement in support of Plaintiffs' Motion for Final Approval of Class Action Settlement (Dkt. 203). Meta supports Plaintiffs' request for final approval of the proposed class settlement because the settlement is fair, reasonable, and adequate. In particular, the settlement properly considers the substantial risks to Plaintiffs and the putative class of further litigation, as well as the nature of the relief, which is limited to only nominal damages. Nominal damages would be far less than the monetary relief available to each settlement class member, which, at least based on the number of facially valid claims to date, will likely be around $25 to $30.

For these reasons, Meta joins the Motion that Plaintiffs filed. In this separate brief, as with its statement in support of the Motion for Preliminary Approval (Dkt. 189), Meta addresses (a) the additional hurdles that Plaintiffs would have faced in attempting to certify a class and at trial; (b) the adequacy of the notice campaign undertaken by the Settlement Administrator; and (c) direct payments to claimants or, alternatively, *cy pres* beneficiaries.

## II.   SUMMARY OF PLAINTIFFS' CLAIMS

This lawsuit challenges Meta's practice of inferring users' location based on their devices' IP address when users had toggled Location Services "off" on their iOS and Android devices for the Facebook application. (Dkt. 132 ¶ 8; *see also id.* ¶ 9 (discussing same claims as to Meta's "Location History" setting).) "Location Services" is a setting on these devices (manufactured and operated by Apple and Google) that allows users to share the "precise" location of their device (e.g., through GPS) with certain apps. Users can turn Location Services "on" or "off" for the entire device, or they can adjust it for each app. Apps may also have their own location-related settings that control how an app may use a person's "precise" location as derived from Location Services; Facebook's setting was called "Location History." But because there is an associated IP address anytime a device connects to the Internet, neither Location Services nor Location History control the ability of apps to receive IP address information. As a result, neither setting impacts the ability of Meta—or any other app developer—to infer users' location from their devices' IP addresses. Nevertheless, Plaintiffs claim that when they turned "off" Location Services on their devices, they believed that Meta would not infer their location

from their IP address *at all* due to Meta's Privacy Policy in place at the time.

As the Court recognized in its order dismissing the first amended complaint in the *Heeger* action, "'every computer or server connected to the Internet has a unique IP address.'" (Dkt. 130 at 6 (quoting *United States v. Forrester*, 512 F.3d 500, 510 n.5 (9th Cir. 2008)).) Much like a home address to deliver mail, an IP address allows the device to communicate and receive content over the Internet. IP addresses, along with other device signals, are commonly used by web browsers, app developers, and other providers of internet services, such as websites and mail systems, to estimate the location of Internet-connected devices. These location predictions are used across many industries and for a variety of functions such as detecting fraud, ensuring browsers render content in the correct language and through the correct website (e.g., the English and not the Spanish version of a website), and serving video and music content only where licensed. The accuracy of these location predictions depends on a number of factors, including whether a user is connecting via a virtual private network (or "VPN"), which enables secure Internet connections by providing a private gateway to the Internet and replacing the user's IP address with the VPN's IP address.

Meta, like most providers of internet services, infers users' locations from their IP address in order to serve geographically-relevant content and provide basic account services. Since late 2016—and with the exception of limited security and integrity functions—Meta has "up-leveled" location inferred from an IP address *to the city or zip code level*. In other words, the estimated locations that Meta inferred from IP addresses during most of the class period were no more granular than the city or zip code level. Before 2016, Meta still intentionally added imprecision to locations inferred from IP addresses but to a lesser extent, at approximately a half-square mile.

Despite the ubiquity of using IP addresses to predict location, Plaintiffs' initial theory of the case focused on alleged invasion of privacy claims. The Court agreed with Meta that Plaintiffs had no expectation of privacy in "general and imprecise" city-level location predictions based on their IP addresses, and consequently whittled down this case to a much more discrete contract-based action. (Dkt. 130 at 13.) In the operative Second Amended Complaint, Plaintiffs pursued only contract, fraud, and unjust enrichment claims based on their allegation that Meta's practice of inferring location of people using the Facebook app through their IP addresses conflicted with the Plaintiffs' reading of

Meta's representations regarding Location Services and Location History. (Dkt. 132 at ¶¶ 151–241.) Still, Plaintiffs admitted the current terms (updated more than five years ago) "addresse[d] the deficiencies in the prior" versions by disclosing explicitly that Meta will collect and use location data inferred from IP addresses. (Dkt. 132 ¶¶ 71–72.)

### III.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

**A.  Plaintiffs Would Face Significant Hurdles If The Settlement Was Not Approved**

As Plaintiffs recognize in their Motion, "continued litigation presents serious risks." (Dkt. 203 at 13.) In addition to the fact that Plaintiffs "necessarily risk losing class action status," continued litigation could result in summary judgment in favor of Meta, "significant risk of a successful *Daubert* challenge to Plaintiffs' disgorgement theory," and, of course, the risk of a loss at trial. (*Id.* at 6, 13.) Even if Plaintiffs were to prevail, they "may have been limited to nominal damages." (*Id.* at 6.) They acknowledge this is likely no greater than $1 per class member, and case law suggests it should be even less (as discussed below).

*First*, upon further development of the record, the variability in this case would likely have overwhelmed any purported "common" issues under Rule 23, reducing Plaintiffs to only individual relief as opposed to the classwide recovery secured by the proposed settlement. Determining whether there was any "breach" or "fraud" would involve a host of individualized inquiries, including whether each putative class member knew and/or viewed Meta's disclosures relating to its practice of inferring location from IP addresses (particularly given its ubiquity across the industry), and if so, when he or she first learned of this practice.

As discovery revealed, Plaintiffs and putative class members did or could have learned of the challenged practices through any number of means. For example, they may have (1) received login alert and password-change verification emails sent during the class period that identified a login in a specific city, state, and country and informed users that their location was derived from the IP address(es) of the activity; (2) seen ads targeted to their location, even after disabling Location Services; (3) viewed their DYI files listing their IP addresses and inferred locations; (4) received Safety Check alerts targeted to their location, even after disabling Location Services, and (5) engaged with Facebook's Weather, News, Events, and Marketplace features, which were tailored to the user's

estimated location.

Individualized issues would also exist with respect to determining whether any putative class member was harmed, and if so, to what extent. Meta developed evidence during discovery that the named Plaintiffs did not suffer any monetary loss, and that several Plaintiffs affirmatively disclosed their location information on Facebook, accessed Facebook via VPN on occasion, and/or benefitted from location-based features. And Plaintiffs' continued use of Facebook after they supposedly learned the "truth" about the practices raises further intractable individualized issues as to damages. These issues, multiplied across the entire putative class, would have jeopardized Plaintiffs' chances of certifying a class and confirm that the proposed settlement presents the best opportunity for the putative class to obtain meaningful relief.

**Second**, continued litigation, of course, presents the risk that Plaintiffs could lose on the merits—either at summary judgment or at trial. Plaintiffs' core theory was that Meta exceeded the scope of Plaintiffs' consent in its collection, storage, and use of users' IP-inferred locations. Not only would Meta vigorously contest the adequacy of its disclosures, but discovery revealed that, for the majority of the class period, Meta "up-leveled" location inferred from an IP address to the city or zip code level—a level the Court already recognized as being neither sensitive nor confidential. (Dkt. 130 at 13.) These facts put Plaintiffs' entire theory of liability at risk.

**Third**, any potential relief would be nominal, at best. Plaintiffs are not seeking actual damages and instead have focused on nominal damages and disgorgement. But calculating classwide damages based on a disgorgement theory would be difficult, as Plaintiffs admit. (Dkt. 203 at 6.) Among other reasons, Meta cannot isolate its profits apportionable to the challenged conduct. Plaintiffs pursued this information in discovery, and Meta devoted significant time to investigating it. But unsurprisingly, Meta simply does not break down its ad revenue in this fashion, nor could it do so retroactively. As Plaintiffs acknowledge, a disgorgement theory would require expert testimony and evidence, and such a report would be susceptible to a *Daubert* motion.

Relief in this case is therefore limited to nominal damages, which would not provide the Settlement Class with monetary relief equal to that available to the Settlement Class under this Settlement Agreement. Plaintiffs acknowledge that nominal damages are typically limited to $1. In

fact, nominal damages are *capped* at $1 in this Circuit.  *See* Ninth Circuit Committee on Model Civil Jury Instructions, Manual of Model Civil Jury Instruction for the District Courts of the Ninth Circuit § 5.6 (2017) ("Nominal damages may not exceed one dollar.").  But state and federal authority hold that nominal damages can and should be less than $1 in a case like this.  *See Am. Color Graphics Inc. v. Travelers Prop. Cas. Ins.*, 2007 WL 832935, at *1 (N.D. Cal. Mar. 19, 2007) (nominal damages of 7 cents for breach of contract); *Avina v. Spurlock*, 28 Cal. App. 3d 1086, 1089 (1972) ("By nominal damages is meant some trifling sum, as a penny, one cent, six cents, etc.").

As Plaintiffs explain in detail, the payment to Settlement Class Members who submitted valid claims in this case should be at least $25.  (Dkt. 203 at 1, 7.)  This exceeds nominal damages by more than twenty-fold.  This Settlement Agreement presents the Settlement Class with a payment that is guaranteed to exceed any relief that they may receive, years down the road, even if Plaintiffs were ultimately able to prevail (which would be unlikely, for the reasons discussed above).  In short, the settlement affords Plaintiffs and the putative class with certainty and actual relief, instead of risks on the merits.

**B.  The Notice Plan Was Effective And Sufficiently Reached The Class**

The Court-approved Notice Plan represented the best practicable notice under the circumstances and provided reasonable notice to the Class.  The administrator successfully delivered notice to approximately 81% of the class an average of 3.45 times through over 210 million impressions generated by the publication notice campaign. (Dkt. 203-2 ¶¶ 7, 17.)  This sweeping campaign resulted in approximately 908,000 facially valid claims, with only 106 unique requests for exclusion.  (*Id.* ¶¶ 36–37.)  This positive reaction by class members to the settlement further confirms the adequacy of notice.

The successful reach of the Notice Plan is notable, particularly given the infeasibility of direct notice.  As explained in the Declaration of Walter Han submitted in support of the Motion for Preliminary Approval and in Meta's statement in support of that motion (Dkts. 187, 189), it was not possible to directly notify class members because Meta does not have data reflecting the precise number, let alone identity, of unique Facebook users who had Location Services disabled during any part of each year starting from January 1, 2015, to April 18, 2018.  Again, Location Services is a setting

that is **_not_** controlled by Meta, but instead by third parties that manufacture Plaintiffs' devices and operating systems. Plaintiffs subpoenaed Apple and Google for this data, but neither company maintains such records.

The 1.3% claims rate is consistent with other recent consumer privacy settlements with rates of less than 1 to 2%, and further confirms the adequacy of the notice campaign here. (Dkt. 203 at 1; Dkt. 188, Appx. A.) That said, the inability to identify class members (as described above) impacts the certainty of the class size estimate and makes it impossible to accurately calculate the claims rate. The parties previously estimated the class size to be approximately 70 million, and as confirmed in Mr. Han's declaration, that estimate is based on the best available data and is believed by Mr. Han to be a reasonable estimate based on his understanding of the underlying data and logging processes. (Dkt. 187 ¶ 15.) Still, as Mr. Han explained, the available data are limited by the fact that Meta is only able to record when a device has Location Services *enabled*, and only then when a user is actively using or running the Facebook mobile application. (*Id.* ¶¶ 9, 12.) As a result, the data would, in the aggregate, undercount the number of daily active users who had Location Services enabled. (*Id.* ¶ 9) Meta provides this further context merely to reiterate the inherent uncertainty in the class size estimate on which the claims rate is based. But in any event, the 1.3% claims rate as calculated using the estimated class size demonstrates that notice sufficiently reached the class.

C.  **Direct Payment To Class Members Is Warranted, Though The Court Can Alternatively Order *Cy Pres* Distributions**

Whether the Court approves direct payments to Class Members or *cy pres* distribution, the Class will be better off as a result of this settlement. The parties believe that direct payments benefit the class and do not present the concerns that this Court expressed at the preliminary approval hearing (specifically, that the distribution and mailing costs would exceed the amount of the recovery). Although there needs to be a final verification and validation, the settlement administrator estimates that the current predicted payout to class members will be approximately $25 to $30 per valid claim. This amount represents a significant recovery for class members, and is well in excess of the nominal damages that Plaintiffs were likely to pursue. The parties believe it is economically and administratively feasible to distribute these payments directly to approved claimants on a *pro rata*

basis.

Still, Meta recognizes that the Court retains the ability to reallocate some or all of the settlement fund to the proposed *cy pres* recipients. (Dkt. 188-1 ¶ 64.) Should the Court choose to do so, reallocating to *cy pres* recipients will also benefit the class because there is a "driving nexus between the plaintiff class and the *cy pres* beneficiaries." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012). The Ninth Circuit requires that *cy pres* distributions "account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011). Collectively, the proposed *cy pres* recipients account for these factors.

Each of the 11 proposed recipients listed below submitted detailed statements explaining how their interests align with those of the class and how they would use any monetary award to further those interests. (Dkt. 190-2.) Here is a brief summary of each organization and its mission:

| **Organization** | **Mission** | **Use of Funds** |
|---|---|---|
| 1. American Civil Liberties Union (ACLU) | "[T]he ACLU defends the privacy of the class and other cell phone users robustly, as well as their related civil rights and liberties." (Dkt. 190-2 at 4.) | "All funds would be used to support the nationwide privacy work of the ACLU's Speech, Privacy, and Technology Project. We would also expect to share some portion of any award to support the privacy work of the ACLU of Northern California (ACLU-NorCal), the largest state-based ACLU affiliate. ACLU-NorCal's Technology & Civil Liberties (TCL) Program has been at the vanguard of integrated legal-policy advocacy to defend and promote privacy and support social justice in the digital age since its founding in 2004." (*Id.* at 5.) |
| 2. Berkeley Center for Law & Technology / University of California, Berkeley, School of Law (BCLT) | "BCLT focuses on (1) compliance with current regulations and (2) development of new regulations necessitated by new technologies. . . . Further, our research helps address the | "BCLT will use the funds for three activities focused on both protecting consumer data and bringing beneficial, ethical technologies to the consumer market," including "provide significant year-round training for privacy professionals on |

DEFENDANT'S STATEMENT IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT - CASE NO. 3:18-CV-06793-JD

| Organization | Mission | Use of Funds |
|---|---|---|
| | balance between the promise of beneficial new technologies and the need to protect personal data." (*Id.* at 7.) | the privacy issues being implicated by new technologies." (*Id.* at 8–9.) |
| 3. The Berkman Klein Center for Internet & Society at Harvard University | "The Center's work, including work that would be funded by *cy pres* funds, benefits the Class by driving critical inquiry, research, advocacy, training and education, public engagement, and legal and policy reform around privacy and data-related issues in the technology sector." (*Id.* at 16.) | "The Class will also benefit from the Center's ongoing efforts to question and raise awareness around social media and other digital technologies, and to help users and policymakers make informed choices about the products they use and regulate." (*Id.*) |
| 4. The Center for Democracy and Technology (CDT) | "CDT pursues multiple strategies to protect consumers' privacy and digital rights: developing policy recommendations and educating policymakers to achieve meaningful change, while also advocating directly to companies to improve their policies and practices." (*Id.* at 21.) | "Funds received will help expand the reach of CDT's Privacy & Data team, allowing staff to," among other projects, "produce an increased number of reports identifying and addressing consumer privacy harms in current and emerging technologies." (*Id.* at 22.) |
| 5. ConnectSafely | "We help families better understand how to use privacy and safety tools available from all major technology platforms, including iOS, Android, Mac OS, Windows and apps such as Facebook, Instagram, TikTok, Snapchat, Robox and many more." (*Id.* at 24.) | "Funds from this settlement would be used to enhance and expand our educational and advocacy programs, including a new parents' guide to privacy, an update to our Parents' and Educators' Guides to Student Data Privacy and a guide to location privacy." (*Id.* at 25.) |
| 6. The Data & Society Research Institute | "There are two ways this program will benefit this class, by first providing policy makers the evidence that they need to protect consumers and users in the future, and also through releasing reports and information that will create a better informed public on technology, privacy, and consumer safety." (*Id.* at 27.) | |
| 7. The Internet Policy Research Initiative / | "IPRI researchers have demonstrated the ability to | "Any funds provided through this cy pres program would be used to cover |

| **Organization** | **Mission** | **Use of Funds** |
|---|---|---|
| Massachusetts Institute of Technology (IPRI) | have a positive impact on privacy and security over the years through privacy preserving technology designs and avoiding harmful systems from being deployed." (*Id.* at 32.) | the costs of our research on accountable systems and privacy enhancing technology, development of educational resources to train our students in privacy engineering, and expanding existing educational material to be made available on free, online open courseware systems operated by MIT." (*Id.* at 34.) |
| 8. The National Consumer Law Center (NCLC) | "A cy pres award to NCLC in this action would benefit the settlement class and sub-class and other similarly situated persons by allowing NCLC to keep abreast of issues and laws relating to privacy, promote and execute the multiple trainings opportunities and resources offered by NCLC and to further educate attorneys, consumers and the public on topics related to privacy." (*Id.* at 41.) | |
| 9. The National Cybersecurity Alliance (NCA) | "NCA runs numerous educational programs on security and privacy throughout the Year," including numerous which "directly address the issue raised by the above-referenced class action – educating the public on the use of social media sites and applications while staying secure and protecting privacy. For example, part of NCA's website, StaySafeOnline.org, includes information on the privacy and security settings on popular social media applications, including Meta platforms like Facebook." (*Id.* at 45.) | "If NCA were to be a *cy pres* recipient of settlement funds, we would use the funds to expand our existing education programs and add new programs, particularly relating to protecting privacy while using social media applications. We would add more educational assets, webinars, and web content." (*Id.* at 46.) |
| 10. The Information Law Institute / New York University School of Law (ILI) | "The ILI's program of research and conferences benefits citizens and consumers by investigating the societal challenges posed by digital technology, and by proposing and critiquing potential policy solutions. Equally importantly, ILI training and interaction equips the new generation of scholars, professors, policy advocates, lawyers and others with the interdisciplinary knowledge background and critical thinking skills needed to confront the challenges of our digital age." (*Id.* at 69.) | |

Gibson, Dunn & Crutcher LLP

| Organization | Mission | Use of Funds |
|---|---|---|
| 11. Rose Foundation | "For consumer protection and internet privacy issues, Rose Foundation offers a number of grantmaking funds that allow the class settlements to be directed to innovative nonprofits and community-based organizations who work on behalf of consumers to advocate for consumer privacy protections and provide information about emerging privacy issues. The best fit for this cy pres would be our Consumer Privacy Rights Fund. . . . [O]ur most recent grant cycle carried a special focus on technological issues related to the intersection of data management, on-line issues and personal privacy." (*Id.* at 80–81.) | |

Each organization therefore qualifies as an appropriate *cy pres* beneficiary with a "driving nexus" to the instant action. These organizations focus on online privacy and safety education; research related to internet and online privacy; and broad consumer protection efforts. These organizations thus have clear overlapping interests with the class, and their work further shares a "driving nexus" with Plaintiffs' allegations that Meta's practice of inferring users' locations from their IP addresses, notwithstanding users' location settings, was inconsistent with Meta's representations as to the same. Moreover, the proposed recipients are geographically diverse and are located throughout and provide services across the United States.

Finally, as confirmed in the organizations' declarations (Dkt. 190-2), all of the proposed recipients operate independently from the parties' and their counsel. Though there are employees of Meta/defense counsel (none directly involved in this litigation) who serve or have served on advisory boards of several of the proposed *cy pres* organizations (*see* Dkt. 189-1 ¶ 4), those connections do not disqualify those organizations. *See Lane v. Facebook, Inc.*, 696 F.3d 811, 821 (9th Cir. 2012) (holding that presence of defendant's employee on the organization's board of directors did not disqualify that organization as a *cy pres* recipient). Thus, if the Court determines that a *cy pres* award is appropriate, Meta agrees with Plaintiffs that distributions to the proposed organizations would benefit the class.

## IV.   CONCLUSION

This settlement, premised on a historical class that is now well over five years old, is a positive result for the putative class. Meta respectfully requests that the Court grant Plaintiffs' motion for final approval for the reasons provided in that motion and for the additional reasons stated herein.

| | | |
|---|---|---|
| 1 | Dated: September 25, 2023 | GIBSON, DUNN & CRUTCHER LLP |

By:    */s/ Christopher Chorba*
                Christopher Chorba

*Attorneys for Defendant Meta Platforms, Inc.*